# EXHIBIT "1"

# Legislative Budget and Finance Committee

### A JOINT COMMITTEE OF THE PENNSYLVANIA GENERAL ASSEMBLY

## PERFORMANCE AUDIT

## STATE BOARD OF FUNERAL DIRECTORS
### (Volume I)



OFFICES: ROOM 400, FINANCE BUILDING, HARRISBURG—TEL: (717) 783-1600

MAILING ADDRESS: P.O. BOX 8737, HARRISBURG, PA 17105-8737

SENATORS
PATRICK J. STAPLETON, CHAIRMAN
CLARENCE D. BELL, VICE CHAIRMAN
ROY C. AFFLERBACH
H. CRAIG LEWIS
JOHN E. PETERSON
ROBERT D. ROBBINS

REPRESENTATIVES
RONALD C. RAYMOND, SECRETARY
DAVID R. WRIGHT, TREASURER
ROBERT W. GODSHALL
CHRISTOPHER K. McNALLY
KAREN A. RITTER
SAMUEL H. SMITH



# Legislative Budget and Finance Committee

## A JOINT COMMITTEE OF THE PENNSYLVANIA GENERAL ASSEMBLY

OFFICES: Room 400 • Finance Building • Harrisburg • Tel: (717) 783-1600 • Facsimile: (717) 787-5487
MAILING ADDRESS: P.O. Box 8737 • Harrisburg, PA 17105-8737

EXECUTIVE DIRECTOR
Philip R. Durgin

CHIEF ANALYST
John H. Rowe, Jr.

## PERFORMANCE AUDIT

## STATE BOARD OF FUNERAL DIRECTORS
### (Volume I)

January 1994

TABLE OF CONTENTS

Page

I.   INTRODUCTION ......................................... 1

II.  FINDINGS AND RECOMMENDATIONS

     A.  State Regulation of the Funeral Directing Profession
         and Other Segments of the Funeral Industry Is
         Important for Consumer Protection Purposes .......... 7

     B.  Although There Are Opportunities for Input From
         the Public, Participation in Board Affairs Comes
         Primarily From the State Funeral Directors
         Association and Others With a Direct Interest
         in the Board ...................................... 31

     C.  A Majority of the Complaints Handled by the Board
         Involve Charges of Unprofessional Conduct, Failure
         to Properly Maintain Pre-Need Accounts, and
         Advertising Violations ............................ 39

     D.  A Court Decision and Changes in Prosecution Strategy
         Have Altered the Board's Role in Disciplining
         Licensees ......................................... 48

     E.  There Is No Indication That the Board and Its
         Prosecutorial Staff Are Unwilling to Enforce
         Professional Standards ............................ 58

     F.  The Absence of a Statutory Definition of the Term
         "Funeral Services" and Inadequate Provisions
         Governing Pre-Need Funeral Sales Make It Difficult
         for the Board to Adjudicate Many Unlicensed
         Practice Complaints ............................... 72

     G.  The Board Should Amend Its Regulations to Include
         Consumer Protection Provisions Required by the
         FTC Funeral Rule .................................. 88

     H.  The Board Should Take Action to Regulate the
         Charging of "Casket Handling Fees" by Its
         Licensees ......................................... 99

     I.  The Board Has Not Developed Basic Public
         Information Materials That Are Important for
         Consumer Protection Purposes...................... 107

i

TABLE OF CONTENTS
(Continued)

Page

II.  FINDINGS AND RECOMMENDATIONS (Continued)

J.  Licensing Funeral Homes Operated by Sole
    Proprietors Would Significantly Increase Board
    Revenues .......................................... 115

K.  Many Funeral Homes Are Not Being Inspected on a
    Regular Basis ..................................... 121

L.  The Board Does Not Adequately Monitor the One-Year
    Resident Internship Phase of Funeral Director
    Training .......................................... 136

M.  The Board Last Increased Its Licensing Fees in FY
    1991-92 and Currently Has a Modest Revenue Surplus ... 146

N.  The Board's Granting of Waivers Complicates
    Administration and Enforcement of Its Regulations .... 149

O.  Consideration Should Be Given to Amending the
    Funeral Director Law to Make It Consistent With
    Other BP&OA Licensing Board Statutes ................ 152

P.  The Funeral Director and Funeral Ownership
    Licensing Structure Administered by the Board is
    Unnecessarily Complex and Restrictive ............... 156

Q.  The Requirement That Every Funeral Home Must
    Maintain a Separate Preparation Room Appears
    Overly Restrictive ................................. 166

R.  A Continuing Professional Education Requirement
    for Funeral Directors Should Be Considered as a
    Condition for License Renewal ...................... 169

S.  Citizenship Requirement for Licensure as a
    Funeral Director Is Unconstitutional ............... 173

III. BACKGROUND INFORMATION ABOUT THE STATE BOARD OF
     FUNERAL DIRECTORS

Legal Background ....................................... 174

Board Composition ...................................... 175

Board Powers and Duties ................................ 176

## TABLE OF CONTENTS
### (Continued)

                                                                  **Page**

III. BACKGROUND INFORMATION ABOUT THE STATE BOARD OF
     FUNERAL DIRECTORS (Continued)

    Board Goals and Objectives ............................... 176

    Board Staffing and Organization ......................... 179

    Board Licensees ......................................... 179

    Board Revenues and Expenditures ......................... 181

    Disciplinary Actions .................................... 184


IV. APPENDICES

    A.  Membership of the State Board of Funeral Directors ... 188

    B.  Comparison of the Average Costs of a Traditional
        Funeral to Immediate Burial and Cremation ............ 189

    C.  Selected Information on Funeral Boards and
        Commissions in Other States ......................... 191

    D.  Changes Needed in the Funeral Director Law as
        Identified by the Funeral Directors Board ............ 196

    E.  Membership and Term Requirements for BP&OA
        Licensing Boards .................................... 197

    F.  Description of BP&OA Complaints Record-Keeping and
        Reporting System .................................... 199

    G.  Information on Questionnaire Responses Received
        From Board Members, Licensees, Complainants, and
        Interested Associations ............................. 201

        G.1  Board Member Responses ......................... 202

        G.2  Licensee Responses ............................. 205

        G.3  Complainant Responses .......................... 207

        G.4  Association/Individual Responses ............... 209

    H.  Funeral Related Complaints Submitted to the
        Pennsylvania Bureau of Consumer Protection ........... 210

## TABLE OF CONTENTS
(Continued)

Page

IV. **APPENDICES** (Continued)

   I.   The BP&OA/Licensing Boards Complaint Handling
       Process ......................................... 211

   J.   Consumer Information on Funeral and Cemetery
       Arrangements Developed by the Oregon State Mortuary
       and Cemetery Board ................................ 214

   K.   Consumer Information Facts About Funerals Developed
       by the Texas Funeral Service Commission ............. 216

   L.   License Requirements and Restrictions for Individual
       Licenses and Registrations Issued by the Board ....... 219

   M.   Selected Information on Funeral Home Licensure in a
       Sample of Other States .............................. 221

   N.   Pending Legislation Relating to the State Board of
       Funeral Directors ................................... 228

   O.   1992 Amendment to Florida Statutes Defining The Term
       "Funeral Directing" ................................. 229

   P.   Response to This Report ............................. 231

## CHAPTER I - INTRODUCTION

The State Board of Funeral Directors[1] is scheduled to terminate on December 31, 1994, under two sunset bills introduced in the General Assembly during the FY 1993-94 legislative session. Under a third sunset bill, the Board would terminate on December 31, 1995. The Legislative Budget and Finance Committee undertook this performance audit to satisfy audit requirements contained in the sunset bills in the event one of the bills is enacted. The results of the audit will be referred to the appropriate standing committees of the General Assembly for their review and consideration as a standard LB&FC performance audit report whether or not a sunset bill is passed.[2]

## Audit Objectives

1.  To determine if Board operations are consistent with the objectives intended by the General Assembly.

2.  To determine if termination of the Board would significantly harm or endanger the public health, safety, or welfare and if there is a demonstrated need, based on service to the public, for its continuing existence.

3.  To determine if the Board's operation has been in the public interest and if it has encouraged public input and participation in its deliberations and decision-making processes.

4.  To determine if there is unnecessary overlap or duplication by other agencies that would permit termination of the Board and if the Board's services may be provided in an alternate, less restrictive manner.

---

1/Also referred to in this report as the Board or the Funeral Directors Board.
2/Note: This is a two-volume report. Volume I examines the need for state regulation of the funeral directing profession and the Board's performance in such areas as licensing, complaint handling, funeral home inspections, and public information and consumer education. Volume II presents the results of an evaluation of the adequacy of pre-need funeral regulation in the Commonwealth.

1

## CHAPTER II – FINDINGS AND RECOMMENDATIONS

### FINDING A

STATE REGULATION OF THE FUNERAL DIRECTING PROFESSION AND
OTHER SEGMENTS OF THE FUNERAL INDUSTRY IS IMPORTANT FOR
CONSUMER PROTECTION PURPOSES

#### SUMMARY

The State Board of Funeral Directors is responsible for
regulating persons and businesses that engage in the preparation
and disposition of human remains.  When originally established,
the Board's primary purpose was to safeguard public health against
the spread of communicable diseases.  However, advances in mortu-
ary science and health regulation have greatly minimized the risks
involved in disposing of human remains.  For example, universal
precautions for preventing the transmission of infectious diseases
are widely accepted and implemented within the industry.  Also,
responsibility for controlling the spread of contagious diseases
is now centralized under the regulatory jurisdiction of agencies
such as the U.S. Center for Disease Control (CDC), the Occupation-
al Safety and Health Administration (OSHA), and state public
health departments.  The Board's functions do not, therefore,
appear to be essential to protect public health and safety.

State regulation of the funeral directing profession does,
however, serve an important consumer protection purpose.  Funerals
are high-cost transactions in which consumers are especially vul-
nerable due to the combined effects of emotional trauma, lack of
information, and extreme time pressures.  In such an environment,
state regulation is important to protect consumers from unethical
and deceptive practices.  State regulation also ensures minimum
competency of funeral practitioners and controls who is permitted
to offer funeral goods and services to the public.

In recent years, many states have shifted the focus of their
regulatory efforts from public health to consumer protection.
This change has not yet occurred in Pennsylvania, due at least in
part to the outdated law under which the Board operates.  The
Board also regulates only one part of a larger industry that in-
cludes cemeterians, crematory operators, and third-party sellers
of funeral goods and merchandise.  These segments of the industry
are largely unregulated at this time.

While governmental control and oversight of the funeral indus-
try appears necessary, such regulation is not best provided
through a board comprised primarily of funeral directors.  Regula-
tion may be better accomplished by replacing the current State
Board of Funeral Directors with a broader-based board responsible
for oversight of the larger funeral service industry.

This disadvantaged position can result in substantial financial harm to consumers who lack adequate knowledge about funeral prices, legal requirements, and the service, merchandise, and price options available to them.  Investigations conducted by the Federal Trade Commission have clearly documented the problems and abuses which consumers can face in arranging and paying for a funeral.  Although not found to be pervasive within the industry, the FTC documented deceptive and unethical practices involving misrepresentations, deceptive merchandising techniques, withholding of price information, cash advance items, prepaid funeral arrangements, and market restraints.  The FTC concluded that these practices can pose a substantial threat to consumers.

## Need for Regulation to Protect Health and Safety

State licensure of funeral directors began as part of the public health movement in the late 1800s.  At that time, the primary concern was to establish standards for preserving dead human bodies to prevent the spread of communicable diseases.  Industry historians have cited "the public health concerns of the time, the quasi-scientific/medical character of embalming, and the social importance of carrying out post-death activities" as factors used to persuade state legislatures to license practitioners of funeral directing and embalming.[8]

Pennsylvania initiated licensure requirements in 1895 through the establishment of a State Board of Undertakers.  This Board was responsible for examining and licensing undertakers to "provide for the better protection of life and health by diminishing the danger from infections and contagious diseases."

In the intervening years, advances in mortuary science and health regulation have virtually eliminated the public health risks

---

[8]/The History of American Funeral Directing, R. Habenstein and W. Lamers, 1962.

14

associated with preparation and disposition of the deceased. Universal precautions to prevent the transmission of infectious diseases are widely accepted and implemented within the industry. Also, responsibility for controlling the spread of contagious diseases has been centralized under the regulatory jurisdiction of such agencies as the U.S. Center for Disease Control (CDC), the Occupational Safety and Health Administration (OSHA), and state public health departments.

Current medical opinion is that dead bodies pose little or no risk to the general public and that embalming is not necessary to protect public health. According to physicians from the Center for Disease Control, the need for embalming as a sanitary and public health measure has been greatly exaggerated. According to one physician, "though there is a common sense need for safeguards against the unpleasant side effects that may attend the process of decomposition, there is virtually no public health necessity for embalming."

The PA Department of Health's position on this matter is similar:

- LB&FC Question: Does the deceased human body pose a public health risk?

  Health Department Position: "It is the Department's position that in fact the human body can pose a public health risk but that risk is not a consequence of that individual being deceased. Rather, it is a consequence of the health status of the individual, which cannot always be known. It is precisely in recognition of such a public health threat that the Center for Disease Control has developed universal precautions. Such precautions are recommended, regardless of setting, for anyone handling a body."

- LB&FC Question: Does embalming serve to prevent or reduce any potential health risks that may be associated with disease being transmitted by human remains?

  Health Department Position: "The Department does not believe that embalming serves a public health purpose. Obviously, embalming is not required as a means of preparing a human body for interment. Of note is the fact that specific

> religious groups within this country do not embalm bodies,
> and the public health has not been threatened as a result.
> Additionally, European countries do not routinely embalm,
> also without a threat to the public."

While the dead human body poses minimal risks to the general
public, there are risks for those who work in the industry.  Ac-
cording to OSHA, these risks relate to the potential harm from
improperly handling and disposing of infectious waste.  Mortuary
service workers such as embalmers who may be exposed to human
bodily fluids are especially at risk.  Funeral service workers
also use potentially hazardous chemicals such as formaldehyde.
OSHA regulations establish specific requirements for infectious
disease control programs which must be in effect whenever there is
a danger of the spread of AIDS, Hepatitis B, or other communicable
diseases.[9]  These regulations are quite extensive covering
personal protective equipment, sanitation, and waste disposal.

To reduce health risks, funeral service workers are also
required to exercise "universal precautions."  In 1987, the Center
for Disease Control published a document entitled <u>Recommendations
for Prevention of HIV Transmission in Health-Care Settings</u>.  These
guidelines apply to persons whose activities involve contact with
patients or with blood or other body fluids from patients in health
care settings.  The document recommends precautions referred to as
"universal blood and body-fluid precautions" or "universal precau-
tions."  Examples of recommended precautions include using barrier
precautions to prevent skin and mucous-membrane exposure when
contact with blood or other body fluids is anticipated, and wash-
ing hands or other skin surfaces immediately if contaminated with
blood or body fluids.

A special section of the document is entitled "Precautions
for Autopsies or Morticians' Services."  This section states that,

---

9/OSHA Instruction CPL-2-2.44A, August 15, 1988.

in addition to the universal blood and body-fluid precautions, additional precautions should be used by persons performing or assisting in postmortem procedures. These precautions also include wearing gloves, masks, protective eyewear, gowns, and waterproof aprons and decontaminating all instruments and surfaces used during postmortem procedures with an appropriate chemical germicide.

These precautionary measures appear to be effective. According to the CDC, there have been no reported cases of Hepatitis B or AIDS being transmitted to a funeral service worker or member of the general public by a corpse or residue therefrom. In information supplied to the Colorado Department of Regulatory Agencies in 1990, the Center for Disease Control reported that "the incidents of transmission of AIDS by a corpse or any of the fluids, clothing, or equipment used in connection with it are theoretically possible but are extraordinarily rare." The CDC also reported that once the human body cools, the blood-borne pathogens which it may carry usually die quickly.

We contacted the CDC in June 1993 to obtain updated information on this issue. A CDC physician reported that there are no documented cases of occupational transmission of the HIV virus to a funeral industry practitioner. This physician also expressed the opinion that the universal precautions are sufficient to prevent transmission of the virus to funeral service workers.

Despite these work place regulations and universal precautions, health and safety issues continue to be a serious concern for those in the industry. For example, in response to an LB&FC audit questionnaire, the PA Funeral Directors Association stated:

> We believe that with the ever increasing concern over
> communicable diseases, the requirements for the disposing
> of hazardous waste and other materials, and . . . that
> licensed and effectively policed funeral directors are
> an absolute necessity.

17

It appears, however, that adequate precautions and laws and regulations administered by various state and federal agencies are in place to address these health risks.  Many public health laws and regulations deal with the control of infectious disease transmission and the safe handling and disposal of hazardous and infectious wastes.  Moreover, there is no epidemiological evidence showing funeral homes and funeral service workers as a source of disease transmission.  In this regulatory environment, a state board such as the Funeral Directors Board does not appear to perform functions that are essential to protecting public health and safety.

## The Changing Focus of Public Regulation of the Funeral Industry

Regulation of the funeral industry was initiated at a time when safeguarding public health was the major focus and interest of public regulation.  In recent years, however, concerns about protecting the public from the spread of contagious diseases have shifted to concerns for the welfare of consumers.

During the 1970s, concerns over business practices, costs, and allegations of fraud and deceptive practices in the funeral industry gave rise to an extensive investigation of funeral industry practices by the Federal Trade Commission and the adoption in 1984 of the FTC Funeral Rule.  The Funeral Rule is a consumer protection trade regulation that requires funeral directors to provide specific price information to consumers, prohibits misrepresentations about the need for particular services or merchandise, and prohibits required purchases (i.e., conditioning the purchase of one item on the purchase of another item).  Adoption of the Funeral Rule signaled a change in regulatory focus that was simultaneously occurring in many states.  (See also Finding G.)

Consistent with the FTC's Funeral Rule, many states have changed the focus of their regulatory efforts from public health to consumer protection.  LB&FC staff examined reports on sunset

18

## Need for Expanding Funeral Regulation in Pennsylvania to Cover Other Providers of Funeral Goods and Services

It is generally accepted that state regulation and licensing of professions and vocations is to be carried out only where reasonably necessary to protect the health, safety, or welfare of the public. Where regulation is reasonably necessary, government regulation in the form of full licensure or other restrictions on the professions or vocations should be retained or adopted. While the threat to public health and safety from the practice of funeral directing appears minimal, continued and expanded regulation of the funeral industry in Pennsylvania appears necessary for consumer protection purposes.

**The Funeral Industry.** The term "funeral industry" can be used to mean all persons and enterprises that engage in the retail sale of goods and services used during the disposition of human remains. Funeral directors are the primary occupational grouping within this industry. Other groups, however, provide funeral goods and services. These include cemetery and crematory owners and operators, sellers of funeral merchandise (e.g., caskets, monuments, and vaults), sellers of pre-need funeral contracts, and salespersons who work for these groups. Others such as persons who transport dead bodies for compensation, counsellors who specialize in grief counseling, and florists are also part of the industry.

The State Board of Funeral Directors is responsible for regulating only one segment of this industry. The Board deals with other segments of the industry only when their activities infringe on or conflict with areas legally reserved for funeral directors. Some, but not all, of the other vendors are regulated by other agencies.

In Pennsylvania, as in other states, funeral homes tend to be family-owned and operated. According to the National Funeral

22

Directors Association, the funeral industry is comprised primarily of small family businesses, passed down from generation to genera-tion. Until fairly recently, well-established divisions existed between the various segments of the funeral industry and the goods and services they could offer. Funeral directors competed only among themselves. Cemeteries only sold plots, headstones, and containment structures, and cremation was relatively rare. Accord-ing to the Board's former chief prosecutor:

> Under this system, the funeral directors tended to carve out geographic, social, or ethnic business areas for themselves. This practice, plus the rules limiting business-expansion and branches, tended to provide their business-es with substantial protection against competition.

The divisions between the various segments of the industry have essentially been removed. The FTC's promulgation of regula-tions governing the sale of funeral goods and services in 1984 was the single most influential factor in this change. The FTC's Funeral Rule opened up the funeral services market and eliminated the funeral directors' former monopoly on the sale of caskets and certain other goods. Thus, funeral goods, such as caskets, began to be marketed by cemeteries and other vendors. The FTC's regula-tions also promoted competition by requiring vendors to maintain price lists and provide price information over the telephone. At the same time, crematory operators began to more actively market cremation services as a low-cost alternative to traditional in-ground burials.

Also, the Commonwealth Court invalidated long-standing rules that prohibited funeral directors from owning or being employed by cemeteries.[10] The industry continues to change as more funer-al directors have obtained the capability to perform cremations and

---

10/See, McKinley v. State Board of Funeral Directors, 313 A.2d 180 (Pa. Commonwealth Ct. 1973); Recupero v. State Board of Funeral Directors, 551 A.2d 7 (Pa. Commonwealth Ct. 1988).

become licensed to sell insurance policies to fund pre-need con-
tracts.   Cemeterians and crematory operators are also competing
more aggressively for a share of the pre-need goods and services
market.   (The regulation of pre-need funeral contracts is dealt
with extensively in Volume II of this report.)

     In short, the funeral industry is becoming more diverse and
the number of non-funeral director vendors competing for a share
of the funeral services market is increasing.   Funeral directors
believe that these vendors, some of whom are substantially unregu-
lated, are encroaching in areas that should be restricted to li-
censed members of their profession.

     Further significant changes in the funeral services industry
seem likely.   At the national level, several large firms have
entered the marketplace.   These firms seek to consolidate or verti-
cally integrate the market by purchasing funeral homes, cemeter-
ies, casket operations, monument retailers, pre-need insurance
subsidiaries, and floral outlets.   The Chicago Corporation, a
private, for-profit securities brokerage firm, reports that:[11]

> Key strategies and tactics adopted by the more aggres-
> sive companies include development of funeral home and
> cemetery combinations, cross-selling of prearranged
> funerals and cemetery space, and regional clustering of
> operations . . . .   The funeral and cemetery combination
> trend is also precipitating a convergence of different
> sub-groups within the death care industry.   Combination
> properties, which typically feature enlarged casket
> showrooms, florists, and monument and memorial product
> dealers, fulfill a market need for one-stop shopping for
> the full range of death care services and products.

These developments will inevitably complicate state regulation of
the funeral industry as the lines between the various segments of
the industry become further blurred.

_____

11/The Death Care Industry/Company Report, The Chicago Corporation, March 1993.  (As part of its consumer prod-
ucts and services, the Chicago Corporation prepares industry and market analyses.)

Options for Regulating the Funeral Industry.  Nationally, the focus of state regulation of funeral service is changing from protection of public health to consumer protection.  This change is not reflected in Pennsylvania's statute.  Moreover, the current Funeral Director Law and Board structure are not well suited to regulating what amounts to a new and evolving funeral services industry.  A comprehensive update and revision of the law, as well as consideration of various options for regulating the funeral directing profession and other components of the industry, appear necessary.

No matter what Board structure is ultimately decided upon, the Funeral Director Law needs to be rewritten.  The current Board's regulation of the funeral directing profession, including adjudication of complaints, is complicated by a statute that is outdated and in need of comprehensive revision.  The Funeral Director Law, which was enacted in 1951 has been amended on several occasions but is essentially the same in purpose and scope as laws dating to the 1930s.

As discussed throughout this report, we found that many sections of the law are ambiguous and outdated and that, overall, it does not provide an adequate basis for regulating today's funeral industry.  Strong sentiment also exists among Board members and licensees for a comprehensive review and update of the law.  One Board member stated:

> The law we are charged to uphold, which must be applied in regulating this industry, is woefully outdated and is in need of SERIOUS REVISION.  Some aspects of the law as now imposed are almost beyond enforcing because of changes which have occurred in educational institutions, in the industry itself, and/or in the expectation of the general population.  Some aspects of this law, as enforced, are unnecessary, self-serving for funeral directors, and add higher costs to funerals.

A statement provided to LB&FC staff by the Board notes that a comprehensive revision of the law would be in the best interests

25

of Commonwealth citizens as well as those serving in the profession. A list of suggested statutory changes developed by the Funeral Directors Board is in Appendix D.

There are several options for regulating the funeral industry that could be considered as part of a comprehensive review of the Funeral Director Law. One option would be to amend the law to deregulate the industry. However, as discussed in this report, the funeral industry is subject to many misleading and deceptive practices. The risks such practices pose to consumers appear serious enough to warrant some level of continued state intervention. Continued state regulation also appears in the public interest to ensure minimum competency of funeral practitioners and to control who is and is not permitted to provide funeral goods and services to the public.

A second option would be to reassign aspects of the Board's regulatory responsibilities to other state agencies (e.g., the Department of Health, Office of Attorney General, and others). This alternative, however, does not provide the visibility and state-wide focus on funeral-related matters that is present in a single board structure. The board structure also provides a forum for dialogue between consumers and various segments of the funeral industry on appropriate standards, business practices, and procedures for complaint resolution.

Another option would be to retain the current Board structure. However, as presently constituted, the Board regulates and receives input from only one segment of the funeral industry. In implementing the Funeral Director Law, the Board focuses its efforts primarily on administering the funeral director licensing system. The Board has not actively promoted adherence to the FTC's Funeral Rule or adequately dealt with important consumer issues such as pre-need funeral contracts and casket handling fees.

Department of Banking and Finance) with the regulation of pre-need funeral contracts (previously under the Department of Insurance) and placed them under a newly created Board of Funeral and Cemetery Services in the Department of Banking and Finance.  This Board consists of two cemetery owners or operators, two independent funeral directors and three consumer members (one of whom must be at least 60 years old).

## RECOMMENDATION

1. The General Assembly should consider carrying out a comprehensive update and revision of the Funeral Director Law.  As part of this revision, the General Assembly should consider replacing the current State Board of Funeral Directors with a broader-based board responsible for regulation of the funeral service industry.  Such a "funeral industry oversight board" should include consumer members and members drawn from all major segments of the industry, including funeral directors, crematory operators, cemeterians, and third-party sellers of funeral merchandise and pre-need funeral contracts.

   (See also Recommendation 1 in Finding B which recommends that the Board consist of a majority of consumer members.)

*FINDING B*

*ALTHOUGH THERE ARE OPPORTUNITIES FOR INPUT FROM THE PUBLIC, PARTICIPATION IN BOARD AFFAIRS COMES PRIMARILY FROM THE STATE FUNERAL DIRECTORS ASSOCIATION AND OTHERS WITH A DIRECT INTEREST IN THE BOARD*

### SUMMARY

The State Board of Funeral Directors holds regular public meetings, complies with the Sunshine Act, and adheres to regulatory review requirements. Thus, there are opportunities for public input and participation in Board affairs. We found, however, that input and participation comes almost exclusively from funeral directors and the Pennsylvania Funeral Directors Association (PFDA). The presence of five funeral directors (a majority) on the Board and a strong and active statewide association account for the industry's predominance in Board activities. While the Board also includes two public members, the BP&OA Commissioner, and a representative from the Bureau of Consumer Protection, there is virtually no direct public input or involvement from consumers.

Regulatory bodies are sometimes "captured" by the industries they are intended to regulate. Some persons, citing examples such as "casket handling fees" (see Finding H) and restrictive ownership provisions (see Finding P) believe that this may be the case with the Funeral Directors Board. A Federal Trade Commission official has suggested that state funeral regulatory boards should have a minority of funeral director members with the majority being public members. Our survey of the member composition of funeral boards in other states found, however, that industry representatives remain in the majority in most states. Exceptions are California which requires that three of its five member State Board of Funeral Directors and Embalmers be appointed from the public, and Texas which put public members in the majority on its Funeral Service Commission as a result of a 1991 sunset evaluation.

### DISCUSSION

#### Board Composition

The State Board of Funeral Directors is made up of nine members. They include five licensed funeral directors, two public members, the Director of the Office of Attorney General's Bureau of Consumer Protection (or designee), and the Commissioner of the

Bureau of Professional and Occupational Affairs (BP&OA).[1] The funeral director members must have at least 10 years experience.

Although the majority of the Board's members are licensed funeral directors, the two public members, the Bureau of Consumer Protection member, and the Commissioner of the Bureau of Professional and Occupational Affairs can represent the interests of the general public in Board proceedings. Both public member positions are currently filled[2] and both regularly attend Board meetings. One of the public members was designated Board Chair in April 1993.

In a report[3] on funeral industry practices, the presiding officer of the Federal Trade Commission (FTC) encouraged increasing the number of public members on funeral boards:

> While it would be relatively difficult to regulate any industry without the advice of practitioners, it is asking for a largeness of view and spirit not generally prevalent to hope that practitioners would act in the public interest on a long-term basis. The states would be well advised to have a minority of funeral director members with the balance being public members of one sort or another.

A recognized authority on occupational licensing, Benjamin Shimberg, also notes that licensing boards are typically made up predominantly of members of the licensed professions, often with ties to professional associations. He states[4] that:

> This process has tended to produce boards that are rather homogeneous in their makeup and strongly oriented toward preserving the status quo. Those appointed are likely to reflect the attitudes, values, and policy

---

1/Act 1993-48, effective September 1, 1993, authorizes the Commissioner of the BP&OA to designate a member of the BP&OA staff as his representative to boards of which he is a member.

2/There were no vacancies on the Board as of September 1993.

3/Funeral Industry Practices, Final Staff Report to the FTC and Proposed Trade Regulation Rule, June 1978.

4/Benjamin Shimberg, Occupational Licensing: A Public Perspective, Educational Testing Service, Princeton, New Jersey, 1982, p. 163.

amendments to regulations in the <u>Pennsylvania Bulletin</u> on April 8, 1989, relating to prepaid burial accounts.  Interested persons were invited to comment on the proposed rulemaking.  The Board received several comments and, as a result, amended the proposed regulations.  Final rulemaking was published in the <u>Pennsylvania Bulletin</u> on November 4, 1989.

On December 8, 1990, the Board proposed general revisions to its licensing and internship regulations, health laws and regulations, and unprofessional conduct.  This proposal was published in the <u>Pennsylvania Bulletin</u> and interested persons were invited to comment.  The Board received several comments from funeral director associations, the House Professional Licensure Committee, the Senate Consumer Protection and Professional Licensure Committee, the Independent Regulatory Review Commission, and others.  The Board made several changes to the proposed regulations pursuant to these comments.  The regulations were published in final form on December 7, 1991.

In 1991 the Board increased its license renewal fees.  Although public comment was solicited, the Board received no comments.  The increase went into effect with the 1991-93 biennial licensing period.

While in compliance with the public notice and input requirements, the Board has, in some cases, changed its regulatory requirements through waivers rather than through amendments to its regulations.  For example, the Board used waivers to reduce the requirements related to the subject matter to be covered by interns.  This is discussed further in Finding L.

## Public and Industry Involvement in Board Proceedings

As discussed above, the Board adheres to the Sunshine Act and regulatory review requirements, includes public members, and holds frequent public meetings.  Despite these opportunities, industry

representatives and concerns appear to predominate Board proceedings.

Regulatory bodies, whether state or federal, are sometimes "captured" by the industry they are intended to regulate.  There are indications that this may be the case with the Funeral Directors Board.  The Board's former chief prosecutor believes the Board exercises little or no control over the industry and serves to advance the interests of the profession, often at the expense of the public.  The former chief prosecutor offered as an example the practice of some funeral directors charging consumers an additional fee when they do not purchase their casket from the funeral director (referred to as a "casket handling fee").[6/] He believes a more consumer-oriented Board would prohibit these fees, but the current Board has not discussed the issue.

Our review of Board meeting minutes shows that Board licensees and their attorneys, and the PFDA are the primary participants at Board meetings.  PFDA representatives are typically asked to make a presentation during the public information portion of Board meetings.  These persons also routinely provide comments and input during other portions of the meetings.  At the December 2, 1992, meeting attended by LB&FC staff the former Board chairman introduced the PFDA counsel as "the public."

While Board meeting agendas include a public input period, the Board's administrative assistant could not recall the Board receiving any consumer input during these periods during her two-and-one-half-year tenure.  A number of Board licensees responding to an LB&FC audit questionnaire expressed concerns about a lack of public awareness of the Board and the lack of public input to the Board.  Among the comments submitted:

_____

[6/]The practice of charging casket handling fees is addressed in Finding H.

- I do not feel the public is aware of the actual board. The board is more influenced by funeral directors than by the public.

- The public has no idea we, as funeral directors, have a direct governing body over us and many funeral directors do not know when and where the board meets. Therefore, how can any public input be gotten.

- I as a funeral director don't know when the board meets, what action if any is taken at these meetings. So how would the public have any knowledge that these meetings even exist?

- Aside from a service related complaint, I do not know if the board hears from the public or if the public knows that there is even an oversight board.

- Public has <u>NO</u> knowledge of Board and state regulating. If public had such knowledge they then could contact Board members and have some input. Public now doesn't even know such a Board exists!

- How can the public have input if the funeral directors don't even know what's happening?

- I don't know how the public would have the opportunity to voice their thoughts since the date and place of meeting is not well publicized.

- They [the public] don't know a board exists.

### RECOMMENDATIONS

1.  *The General Assembly should consider amending the Funeral Director Law to:*

    - *require that public members constitute a majority on the State Board of Funeral Directors (or a renamed state board responsible for overall regulation of the funeral industry), and*

    - *establish four-year terms for Board members with a two-term limit.*

2.  *The Board should develop public information materials to enhance public/consumer awareness of the Board and its activities. (Further recommendations related to public and consumer information efforts are presented in Finding I.)*

3.  *The Board should follow through with its plans to develop a periodic newsletter for distribution to its licensees.*

*FINDING K*

*MANY FUNERAL HOMES ARE NOT BEING INSPECTED ON A REGULAR BASIS*

### SUMMARY

The Funeral Director Law requires that the Board appoint persons to inspect funeral establishments and investigate complaints. The law does not specify the purpose or frequency of these inspections, but Board regulations state that newly built or newly owned funeral homes must be inspected before beginning operation. The funeral home inspection program also has an internal goal to inspect each funeral establishment annually. These inspections are carried out by mortuary inspectors assigned to the Law Enforcement Division of the Bureau of Professional and Occupational Affairs (BP&OA).

We found that Pennsylvania funeral homes are being inspected on an irregular basis. Available records show that 50 percent or less of the state's 1,900 funeral homes receive annual inspections. Inspection files also show that some homes are inspected more than once a year while others have not been inspected for five years or more.

Several factors contribute to problems in the inspection program: (1) inspections are not conducted according to a formal plan or schedule, (2) basic program management information is not available, (3) the inspection program is understaffed and one of the three authorized inspector positions (Philadelphia region) was recently vacant for nearly one year, (4) the requirement that inspectors be licensed funeral directors with ten years experience makes recruitment difficult and, with funeral directors inspecting funeral directors, can compromise the perceived integrity of the process, (5) there is no written inspection policy and few written guidelines on the purpose, objectives and procedure for inspections and violation reinspections, (6) there is no formal training program for mortuary inspectors, (7) inspections focus on routine facility, equipment, and administrative requirements rather than the key areas in which consumers may be vulnerable, and (8) the inspectors' authority to examine licensee business records is unclear. These deficiencies need to be addressed to make funeral home inspections a more effective part of state funeral regulation in Pennsylvania.

### DISCUSSION

Facilities licensed by state government are usually subject to periodic inspections by state personnel. In the case of professional licensing boards, staff of the BP&OA's Law Enforcement

Division inspect facilities operated by certain licensees (e.g., barbershops, cosmetology shops, and pharmacies). Mortuary inspectors assigned to the BP&OA's Law Enforcement Division are responsible for inspecting the Commonwealth's approximately 1,900 funeral homes.[1]

## The Funeral Home Inspection Program

The Funeral Director Law, 63 P.S. §479.16(b), provides for the appointment of inspectors who:

> . . . shall be empowered to serve all processes and papers of the board, and shall have the right of entry into any place, where the business or profession of funeral directing is carried on or advertised as being carried on, for the purpose of inspection and for the investigation of complaints coming before the board and for such other matters as the board may direct.

The law requires that these inspectors must be licensed funeral directors who have been actively engaged in the funeral directing profession for at least ten years.

While generally providing for inspectors and an inspection function, the law does not address the specific purpose of funeral home inspections or how frequently they are to be carried out. Board regulations provide only that newly built or newly owned funeral establishments must receive Board inspection and approval before beginning operation.

The Board's inspection function is performed by three mortuary inspectors in the BP&OA's Law Enforcement Division. These inspectors work out of regional offices in Philadelphia, Scranton, and Pittsburgh. Although unwritten, the reported goal of the

---

[1]/This number includes about 1,064 business class licenses (i.e., corporations, partnerships, restricted corporations, branch offices, widows, and estate) and 816 sole proprietorships.

funeral home inspection program is to conduct a facility compli-
ance inspection of each funeral establishment on an annual basis.

The costs of the funeral home inspection program are included
in the Board's law enforcement budget.  In FY 1992-93, the Board
reimbursed the BP&OA's Law Enforcement Division $116,787 for in-
spection and investigation functions.  While it is not possible to
identify the precise amount of this total attributable to the
inspection program, it is at least $54,958 based on inspectors'
salaries, benefits, and expenses.

Other governmental agencies also inspect funeral homes.
These include the U.S. Occupational Safety and Health Administra-
tion, the PA Department of Labor and Industry, the U.S. Environ-
mental Protection Agency, the PA Department of Environmental Re-
sources, and the Federal Trade Commission.  These agencies do not,
however, conduct inspections on a routine basis.  Rather, these
agencies generally do inspections only in response to complaints
of violations of state and federal laws or regulations.

## Nature of Funeral Home Inspections

Inspections by the BP&OA's mortuary inspectors focus on facil-
ity, equipment, and administrative requirements.  There are no
written procedure manuals or guidelines for the mortuary inspec-
tors to follow.  During a routine inspection, the mortuary inspec-
tor completes a checklist indicating he/she has checked the over-
all physical condition of the homes, the status of licensed and
unlicensed employees, advertising and stationery, elevators,
restrooms, business agreement forms, and preparation rooms.

Although not on the checklist, one inspector told LB&FC staff
that he also checks:

- licenses to make sure that they are current and to ensure that the funeral directors licensed by the Board to work at that location are the ones actually practicing there;

- the funeral home's price lists and statements of goods and services;

- a sample of at-need and pre-need contracts;

- possible "bait and switch" tactics on price lists; and

- the general price list against the casket selection in the showroom.

Although the inspection checklist does not require an examina-tion of business records, a few years ago BP&OA inspectors began to review pre-need burial contracts as part of some inspections. At the January 1990 Board meeting, the Board requested that the administrative assistant send a memorandum to the Law Enforcement Division stating that pre-need burial contracts are confidential and the inspectors should not review them when performing their inspections.  This memorandum also requested the legal office to provide information about inspecting pre-need burial contracts. The legal office's response was that the Board did not have clear statutory or regulatory authority to collect information about the amount of funds in prepaid burial contracts and information about insurance-funded pre-need contracts.

More recently inspectors have again been examining pre-need contracts.  In spring 1993 the Board's prosecutor developed a pre-need auditing manual to be used by the BP&OA investigators and inspectors to conduct pre-need audits resulting from complaints. These audits are restricted to the contracts and pre-need records maintained by the funeral establishments and do not include a review of the trust fund accounts maintained by banking institu-tions.  The prosecutor provides guidance to the investigators/ inspectors on how many pre-need contracts should be audited in a particular situation.  Although several licensees have questioned the authority of the inspectors and investigators to review pre-need files, no one has yet refused access to their records.

## Frequency and Timeliness of Funeral Home Inspections

**Frequency of Inspections.** Funeral home inspections are not conducted on a systematic basis. During calendar year 1991 the inspectors conducted 684 funeral home inspections. In calendar year 1992, this number increased to 969. These numbers do not, however, represent an unduplicated count of inspections of separate funeral homes. The numbers may include both compliance inspections of funeral homes and follow-up or re-inspections where violations are found. Therefore, the actual number of homes inspected in these years may be something less than 684 and 969.

BP&OA records do not provide a breakdown of compliance versus follow-up inspections. It is safe to assume, however, that the BP&OA's mortuary inspectors are not inspecting all funeral homes on an annual basis. The number of homes inspected in 1991 and 1992 (as opposed to the number of inspections conducted) is less than 33 percent in 1991 and less than 50 percent in 1992. Moreover, inspection files show that some homes have not been inspected for several years while others have received multiple inspections and reinspections.

To assess the frequency of funeral home inspections, LB&FC staff examined inspection histories for a sample of 416 funeral homes selected randomly from throughout the state. This sample represents approximately 22 percent of all funeral establishments in Pennsylvania. We reviewed records for homes in all four BP&OA regions to determine the year of last inspection.

The results of our review are shown on Table 14. As shown on this table, 214 homes or about one-half of the sample had been inspected during calendar year 1992 or the first two months of 1993. A total of 169 homes, or about 40 percent, were last inspected during 1990 or 1991 and 22, or about 5 percent, during 1988 or 1989. Eleven homes in the sample had not been inspected since at least 1987.

125

The Board's administrative assistant also reviewed inspection
records and found a similar pattern.  Her review used calendar
year 1989 as a cut-off point and attempted to identify homes which
had not been inspected since at least 1989.  The administrative
assistant found 173 homes in this category, 110 operated by sole
proprietors and 63 by business class licensees.  Of this number,
35 percent (60 funeral homes) had not been inspected since at
least 1986.  Several factors contribute to this sporadic inspec-
tion pattern.

**Inspection Planning and Scheduling Is Inadequate.**  Inspec-
tions are not conducted according to a formal plan or schedule.
Instead, inspectors use a computer printout that lists licensees
by county and community, and shows the date of a licensee's last
inspection.  After selecting a geographical area or municipality
in which to work, the inspectors identify for inspection those
establishments which have not received a recent inspection.  The
inspection program does not, however, have a systematic process
for ensuring that all funeral homes within a given county or BP&OA
region are inspected over a given period of time.  Also contribut-
ing to the inspection frequency problem is the fact that funeral
homes operated by sole proprietors were, until recently, not spe-
cifically identified on the computer-generated inspection list.

**Basic Program Management Information Is Not Maintained.**
Inspection reports and basic management information on the program
are not readily available.  The BP&OA and the Board do not gener-
ate management information reports which monitor and track their
performance against the annual inspection program objective.

**The Inspection Function Is Understaffed and When Vacancies
Occur, They Are Difficult to Fill.**  Given the annual inspection
objective, the inspection program appears understaffed.  The BP&OA
Law Enforcement Division complement is authorized for three

126

### RECOMMENDATIONS

1. The General Assembly should consider amending the Funeral Director Law to:

   - specifically define the purpose and scope of the funeral home inspection program,

   - specify the frequency of inspections (consideration should be given to a biennial rather than annual requirement),

   - delete the requirement that funeral homes must be inspected by licensed funeral directors with ten years experience, and

   - clarify the authority of inspectors to examine licensees' business records.

2. The Board should promulgate regulations for the funeral home inspection program.

3. The BP&OA's Law Enforcement Division should institute a funeral home inspection plan and scheduling process, including management information reports capable of providing information on the inspection status and date of last inspection of all funeral establishments, by region.

*FINDING P*

*THE FUNERAL DIRECTOR AND FUNERAL OWNERSHIP LICENSING
STRUCTURE ADMINISTERED BY THE BOARD IS UNNECESSARILY
COMPLEX AND RESTRICTIVE*

### *SUMMARY*

*The Funeral Director Law provides for various forms of owner-
ship of funeral directing businesses.  As required by the law, the
Board issues funeral director and funeral supervisor licenses and
seven other separate ownership licenses based on business or owner-
ship type.  This system is unnecessarily complex and includes
provisions that appear to restrict and control the start-up of new
funeral businesses.  Most states license only the individual (fu-
neral director or mortician) and the facility (funeral home or
mortuary).*

### *DISCUSSION*

## Description of the Current Ownership Licensing Structure

The Funeral Director Law provides detailed information and
conditions for operating funeral homes in Pennsylvania under the
following types of business ownership licenses:[1]

| | |
|---|---|
| Funeral Restricted Corporation | Funeral Corporation |
| Funeral Branch Office | ("Pre-1935") |
| Funeral Widow | Funeral Partnership |
| Funeral Professional Corporation | Funeral Estate |

These license types and associated requirements and restrictions
are summarized on Exhibit 12.

The current structure of seven separate funeral ownership
licenses has evolved in a piecemeal fashion.  An attorney who has
had a long-term involvement with the Funeral Director Law and the
Funeral Directors Board has characterized some of these provisions

---

[1]/The law does not, however, provide for licensure of sole proprietorships as a business or ownership type.  See
Finding J.

as "historical accidents."  The following is a brief chronology
and reported rationale for the various ownership provisions of the
law.

- Pre-1935 Corporations (No specific statutory provi-
  sion[2]) These business licenses are formed from exist-
  ing pre-1935 corporation licenses which may be owned by
  anyone (there is no requirement for the owner to be a li-
  censed funeral director).  The number of these licenses is
  limited to those in existence as of 1935.

  Prior to 1935, both individuals and corporations could be
  licensed to practice funeral directing in Pennsylvania.
  During the Depression, the Legislature amended the law to
  restrict the licensure of funeral directors to individu-
  als.  At that time, approximately 75 corporations were
  licensed in the Commonwealth.  Further, each of these may
  have had several branches since there were no restrictions
  on the number of branches that could be operated by a funer-
  al director.  These corporations sued in an attempt to
  retain their licensure.  In 1935 the court ruled in their
  favor.  These businesses are now known as the "pre-1935
  corporations."

- Funeral Widow's Licenses (63 P.S. §479.8(a))  Widows or
  widowers may be granted licenses to operate the business of
  the deceased spouse (funeral director) provided they do not
  remarry and the business is supervised by a licensed funer-
  al director.

  In the same time frame that the pre-1935 corporations were
  established, the General Assembly created a widow's license

_____

[2]/The Funeral Director Law does not have a provision which specifically defines pre-1935 corporations. These
corporations have generally been "grandfathered" into the law and are specifically addressed in Board regulations,
49 Pa. Code §§ 13.121 - 13.123.

EXHIBIT 12.   REQUIREMENTS AND RESTRICTIONS FOR FUNERAL BUSINESS LICENSES ISSUED BY THE BOARD

| License Type/Cite | License Requirements | License Restrictions |
|---|---|---|
| Professional Corporation<br><br>63  P.S.  §479.8(d)<br>49  Pa.  Code §§13.131 - 13.135 | - Must be incorporated pursuant to the Professional Corporation Law by one or more licensed funeral directors specifically for conducting a funeral directing practice.<br>- The name must contain the name of one or more shareholders or of a predecessor funeral establishment.<br>- Each place of business must have a licensed funeral director as a full-time supervisor. | - May not own stock or property interest in any other funeral establishment, except a branch. |
| Restricted Corporate<br><br>63  P.S.  §479.8(b)<br>49  Pa.  Code §§13.141 - 13.144 | - Business must be incorporated pursuant to the Business Corporation Law by one or more funeral directors.<br>- One or more of its principal corporate officers must be a licensed funeral director and a member of the board of directors of the corporation.<br>- All shareholders must be licensed funeral directors or an immediate family member of a licensed funeral director or of a deceased funeral director who was a shareholder in the corporation at death.<br>- Corporation must file a registry statement with the corporate tax returns and pay all taxes.<br>- Name of corporation must contain the name or last name of one or more of the licensed shareholders or the name of a predecessor establishment.<br>- Each place of business must be registered with the Board and have a licensed funeral director to serve as a full-time supervisor. | - Corporation may not engage in any other business.<br>- Licensed funeral director is not eligible to apply for more than one restricted corporate license or own shares in more than one restricted corporation or have a proprietary interest in any other funeral branch. |
| Branch<br><br>63  P.S.  §479.8(e)<br>49  Pa.  Code §§13.112, 13.113 | - License is held by licensee authorized to conduct funeral directing practice either as an individual, partnership, professional corporation or restricted business.<br>- Must have a licensed funeral director as supervisor.<br>- Branch location must have the same facilities as principal place of business and comply with law and regulations. | - Each entity may have only one branch location. |

158

EXHIBIT 12   (CONTINUED)

License Type/Cite

License Requirements

License Restrictions

Estate/Widows

63  P.S.  §479.8(a)
49  Pa. Code §§13.151 - 13.159

- A licensee's widow can receive a license without time
  limitation if widow does not remarry.
- The licensee's estate can receive a license.
- Must appoint a licensed funeral director as supervisor.

- Estate license is a three-
  year license.

Partnership

63  P.S.  §479.8(a)
49  Pa. Code §13.109

- Must have a partnership agreement.

Pre-1935 Corporation

49  Pa. Code §§13.121 - 13.123

- Must have a licensed funeral director for a supervisor.

- Only existing pre-1935
  business corporation
  licenses and pre-1935
  branch licensees will
  be renewed. No original
  licenses will be issued to
  these corporations.

a/Licensed funeral directors owning shares of more than one professional corporation prior to February 1977 may maintain
ownership of the shares.

Source:  Developed by LB&FC staff from the Funeral Director Law and Board regulations.

159

to protect a widow when her spouse, a licensed funeral
director, died.  According to an attorney familiar with the
development of this amendment, in many cases the funeral
home was the largest home in town and constructed in a way
that would make it difficult for the widow to sell it for
use other than as a funeral home.  Therefore, the widow was
allowed to retain the home by hiring a licensed funeral
director to supervise the business.

- Funeral Estate Licenses (63 P.S. §479.8(a))  Estates of
deceased funeral directors may be granted licenses to oper-
ate for three years provided the home is under the supervi-
sion of a licensed funeral director.  This license category
was also created during the same time frame as the widow's
license to allow estates to likewise dispose of a unique
piece of property within a reasonable period of time.

- Funeral Professional Corporations (63 P.S. §479.8(d))
Professional corporations are licensed separately by the
Board as businesses and are formed by licensed funeral
directors to take advantage of tax and liability laws.  The
formation of professional corporations conforms to the
requirements of the professional corporation law; e.g., the
shareholders are members of the profession in which the
corporation practices.

In the early 1960s, Pennsylvania enacted the Professional
Corporation Law.  The purpose of the law was to allow pro-
fessional organizations to take advantage of certain feder-
al corporate tax provisions.  The Board then began issuing
licenses for professional corporations in addition to the
funeral director licenses issued to individuals.  The Penn-
sylvania Attorney General's Office issued an opinion stat-
ing that the Board did not have the authority to license
professional corporations.

160

In the meantime some funeral directors acquired multiple
licensure by applying for licenses in a variety of differ-
ent but similar names (for example, as John Doe Funeral
Home, J.D. Funeral Home, and J. Doe Funeral Home, etc.).
The Attorney General attempted to enforce the opinion, and
approximately 50 funeral directors brought suit to maintain
their licenses as professional corporations.  The parties
negotiated a settlement which resulted in an amendment to
the Funeral Director Law (1) authorizing the Board to issue
corporate licenses, (2) grandfathering in the existing
multiple ownership (ownership of more than one corporation
prior to 1977 may continue) and (3) authorizing the estab-
lishment of restricted business corporations.

- Funeral Restricted Business Corporations (63 P.S.
  §479.8(b))  Restricted corporate licenses may be granted to
  businesses whose shareholders are not necessarily funeral
  directors.  Shareholders may be "the members of the immedi-
  ate family of a licensed funeral director or a deceased
  licensed funeral director who was a shareholder in the
  corporation at death."  Family members include spouse,
  children, grandchildren, or trustee or custodian who holds
  shares for the benefit of such family member.

As noted above, the restricted business corporations were
part of a negotiated amendment to the Funeral Director Law
in the early 1970s.  This form of licensure established, to
a certain extent, parity with those who owned pre-1935
corporations in that persons other than funeral directors
(i.e., a close relative) could maintain ownership of a re-
stricted business corporation and the stock of a restricted
business corporation.

- Funeral Partnership (63 P.S. §479.8(a))  Two or more indi-
  viduals may form a partnership to operate from one place of
  business.

161

- Funeral Branch Office (63 P.S. §479.8(e))  Licensees are
  authorized to conduct a funeral directing practice at one
  principal place and no more than one branch.  The branch
  must have a licensed funeral director as a full-time super-
  visor and meet the other requirements of the act and regula-
  tions, e.g., a branch must have a preparation room.

## Effect of the Current Licensing Structure

In Pennsylvania, as nationally, the funeral industry tends to
be made up of family-owned and operated businesses serving specif-
ic locales for long periods of time.  Businesses are often handed
down from generation to generation.  The ownership provisions in
the Funeral Director Law tend to perpetuate this arrangement by
limiting the entry of competitors into the industry.

Under the current licensing system, only licensed funeral
directors may open a new funeral home.  Unlicensed persons are
generally limited in their ownership opportunities.  For example,
anyone can own a "pre-1935 corporation" but there are only 76
available.[3]  In other cases, certain family members, although
unlicensed, can obtain ownership of a funeral business through a
widow(er)'s license, estate license, or restricted business corpo-
ration license.

In all of these instances, the unlicensed owner must employ a
licensed funeral director to operate the funeral establishment.
However, unlicensed owners are not required to have any special
skill, training, or knowledge.

In short, the system appears relatively closed.  Newly estab-
lished or newly licensed businesses must be owned by licensees.

---

[3]/As of July 8, 1993, 61 of the 76 pre-1935 corporations were actively licensed.

To be licensed as a funeral director, one must identify a funeral home at which employment is already arranged. Thus, entry into the profession can only be through an existing business while those already in the business can establish ownership of additional funeral homes through transfer of business licenses to family members.

During the audit, the Board's former chief prosecutor commented on this system:

> Under the present system, there are substantial inequities. However, if equity is achieved by permitting anyone to own such a business, there would be major changes in the industry. Specifically, chain operations would enter into competition with the existing individual vendors. While this type of competition might be advantageous to the consumers (just as K-Mart and Walmart are), the high-priced, small-time established vendors could expect even greater competitive pressure and an eventual winnowing of the uncompetitive enterprises.[4]

There are also internal inconsistencies in the construction of the Funeral Director Law with respect to its ownership licensing provisions. While the act generally restricts ownership of a funeral home to licensed funeral directors, it also authorizes unlicensed persons to own the homes in certain cases. However, although unlicensed persons can own a funeral home, excepting pre-1935 corporations, they must be related to a funeral director. Thus, while ownership is not restricted solely to licensees it is not generally available to the public.

_____

[4]/While small independently-owned homes still predominate nationwide, there is a trend toward consolidation and acquisition in the funeral service industry. Also vertical integration of the industry or ownership of several components of the industry by one firm, is becoming more prevalent. For example, the largest operator of funeral homes and cemeteries in North America, Service Corporation International, operates 674 funeral homes and 176 cemeteries in 39 states, the District of Columbia, and Canada (including one cemetery and two funeral homes in Pennsylvania). Nevertheless, a report by Business Trend Analysts, Inc., estimates that fewer than three percent of all funeral homes in the United States are owned by chains.

Since the Funeral Director Law allows certain nonlicensees to own funeral homes, it differs from the Professional Corporation Law, which generally requires professional businesses operated as corporations to be owned by members of the profession.  Since the Funeral Director Law generally restricts ownership to funeral directors, it also differs from statutes that govern a number of other occupations regulated by the BP&OA which allow ownership by nonlicensees.  Those statutes define ownership forms and require that services be delivered by a licensed professional but do not restrict ownership of the business to licensees.  For example, the various laws authorize anyone to own a business engaging in the practice of barbering, cosmetology, auctioneering, and pharmacy as long as the professional services are provided by a person licensed by the state.

It also appears that the general intent of the Funeral Director Law was to restrict ownership of funeral homes to one primary location and one branch location.  Ownership of more than one home has occurred, however, through the issuance of restricted corporation licenses.  Although the act states that "no licensed funeral director shall be eligible to apply for more than one restricted corporate license or own shares in more than one restricted corporation," [emphasis added] the Board has granted more than one restricted corporate license upon multiple applications by the same funeral director.

## Licensing of Funeral Practice and Ownership in Other States

Pennsylvania's licensing structure based on type of ownership or type of business appears to be unique among the states.  Most states simply license the individual (e.g., as a funeral director, mortician, embalmer) and the location or physical facility (i.e., the funeral home).

164

Thirty-five states responded to an LB&FC staff survey concerning funeral industry licensing and regulations.  None of the states reported a licensing structure based on the form of ownership like Pennsylvania's.  A brief description of funeral business licensure from a sample of these states is provided in Appendix M.  As shown, most of these states allow nonfuneral directors to own funeral homes so long as a licensed funeral director supervises, manages, or operates the establishment.  The establishment is licensed separately.

### RECOMMENDATIONS

1.   *The General Assembly should consider amending the Funeral Director Law to simplify the licensing structure.  The basis of licensure should be the individual (i.e., funeral director) and the establishment (i.e., the funeral home) rather than the form of ownership.*

2.   *The General Assembly should consider amending the Funeral Director Law to authorize ownership of funeral homes by any person, association, partnership, corporation, or other organization as long as the funeral home is supervised and funeral services are provided by a licensed funeral director.*

*FINDING Q*

*THE REQUIREMENT THAT EVERY FUNERAL HOME MUST MAINTAIN A
SEPARATE PREPARATION ROOM APPEARS OVERLY RESTRICTIVE*

## SUMMARY

*Funeral homes must, by law, include a preparation room containing instruments and supplies necessary for the preparation and embalming of human remains.  The State Board of Funeral Directors has promulgated regulations which establish extensive facility and equipment requirements for preparation rooms.  During this audit, Board members, licensees, and the Pennsylvania Funeral Directors Association (PFDA) stated that this requirement is burdensome and unnecessary.  They also noted that maintaining separate preparation rooms results in added costs for funeral directors which result in higher costs for consumers.  According to the PFDA, the cost to construct and equip a preparation room to meet Board standards is $40,000 to $50,000.*

*Almost all parties who commented on the separate preparation room requirement suggested eliminating it from law and specifically authorizing the use of centralized embalming facilities.  Centralized embalming facilities would enable the industry to more easily and economically comply with an array of federal, state, and local laws and regulations governing hazardous waste disposal and occupational safety.  The use of centralized facilities would appear to be particularly feasible in urban and suburban areas.*

## DISCUSSION

The Funeral Director Law, 63 P.S. §479.7, requires that every establishment in which the profession of funeral directing is carried on shall include a preparation room, containing instruments and supplies necessary for the preparation and embalming of human remains.[1]  According to the law, preparation rooms are to be constructed in accordance with sanitary standards prescribed by the Board.  The Board's regulations establish extensive facility and equipment requirements for preparation rooms.  According to the PFDA, the cost to construct and equip a preparation room to meet these requirements is $40,000 to $50,000.

---

[1]/The law does not, however, restrict or require a funeral director to embalm in his/her own facility.

Board members, licensees and the PFDA told us that this re-
quirement is burdensome and unnecessary.  They also noted that
maintaining separate preparation rooms results in added costs for
funeral directors which result in higher costs for consumers.  The
requirement that each branch location include a separate prepara-
tion room is of particular concern.  In commenting on this sub-
ject, one Board member stated:

> There are a number of frivolous requirements in the
> existing law which translate into costs for the Funeral
> Director which must be passed on to consumers . . .
> every Funeral Home in the State must have a "Preparation
> Room" even though a Funeral Director may own more than
> one Funeral Home and not use the Prep. room in each.
> This is an added cost passed on to Consumers.  There is
> no provision in the law for several Funeral Directors in
> a community to use the same Preparation room, an even
> greater cost saving to be realized if this were possi-
> ble.

Licensees who commented on this subject also frequently point-
ed out that the requirement is not in the best interests of consum-
ers.  One licensee commented that it creates needless expense and
creates a waste of inspection resources.

> Funeral homes which do their embalming in one funeral
> home should not be required to maintain embalming rooms
> in other funeral homes which they own, but do not embalm
> in.  This is more true today with the various OSHA
> laws.  It is a needless expense which the consumer must
> pay for and a waste of the inspector's time to inspect
> by the state board.  OSHA does not require embalming
> rooms which are not used to be outfitted to comply with
> the various regulations.

Almost all parties who commented on the separate preparation room
requirement suggested eliminating it from law and specifically
authorizing the use of centralized embalming facilities.

While centralized embalming facilities are not prohibited by
the law, they are not commonly used because each funeral home must
maintain its own preparation room.  Preparation rooms are subject

167

to an increasing array of federal, state, and local laws and regulations governing hazardous waste disposal and protection of industry personnel from toxic material handling dangers.[2] Centralized embalming facilities owned and operated by licensed funeral directors would enable the industry to more easily and economically comply with laws and regulations governing occupational safety and waste disposal practices. The use of centralized facilities would appear to be particularly feasible in urban and suburban areas.

Twelve of the 35 states that responded to an LB&FC audit survey reported that they do not require every funeral home to maintain a separate preparation room. Another state allows firms maintaining more than one facility under the same ownership to centralize preparation room facilities and activities.

### RECOMMENDATION

1. *The General Assembly should consider amending the Funeral Director Law to eliminate the separate preparation room requirement and specifically authorize the use of centralized embalming facilities.*

---

2/A 1990 study by the PA Department of Environmental Resources (DER) found that the Pennsylvania funeral industry disposes of 32 tons of biohazardous waste each year. This is a conservative estimate since the DER study apparently did not include waste disposal by funeral homes operated by 816 sole proprietors. See Finding J for a discussion of the problem associated with identifying sole proprietorships.

APPENDIX D.    CHANGES NEEDED IN THE FUNERAL DIRECTOR LAW AS
               IDENTIFIED BY THE FUNERAL DIRECTORS BOARD

1.  That there be a three-year limit on widow licenses and estate
    licenses.

2.  That one morgue would suffice for a number of funeral homes
    in a given area at the main location.

3.  That there be no limit on funeral establishments that a per-
    son owns and also that a centralized preparation room can be
    utilized.

4.  That continuing education be a part of the law.

5.  That the Board consider some sort of audit in the pre-need
    statutes.

6.  That the requirement for supervisors for branches be eliminat-
    ed.

7.  That uniform terminology be used--e.g., the phrase intern.

8.  That clear definition of funeral directing and what a funeral
    service is be developed.  That "unauthorized practice" be
    defined.

9.  That the physical property of a funeral home be licensed.

10. That what happens to the records after a funeral home closes
    be designated in law.

Source:  State Board of Funeral Directors, February 1993.

<u>RESPONSE OF THE STATE BOARD OF FUNERAL DIRECTORS</u>

<u>COMMONWEALTH OF PENNSYLVANIA</u>

To The

Performance Audit Presented To The

Legislative Budget And Finance Committee

January, 1994

The State Board of Funeral Directors expresses sincere appreciation to the staff of the Legislative Budget and Finance Committee for the excellent work done in the recent Performance Audit of this Board.  The report, which has been submitted for review and possible action, is very thorough, extremely well written, fully documented, and offers recommendations which we believe are greatly needed in this Commonwealth.  As members of this Board we welcome the scrutiny which this report will generate.  We anticipate our participation in some of the discussions which undoubtedly will take place.  We applaud one conclusion of the Audit team in the recommendations for the Legislature to consider amending the Funeral Director Law so that it speaks more directly to today's needs, and more clearly addresses issues of consumer protection.  This Board has gone on record for the past several years, requesting that this Law be revisited by the Legislature to bring it in line with modern practices in the industry and broaden its influence upon a larger industry than the licensed funeral director.  We anxiously await word from the Legislative Budget and Finance Committee as it moves through its process in considering the results of this

3

this Board, in the best interest of the general public.

We acknowledge those areas in the Audit in which this Board is lifted up for criticism of one sort or another in not meeting the expectations of others or, in some cases, not fulfilling the intent of the law and/or regulations for this industry. We believe, however, we have acted on the advice of counsel in almost all situations, and we have sometimes chosen to expedite solutions to presented difficulties in the quickest fashion. For instance, it is a long, drawn out process to promulgate a regulation. When the FTC Funeral Rule Regulations were enacted, the Board contacted every Funeral Director informing them of this event and urged compliance, noting that FTC rules must be followed. The Board also added to the approval of Funeral Goods and Service contracts, the requirement that FTC rules were followed. It is acknowledged that Policy enactments are a poor substitute for Regulations, but they have proved useful at times. What is drastically needed, as concluded by this Audit team and highly affirmed by this Board, is a new Funeral Law.

## FINDINGS AND RECOMMENDATIONS

The Findings and Recommendations contained in the Audit of the State Board of Funeral Directors are extremely important to consider. The Funeral industry is in a constant state of change. There is a growing market for pre-need and/or pre-paid funerals, the regulation of which is woefully lacking at the present time.

234

4

There are persons engaged in questionable practices within this industry.  The existing Funeral Law is very antiquated, often ambiguous, lacking in consumer protection in several vital areas, imposes upon funeral directors and funeral homes  requirements which add to the cost of funerals, but do not really benefit or protect the general public.  It is the firm belief of this Board that regulations in this industry are absolutely necessary for the protection of the general public, that such regulation should extend to a broader segment of the industry (cemeteries, crematories, third party sellers of funeral goods and services), and that the drafting of a new and expanded Law should be accomplished as quickly as possible.  We urge, however, that the entire Law be examined in one legislative effort rather than attempt to revise, change, add to, or delete from the existing Law on a piece meal basis.

In regard to those Findings and Recommendations referred to in the Audit, the State Board makes the following affirmations:

A.   The finding and the Recommendation for a comprehensive update and revision of the Funeral Director Law is highly affirmed.

B.   The need for disseminating information about the Funeral Board and the Funeral Director Law is affirmed. We applaud the proposal to amend the Funeral Director Law to require that public members constitute a majority on a regulatory Board.  We also affirm the need to establish new terms and term limits.

It is the intention of the present Board to develop public information materials for distribution and to improve its writing and distribution of a periodic newsletter.

C & D.  Complaints against Funeral Directors are taken seriously by this Board.  It is the opinion of the

235

5

Board that there have been difficulties in our
prosecutorial activities, even before the Lyness
case emerged and changed the method of Board
involvement in the process. Some of this difficulty
has been due to the number of changes in prosecutors
assigned to the Board. Some difficulties have occurred
when, in the opinion of the Board, inadequate
investigation took place. We recognize the ambiguities
in the Funeral Director Law which makes it difficult to
prosecute on certain types of complaints. We hope a
newly devised Law will correct this deficiency. This
Board has delayed action of making use of the screening
panel concept until we are able to review work now
being done on this by another Board. This action was
taken on advice of counsel.

E.   The Board fully agrees that more work needs to be done
to clearly define professional responsibilities,
recognizing, however, the difficulty which might be
encountered in applying such definitions to the
existing law. A thorough review of Regulations in this
regard will be undertaken immediately. We will also
begin to develop an "elements manual," which might be
applied to unprofessional conduct activities.

F.   The Board affirms the Finding on the difficulty to
adjudicate many unlicensed practice complaints. The
Board also highly affirms the recommended solution to
this serious problem, as put forth by the Audit staff.
We would urge, however, that remedial provisions be
presented as an entirely new Law for an expanded
industry.

G & H.  The Funeral Board accepts the Finding concerning the
FTC ruling. The Board will begin right way to address
this matter by a careful review and possible revision
of existing regulations in the expectation of
correcting any omission which might be found.

I.   As noted before, the Board will begin right away to
develop public information materials for consumer
information and protection purposes. The Board accepts
this Finding and affirms the Recommendation.

J.   The Auditors are correct in stating that the existing
Funeral Director Law does not provide for the licensing
of sole proprietorships. The general public would be
much better served if such establishments were
licensed. The section of the Funeral Director Law
having to do with types of business establishments is
very ambiguous, inconsistent, and often confusing to
the general public, as well as to some within the

6

profession.  There are far greater reasons than revenue
enhancement to change the statute on this matter.  The
Board would welcome such changes with rejoicing.

K.  The Finding regarding inspection of funeral
establishments is a matter of serious concern to this
Board.  The oversight of inspectors and their routine
is out of the hands of this Board.  The Board will,
however, begin work on regulations for the funeral home
inspection program.  We urge that the Funeral Director
Law be changed to clarify the whole matter of funeral
home inspections so that more appropriate regulations
can be promulgated.

L.  The Board acknowledges the apparent lax role it has
played in monitoring the resident internship program.
Requirements are established for the training of
preceptors (each five years), with content input for
the internship.  Following that intern through the
process, with the exception of periodic reports is not
accomplished.  Neither has the Board adopted a
comprehensive outline of training which should be
included in the internship, with the exception of broad
categories.  This matter will be placed on an early
agenda of the Board to review every aspect of the
internship program and to set up a more responsible
method of monitoring it.

M.  Changing the fee structure under the Funeral Director
Law comes to the attention of the Board through the
staff of the Bureau of Professional and Occupational
Affairs.  The advice of this agency is followed in
setting the fees.

N.  The Board agrees that waivers to enforcement of
regulations is inappropriate.  Although each incident
has been considered on the merits of the request, it
does give the appearance of flaunting regulations.
Serious discussion will take place on this activity in
a full review of all regulations.  The Board will also
attempt to write policy briefs on granting of waivers
in the future.  An attempt will also be made to
catalogue any waivers which might have been granted in
the past.

O.  The Board has no opinion to express on making the
Funeral Director Law consistent with other Licensing
board Statutes.  The Board sees no problem with this at
this time.

P.  It has already been stated that the Board feels a new
Funeral Law is required.  Such a new law should

7

definitely clarify the funeral director and funeral
ownership licensing structure.  The Board believes some
real advantage can accrue to the general public if this
section of the law can be modified considerably.

Q.   The Board agrees with the Finding on the restrictive
nature of requiring a preparation room for every
funeral home.  Not every funeral home needs a
preparation room as required by existing law.  A
centralized embalming facility makes a lot more sense,
according to the way this business is conducted today.
This is a matter which deserves serious consideration.

R.   The Board agrees that continuing education should be
required for those licensees in this profession.  Joint
determination of the content of a broad continuing
education program should be developed cooperatively
between the Board, the schools of mortuary science, and
the major professional organization in the state.


## CONCERNING PRE-NEED

The Performance Audit of the State Board of Funeral

Directors included a separate document showing an evaluation of

pre-need funeral regulation in Pennsylvania.  The Board concurs

with the finding of the Audit and urges the Legislature to do

something about this important growth industry as quickly as

possible.  Inadequate, ambiguous, and inconsistent regulations of

pre-need sales poses a real threat to an unsuspecting society.

The longer an inadequately regulated business venture is

permitted to continue, the more difficult it will be to bring it

under regulation later.  Already, evidence shows the magnitude of

this venture in terms of revenue generated to the funeral

industry.  Evidence also abounds that some unscrupulous persons

have been taking advantage of innocent people.

Although the State Board of Funeral Directors agrees that

238

8

new laws must be written to protect the public in regard to pre-need funeral sales, the Board does not believe the proposed legislation, identified as HOUSE BILL NO. 2347 (Printer's No. 2916) is the best way to accomplish this.  This BILL stipulates it is an ACT "providing for the regulation of pre-need funeral and burial contracts; providing for powers and duties of the Office of Attorney General, Bureau of Consumer Protection; creating funds; imposing penalties; and making repeals." (p.1) It is recognized that this proposed legislation is very similar to a Model Law developed by the American Association of Retired Persons.  It is also recognized that this Bill has been endorsed by the Pennsylvania Funeral Directors Association (PFDA), the major professional organization for funeral directors in the Commonwealth.

The State Board of Funeral Directors expresses its appreciation for the good work these groups have accomplished in bringing this matter to the attention of Legislators.  However, it is the  opinion of members of the State Board of Funeral Directors that to adopt House Bill No 2347 without considering its important aspects along with a complete review of the existing Funeral Director Law would be a serious mistake.  To do so has the effect of addressing the needs of this important industry on a piece meal basis only.  It also adds to a bureaucratic maze to which the funeral industry must relate by creating a separate regulatory Board set up for the purpose of addressing pre-need funeral and burial contracts, and lodges this

239

9

responsibility under the auspices of the Bureau of Consumer Protection in the Office of the Attorney General. It is the feeling of this Board that there are many aspects of the existing law which need to be changed and much of pre-need which needs to be developed. We believe it will be far better for the industry and the general public to consider all aspects of this industry in one piece of legislation, written for today's time, today's industry, and strong enough to take us well into the next century.

## CONCLUDING REMARKS

The State Board of Funeral Directors thanks the Legislative Budget and Finance Committee for this opportunity to respond to the Performance Audit before it is released to the general public. We look forward to all that might transpire for this industry as you continue to work through the Findings and Recommendations contained in this excellent document.

MEMBERS OF THE BOARD

Horace S. Sills, Chair
Public Member
Neil W. Regan, Sec.
Professional Member
Ellen Marie Coggins
Public Member

Leandro N. Angelone, Vice Chair
Professional Member
Anthony A. Sanvito
Professional Member
Doris L. Shickley, Designee
Bureau Consum. Protect.

Vincent G. Guest
Acting Commissioner, BP&OA

240

# Legislative Budget and Finance Committee

### A JOINT COMMITTEE OF THE PENNSYLVANIA GENERAL ASSEMBLY

## PERFORMANCE AUDIT

## State Board of Funeral Directors
## (Volume II)

## An Evaluation of Pre-Need Funeral
## Regulation in Pennsylvania



OFFICES: ROOM 400, FINANCE BUILDING, HARRISBURG—TEL: (717) 783-1600
MAILING ADDRESS: P.O. BOX 8737, HARRISBURG, PA 17105-8737

SENATORS
PATRICK J. STAPLETON, CHAIRMAN
CLARENCE D. BELL, VICE CHAIRMAN
ROY C. AFFLERBACH
H. CRAIG LEWIS
JOHN E. PETERSON
ROBERT D. ROBBINS

REPRESENTATIVES
RONALD C. RAYMOND, SECRETARY
DAVID R. WRIGHT, TREASURER
ROBERT W. GODSHALL
CHRISTOPHER K. McNALLY
KAREN A. RITTER
SAMUEL H. SMITH



# Legislative Budget and Finance Committee

## A JOINT COMMITTEE OF THE PENNSYLVANIA GENERAL ASSEMBLY

OFFICES: Room 400 • Finance Building • Harrisburg • Tel: (717) 783-1600 • Facsimile: (717) 787-5487
MAILING ADDRESS: P.O. Box 8737 • Harrisburg, PA 17105-8737

EXECUTIVE DIRECTOR
Philip R. Durgin

CHIEF ANALYST
John H. Rowe, Jr.

## PERFORMANCE AUDIT

### State Board of Funeral Directors
### (Volume II)

### An Evaluation of Pre-Need Funeral Regulation in Pennsylvania

January 1994

# TABLE OF CONTENTS

Page

I.   INTRODUCTION ......................................... 1

II.  STATE REGULATION OF PRE-NEED CONTRACTING FOR
     FUNERAL GOODS AND SERVICES IS SERIOUSLY DEFICIENT ...... 5

     A. No Single State Agency Is Responsible for Regulating
        Pre-Need Sales ..................................... 6

     B. Existing Pre-Need Statutes Are Unclear,
        Inconsistent, and Do Not Adequately Protect
        Consumers' Rights ................................. 7

     C. The Funeral Directors Board Has Not Effectively
        Regulated Pre-Need Contracting ..................... 16

     D. There Is Strong Sentiment Within the Funeral Industry
        on the Need to Reform Pre-Need Regulation .......... 31

     E. Pennsylvania Law and Regulations Contain Few
        Provisions Called for in a Model Pre-Need Law ....... 33

III. RECOMMENDATIONS ...................................... 37

IV.  BACKGROUND INFORMATION ABOUT PRE-NEED FUNERAL
     CONTRACTING .......................................... 40

V.   APPENDICES

     A.  Selected Information on Pre-Need Regulation in
         Pennsylvania and a Sample of Other States .......... 48

     B.  A Model Law for Prepaid Funeral Arrangements
         Developed by the American Association of Retired
         Persons ............................................ 53

i