IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

ERNEST F. HEFFNER, et. al,      :      No.  08-cv-990
                          :
         Plaintiffs       :
                          :
         v.             :      Hon. John E. Jones III
                          :
DONALD J. MURPHY, et. al,     :
                          :
         Defendants.     :

## MEMORANDUM AND ORDER

### May 8, 2012

## THE BACKGROUND OF THIS ORDER IS AS FOLLOWS:

Pending before this Court is Defendants' Motion for Summary Judgment,
(doc. 117), Plaintiffs' cross motion for summary judgment, (doc. 137), and
Defendants' Motion to Strike.  (Doc. 163).  For the following reasons, Plaintiffs'
motion for summary judgment shall be granted in part and denied in part,
Defendants' motion for summary judgment shall be granted in part and denied in
part, and Defendants' motion to strike shall be denied.

## I.    Procedural History

Plaintiffs[1] initiated the instant action by lodging a massive Complaint against

---

[1] The named Plaintiffs are: Ernest F. Heffner; Harry C. Neel; Bart H. Cavanagh, Sr.; John
Katora; Brian Leffler; Rebecca Ann Wessel; Mark Patrick Dougherty; Cynthia Lee Finney;
Nathan Ray; Todd Eckert; Ben Blascovich; Matthew Morris; Greg Achenbach; Karen Eroh;

the Defendants[2] on May 20, 2008 alleging claims pursuant to 42 U.S.C. § 1983[3]

and 28 U.S.C. § 2201[4] for deprivations of rights secured by the United States

Constitution and the Pennsylvania Constitution.[5]  (Doc. 1).  On July 25,

William Pugh; William Sucharski; John McGee; Amber M. Scott; Arika Haas; Nicholas Wachter; David Halpate; Patrick Connell; Eugene Connell; Matthew Connell; James J. Connell, Jr.; Jefferson Memorial Park, Inc.; Jefferson Memorial Funeral Home, Inc.; Wellman Funeral Associates, Inc. D/b/a Forest Park Funeral Home; East Harrisburg Cemetery Company d/b/a East Harrisburg Cemetery & Crematory; Robert Lomison; Craig Schwalm; Gregory J. Havrilla; and Betty Frey (collectively "Plaintiffs").

[2] The named Defendants are: Donald J. Murphy; Joseph A. Fluehr III; Michael J. Yeosock; Bennett Goldstein; James O. Pinkerton; Anthony Scarantino; Basil Merenda; Michael Gerdes; Peter Marks; and C.A.L. Shields (collectively "Defendants").

[3] This statute states, in pertinent part, "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . ." 42 U.S.C. § 1983 (1996).

[4] This provision states, in relevant part, "In a case of actual controversy within its jurisdiction any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such." 28 U.S.C. § 2201 (1993).

[5] The Complaint contains the following counts:

Count I–Plaintiffs Heffner, Cavanagh, Patrick Connell, Eugene Connell, James Connell, Katora, Leffler, Wessel, Dougherty, Finney, Ray, Eckert, Blascovich, Morris, Achenbach, Eroh, Pugh, Sucharski, McGee, Scott, Haas, Wachter, Halplate, and Jefferson Memorial Funeral Home, Inc. v. All Named Defendants alleging Fourth Amendment violations as a result of 63 Pa. Stat. Ann. § 479.16(b).

Count II–Plaintiffs Heffner Cavanagh, Patrick Connell, Eugene Connell, Sucharski, Leffler, Jefferson Memorial Park, Inc., Jefferson Memorial Funeral Home, Inc., Robert Lomison, and Wellman Funeral Associates v. All Named Defendants alleging deprivations of rights secured by the Substantive Due Process Clause, Commerce Clause, and Article I § 1 of the

_____

Pennsylvania Constitution as a result of 63 Pa. Stat. Ann. § 479.8(a), (b), (d), and (e).

Count III–Plaintiffs Neel, Havrilla, Lomison, Schwalm, Frey, Wellman, Scott, Haas, and Wachter v. All Named Defendants alleging deprivations of rights secured by the Substantive Due Process Clause, Equal Protection Clause, Commerce Clause, and Article I § 1 of the Pennsylvania Constitution as a result of 63 Pa. Stat. Ann. § 479.8(a), (b), and (d).

Count IV–Plaintiffs Scott, Haas, and Wachter v. All Named Defendants alleging deprivations of their rights secured by the Substantive Due Process Clause, Equal Protection Clause as a result of 63 Pa. Stat. Ann. § 479.8(a), (b), and (d).

Count V–Plaintiffs Heffner, Cavanagh, Katora, Leffler, Ray, Eckert, Blascovich, Morris, Achenbach, Eroh, Pugh, Haas, Wachter, Halpate, and Wellman v. All Named Defendants alleging deprivations of the rights secured by the Substantive Due Process Clause, Commerce Clause and Article I §1 of the Pennsylvania Constitution as a result of 63 Pa. Stat. Ann. § 479.8(e).

Count VI–Plaintiffs Heffner, Cavanagh, Patrick Connell, Eugene Connell, Mathew Connell, James J. Connell, Jr., Katora, Leffler, Wessel, Dougherty, Finney, Ray, Eckert, Blascovich, Morris, Achenbach, Eroh, Pugh, Sucharski, McGee, Scott, Haas, Wachter, and Halpate v. All Named Defendants alleging deprivations of rights secured by the Substantive Due Process Clause and Article I §1 of the Pennsylvania Constitution as a result of 63 Pa. Stat. Ann. § 479.2(11).

Count VII–Plaintiffs Heffner and Cavanagh v. All Named Defendants alleging deprivations of the rights secured by the Substantive due Process Clause and Article I § 1 of the Pennsylvania Constitution as a result of 63 Pa. Stat. Ann. § 479.7.

Count VIII–Plaintiffs Heffner Cavanagh Patrick Connell, Eugene Connell, Matthew Connell, James J. Connell, Jr., Katora, Leffler, Wessel, Dougherty, Finney, Ray, Eckert, Blascovich, Morris, Achenbach, Eroh, Pugh, Sucharski, McGee, Scott, Haas, Wachter, Halpate, Havrilla, Neel, and Jefferson Memorial Funeral home, Inc. v. All Named Defendants alleging deprivations of the rights secured by the Substantive Due Process Clause and Article I § 1 of the Pennsylvania Constitution as a result of 63 Pa. Stat. Ann. § 479.7.

Count IX–Plaintiffs Heffner, Sucharski, Sucharski Cremation Service, Inc., and Jefferson Memorial Park, Inc. v. All Named Defendants alleging deprivations of the rights secured by the First Amendment Free Speech Clause and the Pennsylvania Constitution as a result of 63 Pa. Stat. Ann. § 479.8 (a), (b), and (d).

Count X–All Plaintiff Funeral Directors v. All Named Defendants alleging deprivations of the rights secured by the Substantive Due Process Clause and Equal Protection Clause as a

2008, the Defendants filed a Motion to Dismiss Plaintiffs' Complaint.  (Doc. 11).

Following full briefing of the motion, and oral argument on December 15, 2008,

we issued a memorandum and order granting in part and denying in part

Defendants' motion.  (*See* Doc. 32 at 30-32).  After numerous motions to extend

the trial term were granted, the Pennsylvania Funeral Directors Association filed a

Motion to Intervene on March 9, 2010, (doc. 50), which we subsequently denied

on June 25, 2010.  (Doc. 80).

---

result of 63 Pa. Stat. Ann. § 479.10(b).

   Count XI–Plaintiffs Lomison, Schwalm, East Harrisburg, and Jefferson Memorial Park, Inc. v. All Named Defendants alleging deprivations of the rights secured by the substantive Due Process Clause, Free Speech Clause, Contract Clause as a result of interpretations of the Funeral Director Law and Regulations that preclude properly licensed crematories that are not lciensed funeral establishments from contracting with the general public to provide cremation services for either at need or pre-need.

   Count XII–Plaintiffs Heffner, Cavanagh, Patrick Connell, Eugene Connell, Matthew Connell, James J. Connell, Jr., Katora, Leffler, Wessel, Dougherty, Finney, Ray, Eckert, Blascovich, Morris, Achenbach, Eroh, Pugh, Sucharski, McGee, Scott, Haas, Wachter, Halpate, and Jefferson Memorial Funeral Home, Inc. v. All Named Defendants alleging deprivations of the rights secured by the Substantive Due Process Clause, Equal Protection Clause, Free Speech Clause, Contract Clause, and the Pennsylvania Constitution as a result of interpretations of the Funeral Director Law and Regulations to preclude licensed funeral directors from having a legal interest in a merchandise company that sells funeral merchandise either at need or pre-need; or having a legal interest in a company that performs cremations unless those companies are licensed as funeral establishments.

   Count XIII–All Plaintiffs v. All Defendants challenging the legality of 63 Pa. Stat. Ann. § 479.11(a)(8) and 49 Pa. Code § 13.202(5).

   Count XIV–All Plaintiffs v. All Named Defendants requesting injunctive relief and continuing jurisdiction from this Court.

On August 25, 2010, Plaintiffs filed a Motion for Leave to File an Amended

Complaint.  (Doc. 91).  We granted the motion on November 5, 2010, (doc. 100),

and Plaintiffs filed an Amended Complaint on November 9, 2010.  (Doc. 101).[6]

---

[6]  The amended complaint contains the following counts:

Count I – Plaintiffs, Heffner, Cavanagh, Patrick Connell, Eugene Connell, Matthew
Connell, James Connell, Katora, Leffler, Wessel, Dougherty, Finney, Ray, Eckert, Blascovich,
Morris, Sucharski, McGee, Scott, Haas, Wachter, Halpate, and Jefferson Memorial Funeral
Home, Inc. v. All Defendants (Warrantless, Limitless Inspections).

Count II – Plaintiffs, Heffner, Cavanagh, Patrick Connell, Eugene Connell, Sucharski,
Leffler, Jefferson Memorial Park, Inc., Jefferson Memorial Funeral Home, Inc., Robert Lomison,
and Wellman Funeral Associates, Inc., d/b/a Forest Park Funeral Home v. Defendants (Undue
Restriction on Ownership).

Count III – Plaintiffs, Neel, Havrilla, Lomison, Schwalm, Frey, Wellman, Scott, Haas
and Wachter v. Defendants (Undue Restriction on Ownership to Licensed Funeral Directors).

Count IV – Plaintiffs, Scott, Haas and Wachter v. Defendants (Ownership Restrictions
Violate Equal Protection of the Law).

Count V – Plaintiffs, Heffner, Cavanagh, Katora, Leffler, Ray, Eckert, Balscovich,
Morris, Haas, Wachter, Halpate and Wellman Funeral Associates, Inc. D/b/a Forest Park Funeral
Home v. Defendants (Undue Restriction on Place of Practice).

Count VI – Plaintiffs, Heffner, Cavanagh, Patrick Connell, Eugene Connell, Matthew
Connell, James J. Connell, Jr., Wellman, Katora, Leffler, Wessel, Dougherty, Finney, Ray,
Eckert, Blascovich, Morris, Sucharski, McGee, Scott, Haas, Wachter and Halpate v. Defendants
(Undue Requirement of "Full Time" Supervisor).

Count VII – Plaintiffs, Heffner, Cavanagh, and Wellman v. Defendants (Undue
Requirement that Every Establishment Include a Prep Room).

Count VIII – Plaintiffs, Heffner, Cavanagh, Patrick Connell, Eugene Connell, Matthew
Connell, James J. Connell, Jr., Katora, Leffler, Wessel, Dougherty, Finney, Ray, Eckert,
Blascovich, Morris, Sucharski, McGee, Scott, Haas, Wachter, Halpate, Havrilla, Neel and
Jefferson Memorial Funeral Home, Inc. v. Defendants (Undue Restriction on Food).

Count IX – Plaintiffs, Heffner, Sucharski, McGee, and Jefferson Memorial Park, Inc. v.

The Pennsylvania Funeral Directors Association ("PFDA") filed a Motion for Leave to File an Amicus Brief on June 20, 2011, (doc. 111), which we granted on June 22, 2011. (Doc. 112). On July 19, 2011, the parties filed a Stipulation of Dismissal of Count X of the Amended Complaint, agreeing to dismiss the same with prejudice. (Doc. 113). Thereafter, on August 10, 2011, Defendants filed the instant Motion for Summary Judgment and brief in support thereof. (Docs. 117, 126). On August 15, 2011, Plaintiffs filed the instant cross Motion for Summary Judgment and supporting brief. (Docs. 137, 140).

In addition, on August 23, 2011, we granted the International Cemetery, Cremation and Funeral Association leave to file an amicus curiae brief in support

---

Defendants (Infringement on Commercial Speech).

Count X – All Plaintiff Funeral Directors v. Defendants (Arbitrary Restrictions on Continuing Education Course Availability). This Count was dismissed with prejudice by stipulation of the parties on July 19, 2011. (Doc. 113).

Count XI – Plaintiffs, Lomison, Wellman, Schwalm, East Harrisburg and Jefferson Memorial Park, Inc. v. Defendants (Unlawful Interference with Trade).

Count XII – Plaintiffs, Heffner, Cavanagh, Patrick Connell, Eugene Connell, Matthew Connell, James J. Connell, Jr., Katora, Leffler, Wessel, Dougherty, Finney, Ray, Eckert, Blascovich, Morris, Sucharski, McGee, Scott, Haas, Wachter, Halpate, and Jefferson Memorial Funeral Home, Inc. v. Defendants (Unlawful Restriction on Ownership of Merchandise Company).

Count XIII – All Plaintiffs v. Defendants (Challenge to Section 11(a)(8) of the Funeral Directors Law and Section 13.202(5) of the Regulations).

Count XIV – All Plaintiffs v. Defendants (Request for Injunctive Relief and Continuing Jurisdiction).

of Plaintiffs' motion for summary judgment.  (Doc. 142).  On October 12, 2011, the National Funeral Directors Association ("NFDA") filed a motion for leave to file an amicus curiae brief regarding the cross motions for summary judgment. (Doc. 152).  We granted the motion in part on October 17, 2011 to the extent we limited petitioners to twenty (20) pages and directed them not to expand the factual record given the potentially duplicative nature of petitioner's filing with that of the PFDA.  (Doc. 155).

Defendants filed a brief in opposition to Plaintiffs' motion for summary judgment on October 21, 2011.  (Doc. 158).  They also filed the instant Motion to Strike, (doc. 163), and brief in support thereof, (doc. 164), on the same day. Plaintiffs filed a brief in opposition to Defendants' motion for summary judgment on October 21, 2011.  (Doc. 168).  Plaintiffs filed a brief in opposition to Defendants' motion to strike on November 4, 2011, (doc. 173), and on November 10, 2011, Defendants filed a reply brief in further support of their motion for summary judgment.  (Doc. 176).  Plaintiffs filed a reply brief in further support of their motion for summary judgment on November 11, 2011.  (Doc. 177). Defendants also filed a reply brief in further support of their motion to strike on November 17, 2011.  (Doc. 179).

Therefore, the pending motions have been fully briefed and are ripe for

disposition.

## II.    Standard of Review

Summary judgment is appropriate if the record establishes "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  Initially, the moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The movant meets this burden by pointing to an absence of evidence supporting an essential element as to which the non-moving party will bear the burden of proof at trial. *Id.* at 325.  Once the moving party meets its burden, the burden then shifts to the non-moving party to show that there is a genuine issue for trial.  Fed. R. Civ. P. 56(e)(2).  An issue is "genuine" only if there is a sufficient evidentiary basis for a reasonable jury to find for the non-moving party, and a factual dispute is "material" only if it might affect the outcome of the action under the governing law. *Anderson v. Liberty Lobby, Inc*, 477 U.S. 242, 248-49 (1986).

In opposing summary judgment, the non-moving party "may not rely merely on allegations of denials in its own pleadings; rather, its response must ... set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2).  The non-moving party "cannot rely on unsupported allegations, but must go beyond

pleadings and provide some evidence that would show that there exists a genuine

issue for trial." *Jones v. United Parcel Serv.*, 214 F.3d 402, 407 (3d Cir. 2000).

Arguments made in briefs "are not evidence and cannot by themselves create a

factual dispute sufficient to defeat a summary judgment motion." *Jersey Cent.*

*Power & Light Co. v. Twp. of Lacey*, 772 F.2d 1103, 1109-10 (3d Cir. 1985).

However, the facts and all reasonable inferences drawn therefrom must be viewed

in the light most favorable to the non- moving party. *P.N. v. Clementon Bd. of*

*Educ.*, 442 F.3d 848, 852 (3d Cir. 2006).

Summary judgment should not be granted when there is a disagreement

about the facts or the proper inferences that a factfinder could draw from them.

*Peterson v. Lehigh Valley Dist. Council*, 676 F.2d 81, 84 (3d Cir. 1982).  Still, "the

mere existence of *some* alleged factual dispute between the parties will not defeat

an otherwise properly supported motion for summary judgment; there must be a

*genuine* issue of *material* fact to preclude summary judgment." *Anderson*, 477

U.S. at 247-48.

## III.   Factual Background

### A.      Parties

Plaintiffs Ernest F. Heffner ("Heffner") and Nathan Ray are licensed funeral

directors in York, PA.  Plaintiff Betty Frey ("Frey") is an associate of Heffner and

is not a licensed funeral director.  Plaintiff Harry C. Neel ("Neel") is the President of Plaintiff Jefferson Memorial Funeral Home, Inc. and Plaintiff Jefferson Memorial Park, Inc., and has a principal place of business in Pittsburgh, PA. Plaintiff Bart H. Cavanagh, Sr. ("Cavanagh") is a licensed funeral director in Norwood, PA.  Plaintiff John Katora ("Katora") is a licensed funeral director in Lewisberry, PA.  Plaintiff Brian Leffler ("Leffler") is a licensed funeral director in Avoca, PA.  Plaintiffs Rebecca Ann Wessel ("Wessel"), Mark Patrick Dougherty ("Dougherty"), Amber M. Scott ("Scott"), and Cynthia Lee Finney ("Finney") are licensed funeral directors in Pittsburgh, PA.

Plaintiffs Todd Eckert ("Eckert") and Matthew Morris ("Morris") are licensed funeral directors in Red Lion, PA.  Plaintiff Ben Blascovich ("Blascovich") is a licensed funeral director in Mill Hall, PA.[7]  Plaintiff William Sucharski ("Sucharski") is a licensed funeral director and owner of a duly approved crematory in Philadelphia, PA.  Plaintiff John McGee ("McGee") is a licensed funeral director in Philadelphia, PA.  Plaintiffs Erika Haas ("Haas") and Nicolas Wachter ("Wachter") are licensed funeral directors in Milton, PA. Plaintiff David Halpate ("Halpate") is a licensed funeral director in Renovo, PA.

---

[7] On March 30, 2010, Plaintiffs filed a Stipulation of Dismissal of Plaintiffs Achenbach, Eroh, and Pugh, and all of their claims asserted in the case *sub judice*.  (Doc. 52).

Plaintiffs Patrick Connell ("P. Connell"), Eugene Connell ("E. Connell"),

Matthew Connell ("M. Connell"), and James J. Connell, Jr. ("J. Connell") are

licensed funeral directors in Bethlehem, PA.

Plaintiff Jefferson Memorial Park, Inc. ("Jefferson MP") is a Pennsylvania

corporation with a principal place of business in Pittsburgh, PA.  Jefferson MP is a

licensed cemetery and is the sole shareholder of Plaintiff Jefferson Memorial

Funeral Home, Inc. ("Jefferson MFH"),[8] which is also a Pennsylvania corporation

with a principal place of business in Pittsburgh, PA.   Plaintiff Wellman Funeral

Associates, Inc., d/b/a Forest Park Funeral Home ("Wellman"), is a Louisiana

corporation with a principal place of business in Shreveport, LA.[9]   Plaintiff East

Harrisburg Cemetery Company, d/b/a East Harrisburg Cemetery & Crematory

("East HBG Cem.") is a Pennsylvania corporation with a principal place of

business in Harrisburg, PA.[10]  Plaintiff Robert Lomison ("Lomison") owns and

---

[8] Plaintiffs aver that Jefferson MFH is a "Pre-1935" corporation under the Funeral
Director Law such that its stock can be owned by any person, regardless of whether the person is
a licensed funeral director, or by any entity.

[9] Plaintiff Wellman is owned by an individual who is not a licensed funeral director in
any state and who owns cemeteries and a crematory in Pennsylvania.  Plaintiff Wellman,
however, is precluded under the Funeral Director Law from owning a funeral home in
Pennsylvania.

[10] Plaintiff East HBG Cem. is a properly licensed cemetery and crematorium, but, as a
result of Defendants' interpretation and enforcement of the Funeral Director Law, is currently
precluded from marketing and selling cremation packages to the public.

operates the William Howard Day Cemetery ("WHD Cem."), East HBG Cem., and

Wellman.  Plaintiff Craig Schwalm operates a crematory and cemetery and is the

Vice President and General Manager of East HBG Cem.  Plaintiff Gregory J.

Havrilla is not a licensed funeral director, but is the General Manager of Jefferson

MFH.

Defendant Donald J. Murphy ("Murphy") is an appointed consumer

member of the Pennsylvania State Board of Funeral Directors (the "Board").

Defendants Mike Gerdes ("Gerdes"), Joseph A. Fluehr III ("Fluehr"), Michael J.

Yeosock ("Yeosock"), Bennett Goldstein ("Goldstein"), James O. Pinkerton

("Pinkerton"), and Anthony Scarantino ("Scarantino") are members of the Board.

Defendant Basil Merenda ("Merenda") is the Commissioner of the Bureau of

Professional and Occupational Affairs, and is a member of the Board.[11]

Defendant Peter Marks ("Marks") is the former Executive Deputy Chief

Counsel for the Bureau of Professional and Occupational Affairs.  Defendant

Marks oversaw a unit that made prosecutorial decisions, and oversaw

investigations and prosecutions of individuals subject to various licensing laws,

including the Funeral Director Law.  Defendant C.A.L. Shields ("Shields"), is the

former Director of the Bureau of Enforcement and Investigation ("BEI"), and

---

[11] The Defendants set forth above are sued in their official and individual capacities.

12

oversaw all investigations conducted by the Bureau of Professional and Occupational Affairs.  Defendants Marks and Shields are sued solely in their former official capacities.

### B.     Factual Background

The parties and the Court are all too intimately familiar with the facts undergirding this sweeping and multi-faceted case.  Therefore, for the purposes of deciding the various motions, we shall simply make a generalized statement of the facts.[12]  We shall refer to or address specific facts in our discussion only as they become necessary for resolution of the pending motions.

The Funeral Director Law (the "FDL") was enacted in 1952 to, purportedly, "provide for the better protection of life and health of the citizens of this Commonwealth by requiring and regulating the examination, licensure and registration of persons and registration of corporations engaging in the care, preparation and disposition of the bodies of deceased persons . . . ."[13]  (Doc. 101 ¶ 45 (citing 63 PA. STAT. ANN. § 479.1 (1952))).  The Board is the administrative

---

[12] Since our factual recitation is merely a broad overview of the basis for the instant litigation, it is generally taken from Plaintiffs' amended complaint.

[13]  The Plaintiffs allege that while the FDL has been amended numerous times since its ratification in 1952, it nonetheless has failed to address changes in the law, generally, and changes in the death care industry, in particular.

entity charged with enforcement of the FDL.[14] (*Id.* ¶ 46 (citing § 479.16(a))).  In particular, the Board is "empowered to formulate necessary rules and regulations not inconsistent with this act for the proper conduct of the business or profession of funeral directing and as may be deemed necessary or proper to safeguard the interests of the public and the standards of the profession." (*Id.* ¶ 50).  To this end, the Board has promulgated regulations (the "Funeral Regulations") to implement the dictates of the FDL.[15] 49 PA. CODE § 12.1 *et seq.*

Plaintiffs aver that although the FDL and Regulations have not undergone significant change since their initial implementation, the funeral directing industry has experienced massive changes since that time, a result of which has been increased competition in the industry. (Doc. 101 ¶¶ 61-69).  Plaintiffs assert that the rise in competition has not been warmly received by established funeral directors. (*Id.* ¶ 70).  Thus, Plaintiffs contend that the Board's current interpretation of the FDL and Regulations, which in some instances completely contradicts its past interpretations, is driven by an anti-competitive attitude that is aimed towards appropriating an even larger market share, if not an absolute monopoly, for

---

[14]  Per the Funeral Law, the Board itself is composed of nine members, five of which are licensed funeral directors. 63 PA. STAT. ANN. § 479.16(a).

[15] The Plaintiffs contend that, similar to the Funeral Law, the Funeral Regulations have not been substantially modified to reflect societal changes.

established funeral directors.[16] (*See id*. ¶¶ 71-73).  The Plaintiffs assert that these

interpretations violate both the federal and state constitutions in various ways.  We

will delve into the specifics of these averments in relation to the instant Motions in

the following section.

## IV.   Discussion

Plaintiffs' cross motion for summary judgment presents their arguments for

summary judgment by count number, while Defendants' brief first lodges

threshold arguments for dismissal that would, if accepted by this Court, obviate the

need to reach the merits of each count.  For ease of reference, we shall first address

the larger threshold issues raised by Defendants' brief, and then proceed to analyze

the parties' respective arguments by count as presented in Plaintiffs' brief.   **A.**

**Threshold Issues**

**1.   Jurisdiction**

At the outset, Defendants contend that this Court lacks jurisdiction over

several claims.  (Doc. 126 at 24).   They argue that based on the Commonwealth

---

[16] In fact, Plaintiffs aver that the PFDA, a trade association comprised of licensed funeral directors in the Commonwealth, is the anti-competitive force driving the present interpretations of the FDL. (*Id*. ¶¶ 74-76).  In this vein, Plaintiffs maintain that over the past two to three decades numerous professional members of the Board have been high ranking officers of the PFDA.  (*Id*. ¶ 78).  Indeed, it is Plaintiffs' belief that no professional appointed to serve on the Board in the last decade has been confirmed over the objection of the PFDA. (*Id*. ¶¶ 79-80). Therefore, Plaintiffs assert that "unless you are 'anointed' by PFDA to serve on the Board, you will not . . . serve on the Board." (*Id*. ¶ 80).

Court of Pennsylvania's decision in *Bean v. State Board of Funeral Directors*, where the court held that the Board had jurisdiction to initially adjudicate the matter, this Court should abstain from adjudicating this matter pending a decision from the Board.  (*Id.* 26).  Defendants also claim that Cavanagh recently sent the Board a letter requesting clarification concerning a cremation business he wants to pursue.  (*Id.*).  After being informed that, with his consent, the issue would be designated as a Petition for Declaratory Order, Defendants claim that James Kutz ("Kutz"), attorney for Plaintiffs, informed the Board that his client did not wish to pursue the issue as a Petition for Declaratory Order and requested that the issue be withdrawn.  (*Id.*).  They assert that based on the above, Plaintiffs should be compelled to utilize the process for adjudication of such issues through the Board, and consequently, this Court should abstain.

In response, Plaintiffs argue that Defendants fail to identify the "several claims" over which the Court lacks jurisdiction.  (Doc. 168 at 23).  Moreover, they claim that Defendants' lone citation to *Bean* is an insufficient legal basis for the Court to abstain from deciding the case *sub judice*.  They also maintain the *Bean* court did not hold that the Board has power to issue a declaratory judgment, but that the court therein had jurisdiction over the declaratory judgment action and it was proper to invoke the primary jurisdiction doctrine to benefit from the Board's

16

expertise in this area.  (*Id*. at 28).

Furthermore, Plaintiffs claim that even if Defendants' contention is accepted, plaintiffs suing under § 1983 are not required to exhaust state remedies. (*Id*. at 29 (citing *Patsy v. Bd. of Regents*, 457 U.S. 496, 516 (1982))).  They argue that to the extent Defendants' assertions are construed as standing or ripeness arguments, the Court has already determined that Plaintiffs have standing. Defendants also contend that funeral directors should not be required to file a lawsuit against the Board to obtain a clear interpretation of the FDL.  (*Id*. at 35 (citing *Walker v. Flitton*, 364 F. Supp. 2d 503, 517 n.15 (M.D. Pa. 2005) ("beyond merely initiating adjudications, the Law tasks the Board with enacting binding regulations that interpret the Law so that funeral directors can have a better understanding of what is permitted."))).

We ultimately agree with Plaintiffs and find that the discussion in our prior memorandum and order ruling on Defendants' motion to dismiss dealt with most of the arguments Defendants advance herein.  Notably, in that opinion we found that unlike the regulations at issue in *Chiropractic America v. Lavecchia*, 180 F.3d 99, 104 (3d Cir. 1999), which were complex and recently enacted, the Funeral Laws and Regulations, as noted by Plaintiffs, are extremely antediluvian and incomprehensive.  (Doc. 32 at 13-14).  We also highlighted the 1994-95

Legislative Audit Committee Report ("Audit Report") which found that the "Board's regulation of the funeral directing profession . . . is complicated by a statute that is outdated and in need of comprehensive revision." (*Id.*, Ex. 1 at 25). We further recognized the Board's admission that a number of its regulations were devoid of purpose or value. (*See generally id.*).[17]   Finally, we emphasized that Plaintiffs had cast doubt upon the coherence of the scheme, alleging that Defendants had, in the not so distant past, interpreted the same regulations inconsistently. (*Id.* ¶¶ 88-93).   Therefore, we find that in the absence of more compelling case law suggesting we should abstain from deciding the instant motions until after Plaintiffs obtain a decision from the Board, or that Plaintiffs were obligated to submit the constitutional claims they raise herein first to the Board, we decline to abstain.

---

[17] Additionally, seven years ago in *Walker* we resolved a similar issue involving the Board and the Funeral Laws and Regulations.  In that case, we held the following:  (1) that a prohibition against all solicitation and contact by anyone other than licensed funeral directors regarding preneed funeral services violated unlicensed salespersons' commercial speech rights; and (2) that individuals who are licensed as insurance agents but not as funeral directors, and who are also employees or agents of funeral directors, may interact with consumers for the purpose of having their employer sell preneed funeral services and plans.  During oral argument on December 15, 2008, we became aware of a contention by Plaintiffs that the Board was presently attempting to circumvent the *Walker* holdings by preventing agents and employees licensed as insurance agents, but not licensed as funeral directors, from collecting commissions from funeral directors for their preneed funeral sales.  While we do not accept this assertion as factual, nonetheless, such alleged recalcitrance only gives credence to Plaintiffs' assertion that the Funeral Laws and Regulations do not qualify as a comprehensive and coherent regulatory scheme.

18

## 2.    State Law Claims

Defendants next argue that Plaintiffs' claims grounded in the Pennsylvania

Constitution are duplicative and lack merit.  (Doc. 126 at 26-27).  They assert that

because Plaintiffs' state law constitutional claims do not qualify as one of the nine

negligence claims for which the General Assembly has waived immunity, that

Defendants enjoy immunity for all such claims.  (*Id*. at 27 (citing 42 PA. CON.

STAT. § 8522(b))).  Regarding Plaintiffs' claim for monetary damages in Count

XII, Defendants maintain that there is no private right of action for monetary

damages under Article I of the Pennsylvania Constitution.  (*Id*.).  They contend that

the Eleventh Amendment has been interpreted by the Supreme Court to preclude

suits against a state or its agencies in federal court by citizens of that state, or by

citizens of other states.  (*Id*. at 28 (citing *Atascadero State Hosp. v. Scanlon*, 473

U.S. 234, 238 (1985); *Pennhurst State Sch. and Hosp. v. Halderman*, 465 U.S. 89,

98 (1984); *Edelman v. Jordan*, 415 U.S. 651, 662-63 (1974))).  Defendants also

assert that the Eleventh Amendment's jurisdictional bar is not dependent upon the

nature of the relief requested, and thus is applicable to suits seeking money

damages and equitable relief.  (*Id*. (citing *Pennhurst*, 465 U.S. at 117 ("[t]he

reasoning of our recent decisions on sovereign immunity thus leads to the

conclusion that a federal suit against state officials on the basis of state law

contravenes the Eleventh Amendment when – as here – the relief sought and ordered has an impact directly on the State itself.")))

On the other hand, Plaintiffs claim that suits seeking declaratory and injunctive relief to prohibit officials from enforcing an unconstitutional statute are not barred by state sovereign immunity.  (Doc. 168 at 35-36 (citing *Benkoski v. Wasilweski*, 2007 U.S. Dist. LEXIS 66315, at *18 (M.D. Pa. Sept. 7, 2007) ("Suits which seek to compel *affirmative action on the part of state officials* or to obtain money damages or to recover property from the Commonwealth are within the rule of immunity; suits which simply seek to restrain state officials from performing affirmative acts are not within the rule of immunity.") (emphasis in original))).  They also highlight that the Court has already dismissed Plaintiffs' state law claims for injunctive and equitable relief against Defendants sued in their official capacities, but allowed claims against Defendants sued in their individual capacities to proceed.  (*Id*. at 36).

As noted in our December 22, 2008 memorandum and order, we granted Defendants' motion to dismiss to the extent Plaintiffs' complaint sought injunctive relief and equitable relief from Defendants sued in their official capacities for violations of state law.  (Doc. 32 at 31).  However, we denied the motion to the extent Plaintiffs sought injunctive and equitable relief from Defendants sued in

their individual capacities for violations of state law.  (*Id*.).  Moreover, we reserved

the right to revisit the issue of Plaintiffs' request for monetary relief from

Defendants sued in their official and individual capacities for violations of state

law.  We also noted that as to the availability of injunctive or equitable relief, such

relief can be obtained against Defendants sued in their individual capacities.[18]

However, such relief cannot be obtained against individuals sued in their official

capacities. *Pennhurst v. Halderman*, 465 U.S. 89 (1984).

As a result, the remaining issue for the Court to determine is whether

Plaintiffs may seek monetary relief from Defendants sued in their official and

individual capacities for violations of state law.  We note that although few federal

courts have discussed this issue, and it does not appear that the Supreme Court of

Pennsylvania has ruled upon whether the Pennsylvania Constitution provides a

cause of action for damages for state constitutional violations, a number of

Pennsylvania district courts have opined on the viability of such claims on a case

by case basis.  *See Aquino v. County of Monroe*, 2007 U.S. Dist. LEXIS 37872, at

*5 (M.D. Pa. 2007) (noting that where there is no ruling currently available from

---

[18] "The Eleventh Amendment bars a suit against state officials when "'the state is the real, substantial party in interest.'"  *Pennhurst*, 465 U.S. at 104 (quoting *Ford Motor Co. v. Dep't of Treasury*, 323 U.S. 459, 465 (1945)).  Thus, a state cannot be a "real party in interest" when its employee is sued in his or her *individual* capacity.  Thus, these claims are not barred by the Eleventh Amendment.

the state's highest court on a matter of state law, the district court "must predict how that court would resolve [the relevant] issues should it be called upon to do so."). The *Aquino* court stated that the factors a district court should consider in predicating how a state's highest court would rule on a particular issue, include: "(1) state Supreme Court decisions in related areas; (2) 'decisional law' of intermediate state courts; (3) opinions of federal courts of appeals and district courts applying state law; and (4) decisions from other jurisdictions that have discussed the issues before the court." *Id*. at 6-7.

After reviewing the decisions of Pennsylvania intermediate state courts and Pennsylvania district courts, we find that most courts have found that a cause of action for monetary relief against defendants sued in their individual capacity for violations of state law does not exist. For example, in *R.H.S. v. Allegheny County Department of Human Services, Office of Mental Health*, the court held that "neither statutory authority, nor appellate case law has authorized the award of monetary damages for a violation of the Pennsylvania Constitution." 936 A.2d 1218, 1225-26 (Pa. Commw. Ct. 2007) (quoting *Jones v. City of Phila.*, 890 A.2d 1188, 1208 (Pa. Commw. Ct. 2006)). Furthermore, in *Underwood v. Beaver County Children and Youth Services*, the Western District of Pennsylvania noted that Pennsylvania law lacks a statutory parallel to 42 U.S.C. § 1983 and its

22

provision of a damages cause of action for federal constitutional violations.  2007

WL 3034069 at *2 (W.D. Pa. 2007).  In fact, the court recognized, "[t]he great

majority of our sister courts that have decided the issue have concluded that money

damages are not available."  *Id*. at *2.  Expressing a similar sentiment, the Eastern

District of Pennsylvania stated, "[t]he Supreme Court of Pennsylvania has not

ruled on the issue of whether there is a private cause of action for damages under

the state constitution, and the federal courts in this Circuit that have considered the

issue have concluded that there is no such right under the Pennsylvania

Constitution."  *Ryan v. Gen. Mach. Prods.*, 277 F. Supp. 2d 585, 595 (E.D. Pa.

2003).  Therefore, we shall grant Defendants' motion to the extent Plaintiffs are

precluded from seeking money damages from Defendants sued in their individual

or official capacity for alleged violations of state law.

### B.    Substantive Counts

#### 1.    Count I: Fourth Amendment

In Count I of the Amended Complaint, Plaintiffs challenge Section16(b) of

the FDL pursuant to the Fourth Amendment.  Section 16(b) provides, in pertinent

part:

> The board shall appoint an inspector or inspectors . . . .  Inspectors . . .
> shall have the right of entry into any place, where the business or
> profession of funeral directing is carried on or advertised as being carried
> on, for the purpose of inspection and for the investigation of complaints

23

coming before the board and for such other matters as the board may direct.

63 PA. STAT. ANN. § 479.16(b).  Plaintiffs argue the inspections conducted

pursuant to Section 16(b) are warrantless and generally unannounced.  (Doc. 140 at

29).  They note the Supreme Court has held that "warrantless searches are

generally unreasonable, and that this rule applies to commercial premises as well as

homes."  (*Id.* (citing *Marshall v. Barlow's Inc.*, 436 U.S. 307, 312 (1978))).

Plaintiffs acknowledge that when "the privacy interests of the owner [of a

'pervasively' regulated industry] are weakened and the government interests in

regulating particular businesses are concomitantly heightened, a warrantless

inspection of commercial premises may well be reasonable within the meaning of

the Fourth Amendment."  (*Id.* (citing *New York v. Burger*, 482 U.S. 691, 702

(1987))).  However, they claim that "[i]n regulated industry cases, warrantless

searches are still presumptively unreasonable and the government retains the

burden of justifying its disregard for the warrant requirement."  (*Id.* at 30 (citing

*Balelo v. Baldridge*, 724, F.2d 753, 771-72 (9th Cir. 1984) (citing *Marshall*, 436

U.S. at 312-13))).  They emphasize that a warrantless inspection in a pervasively

regulated industry is valid under the Fourth Amendment only if three factors are

satisfied: (1) "there must be a substantial government interest that informs the

regulatory scheme pursuant to which the inspection is made," (2) "the warrantless

inspections must be necessary to further the regulatory scheme," and (3) "the statute's inspection program, in terms of the certainty and regularity of its application, must provide a constitutionally adequate substitute for a warrant." (*Id*. (citing *Burger*, 482 U.S. at 702-03)).

Under the first element, Plaintiffs maintain that in determining whether a particular business is pervasively regulated "the proper focus is on whether the regulatory presence is sufficiently comprehensive and defined that the owner of commercial property cannot help but be aware that his property will be subject to periodic inspections undertaken for specific purposes." (*Id*. at 30-31 (citing *Burger*, 482 U.S. at 705 n.16)). Here, they assert the purpose and scope of inspections under the FDL is undefined and that the Audit Report found that the FDL "does not address the specific purpose of funeral home inspections," (*id*. at 32 (citing Plaintiffs' Record "Pl. R." at 127)), but grants inspectors the authority to enter funeral homes "for the purpose of inspection" and "for such other matters as the board may direct." (*Id*. (citing 63 PA. STAT. ANN. §479.16(b))).

Furthermore, Plaintiffs claim that the Board's regulations do not add any limits on inspectors' authority or address what will be inspected or how frequently inspections will occur. (*Id*. (citing 49 PA. CODE Ch. 13)). They contend there are no published policies or procedures regarding the scope of inspections, and one

Board member, Goldstein, has said that the frequency, nature, and extent of an

inspection is "usually up to the inspector." (*Id*. at 32 (citing Pl. R. at 1316)).

Additionally, Plaintiffs state that while inspectors complete an inspection checklist,

the checklist is not published or made available to licensees prior to inspection, and

it is often the subject of frequent change. (*Id*. at 33). They further claim that a

review of checklists from the years 1986, 1990, 1996, 2005, 2009, and the current

form, demonstrates substantial differences in the information sought from funeral

directors by inspectors. (*Id*.). Plaintiffs cite the deposition testimony of John

Katora who testified that he "hold[s] his breath every time an inspector shows up"

because the scope of the inspection "depends on who shows up and . . . what mood

they're in." (*Id*. at 35 (citing Pl. R. at 6468-69)). They also complain of the

unbridled discretion inspectors exercise in deciding whether a violation has

occurred and in deciding how to classify such violations. Plaintiffs contend that

neither the FDL nor the Board's regulations establish a schedule or frequency for

inspections. For example, Plaintiffs highlight David Halpate's testimony that the

funeral home he has supervised for the last eleven years was inspected in 2001,

2004, 2008, and 2009. (*Id*. at 36 (citing Pl. R. at 6623, 6627-28)).

    As a result, Plaintiffs argue that the inspections they are subjected to under

the FDL are too irregular and lacking in scope or definition to be considered part of

a "pervasive" regulatory plan. (*Id*. at 37). They cite the Supreme Court's decision in *Burger* for the proposition that "the sheer quantity of pages of statutory material is not dispositive" of whether an industry is pervasively regulated, rather, "the proper focus is on whether the regulatory presence is sufficiently comprehensive and detailed." (*Id*. at 38 (citing 482 U.S. at 705)).

As to the second element, Plaintiffs argue that no substantial governmental interest justifies warrantless inspections of funeral homes. (*Id*.). They claim that while laws such as the FDL were concerned with public health when they were enacted, the Audit Report that "advances in mortuary science and health regulation have virtually eliminated the public health risks associated with preparation and disposition of the deceased," and that "[c]urrent medical opinion is that dead bodies pose little or no risk to the general public." (*Id*. (citing Pl. R. at 20)). Furthermore, Plaintiffs highlight the Audit Report's statement that there is "no epidemiological evidence showing funeral homes and funeral service workers as a source of disease transmission." (*Id*. at 39 (citing Pl. R. at 23)). The Audit Report also found that the Board "does not appear to perform functions that are essential to protecting public health and safety." (*Id*.). Finally, Plaintiffs maintain that as many funeral homes are both businesses and residences, and because the provision of funeral services involves deeply personal choices for customers, that permitting

27

inspectors to enter the premises at any time constitutes an unreasonable intrusion into the expectation of privacy to which funeral homes, and their customers, are entitled.  (*Id*. at 39-40).  They also contend that Defendants have not presented any evidence of consumer harm from pre-need sales.  (Doc. 168 at 44).

Regarding the third element, Plaintiffs argue that warrantless inspections in the funeral industry are unnecessary because the nature of the business is not akin to other industries where the Supreme Court has found warrantless inspections necessary.  They note that unlike chop shops, where "stolen cars and parts often pass quickly through an automobile junkyard," (doc. 140 at 40 (citing *Burger*, 482 U.S. at 710)), funeral homes are unable to cure deficiencies as quickly or as easily as those in other industries.  Plaintiffs argue that hanging licenses and preparation room tables are not as transient as items such as stolen car parts, thus, warrantless inspections are even less justified in this context.  (Doc. 168 at 46).  They cite *United States v. Biswell* where the Court found warrantless inspections unnecessary for fire marshals because:

> the mission of the inspection system was to discover and correct violations of the building code, conditions that were relatively difficult to conceal or to correct in a short time.  Periodic inspection sufficed, and inspection warrants could be required and privacy given a measure of protection with little if any threat to the effectiveness of the inspection system there at issue.

(Doc. 140. at 40-41 (citing 406 U.S. 311, 316 (1972))).  Additionally, Plaintiffs

claim that even if funeral home directors, upon learning of an impending inspection, attempt to bring their facility into compliance, the overall goal of the FDL will be furthered.  In fact, Plaintiffs contend, unannounced and warrantless inspections can prove to be counterproductive, as in the case of Plaintiff Halpate and the Connell Funeral Home, who were prosecuted, publicly reprimanded, and fined $1,000 after requesting that an inspector wait for the responsible person to arrive to conduct the inspection.  (*Id*. at 43).

Finally, Plaintiffs assert that the warrantless inspection scheme must fail because it does not provide an adequate substitute for a warrant.  (*Id*. at 45).  They compare section 16(b) of the FDL to a Pennsylvania Game Commission regulation that the court in *Showers v. Spangler* found violated the constitution.  In that case, the regulation provided that the records and premises of taxidermists "shall be open to inspection upon demand of an officer of the Commission" and further required that taxidermists "answer, without evasion, questions that may be asked by a representative or officer of the Commission."  (*Id*. at 45-46 (citing 957 F. Supp. 584 (M.D. Pa. 1997))).  Notably, the court found that the regulation's "failure to limit the inspecting officer's discretion through careful limitations of place and scope render it unconstitutional."  (*Id*. at 46 (citing *Showers*, 957 F. Supp. at 591-92)).

29

Plaintiffs emphasize that section 16(b), similar to the Game Commission regulation found to be unconstitutional in *Showers*, fails to define the frequency, purpose, or scope of inspections.  (*Id.*).  They claim that inspections are not subject to any purpose but are left to the inspector's discretion, causing great disparity between some funeral homes, which are inspected with some regularity, while others are seldom inspected, with many years lapsing in between.  Plaintiffs argue that the discretion of inspectors under the FDL is far greater than the discretion permitted through the regulation at issue in *Showers*, which the court found violated the Fourth Amendment.  (*Id.* at 46-47).

In response, Defendants claim that the Pennsylvania funeral profession is, in fact, pervasively regulated.  (Doc. 158 at 16).  They cite *Marshall v. Barlow's, Incorporated* for the proposition that "[t]he businessman in a regulated industry in effect consents to the restrictions placed upon him."  (*Id.* (citing 436 U.S. 307, 313 (1973))).  Defendants also cite *New York v. Burger* where the Court stated, "in light of the regulatory framework governing his business and the history of regulation of related industries, an operator of a junkyard engaging in vehicle dismantling has a reduced expectation of privacy in this 'closely regulated' business."  (Doc. 158 at 18-19 (citing 482 U.S. 691, 707 (1987))).  They further emphasize the Court's holding in *Donovan v. Dewey* where the Court explained:

> [t]he greater latitude to conduct warrantless inspections of commercial
> property reflects the fact that the expectation of privacy that an owner of
> commercial property enjoys in such property differs significantly from
> the sanctity accorded an individual's home, and that this privacy interest
> may, in certain circumstances, be adequately protected by regulatory
> schemes authorizing warrantless inspections.

(Doc. 126 at 113 (citing 452 U.S. 594, 598-99 (1981); *see also New York v.*

*Burger*, 482 U.S. at 710 (noting that to be "effective and serve as a credible

deterrent, unannounced, even frequent, inspections are essential" and that "the

prerequisite of a warrant could easily frustrate inspection"))).  Moreover, they

claim that the funeral industry has been highly regulated since the mid 1890s and

the current FDL, including section16(b), has regulated applications, qualifications,

and examinations for licensure, operational restrictions, defined services that

constitute the profession of funeral directing, outlined a process for enforcement

against licensees, established a Board to administer the FDL through fines,

penalties, and revocation, governed the renewal of licenses, and provided for the

generation of fees since 1952.  (*Id*. at 114 (citing *Heffner Funeral Chapel and*

*Crematory, Inc. v. Dept. of State, BPOA*, 824 A.2d 397 (Pa. Commw. Ct. 2003); 63

PA. STAT. ANN. §§ 479.2-479.20))).

    As to the first element, Defendants claim that Plaintiffs misconstrue the

*Burger* Court's explanation of this factor, and the element as described by the

Court is that "there must be a 'substantial' government interest that informs the

31

regulatory scheme pursuant to which the inspection is made." (Doc. 158 at 19 (citing 482 U.S. at 702)). As a result, Defendants claim the question is not whether there is a substantial justification for the inspection, but whether there is a substantial government interest in regulating the profession." (*Id*. at 20). They argue that because funeral directing involves pre-need trusting and the purchase of life insurance products, in addition to the care, preparation, sanitization, and disposition of possibly infectious human dead bodies with chemicals, that Pennsylvania has a substantial interest in regulating this industry. (Doc. 126 at 115).

Regarding the second element, Defendants maintain that inspections are necessary to further Pennsylvania's interests. (Doc. 158 at 21). They claim unannounced inspections not only ensure that appropriate equipment is installed, but that it is functioning properly. (*Id*. at 22 (citing Counter-Statement of Material Facts "CSMF" ¶ 191)). Additionally, Defendants highlight that because the FDL requires 100% trusting of pre-need money, and since consumers are provided with a general price list, that an inspection of such documents is appropriate to ensure consumers are not being overcharged. (*Id*. at 23 (citing 49 PA. CODE § 13.224)). For example, they claim that inspectors examine the following during visits to funeral homes: whether the license is displayed in an appropriate public place,

whether the preparation room is in good order, and whether documents, such as

pre-need contracts, at-need contracts, and statements of goods are services, are

accurate.  (Doc. 126 at 117 (citing SMF ¶ 621)).

Although Defendants contend Plaintiffs admitted that unannounced

inspections are proper and reasonable in time, place, and scope, the exhibit they

cite for this point merely states Dr. Cyril Wecht's expert opinion that "I believe

such facilities should be approved and inspected periodically by appropriate

governmental agencies."  (Pl. R. at 411).  Notably absent from Dr. Wecht's opinion

is the matter of whether these inspections should be unannounced and warrantless.

Thus, it is clear from a plain reading of Dr. Wecht's expert report that Defendants

have provided a strained interpretation of his opinion and Plaintiffs' opposition to

warrantless inspections.

Finally, Defendants claim that based on the FDL and the admissions of

Plaintiffs, the unannounced inspections are limited and reasonable.  (*Id*. at 24).

They highlight section 16(b) which provides that inspectors "shall have the right of

entry into any place, where the business or profession of funeral directing is carried

on or advertised as being carried on, for the purpose of inspection and for the

investigation of complaints coming before the board and for such other matters as

the board may direct."  (*Id*. at 24 (citing 63 PA. STAT. ANN. § 479.16(b))).

Defendants also cite the deposition testimony of Sucharski who said, "I'm a proponent of unannounced inspections and I think it's important . . . [I]t's a good thing to come unannounced and observe things and just see normal cleanliness and operational procedures."  (Doc. 118 ¶ 630).

The Fourth Amendment states, in relevant part, "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures shall not be violated, and no Warrants shall issue, but upon probable cause." U.S. CONST. amend IV.  Count I asserts that 63 PA. STAT. ANN. § 497.16(b) violates the Fourth Amendment.[16]

As at the dismissal stage, Defendants rely upon the Supreme Court's decision in *Donovan v. Dewey*, wherein the Court stated,

> [L]egislative schemes authorizing warrantless administrative searches of commercial property do not necessarily violate the Fourth Amendment . . . . The greater latitude to conduct warrantless inspections of commercial property reflects the fact that the expectation of privacy that an owner of commercial property enjoys . . . differs significantly from the sanctity accorded an individual's home, and that this privacy interest may, in certain circumstances, be adequately protected by regulatory schemes authorizing warrantless inspections.

*          *          *

---

[16]  This provision authorizes the Board to appoint inspectors who have the right to enter "any place, where the business or profession of funeral directing is carried on or advertised as being carried on, for the purpose of inspection and for the investigation of complaints coming before the Board and for such other matter as the Board may direct." 63 PA. STAT. ANN. § 479.16(b).

> [A] warrant may not be constitutionally required when Congress has
> reasonably determined that warrantless searches are necessary to further
> a regulatory scheme and the federal regulatory presence is sufficiently
> comprehensive and defined so that the owner of commercial property
> cannot help but be aware that his property will be subject to periodic
> inspections undertaken for specific purposes.

452 U.S. 594 (1981).  *See also U.S. v. Biswell*, 406 U.S. 311 (1972) (upholding

validity of warrantless inspections authorized by the Gun Control Act); *Colonnade*

*Catering Corp. v. U.S.*, 397 U.S. 72 (1970) (upholding the validity of warrantless

inspections of businesses in the alcoholic beverage industry).

However, we again find that Plaintiffs appropriately highlight the

*Biswell/Colonnade* Doctrine, which only permits warrantless searches within the

context of a regulatory scheme *if* certain safeguards are set forth to, *inter alia*, limit

the discretion of the inspecting officers and limit the time, place, and scope of the

inspections.  *See Burger*, 482 U.S. at 702-03.  In particular, according to the test set

forth in *New York v. Burger*, warrantless inspections in pervasively regulated

industries are only valid under the Fourth Amendment if three factors are satisfied.

482 U.S. at 702-703.  While we recognize the *Burger* Court held, "where the

privacy interests of the owner are weakened and the government interests in

regulating particular businesses are concomitantly heightened, a warrantless

inspection of commercial premises may well be reasonable within the meaning of

the Fourth Amendment," the Court proceeded to instruct that three criteria must be

met: (1) "there must be a 'substantial' government interest that informs the regulatory scheme pursuant to which the inspection is made;" (2) "the warrantless inspections must be 'necessary to further [the] regulatory scheme;" and (3) "the statute's inspection program, in terms of the certainty and regularity of its application, [must] provide a constitutionally adequate substitute for a warrant." *Burger*, 482 U.S. at 702-03.

Here, we find that Defendants have failed to raise a genuine issue of material fact in proving that unannounced and warrantless inspections of funeral homes satisfy the standard established by the *Burger* Court. Concerning the first element, we find Defendants' contention that the Commonwealth has a substantial interest in regulating the profession simply because the industry has been highly regulated since the mid 1890s, and because the current version of the FDL has been in place since 1952, to be insufficient to justify warrantless and unannounced inspections. While the interest to regulate that informs the regulatory scheme may be substantial standing alone, we find such interests to inadequately justify warrantless and unannounced inspections. To reiterate and expand upon what the *Burger* Court emphasized:

> the sheer quantity of pages of statutory material is not dispositive of [whether a particular business is 'closely regulated'], . . . the proper focus is on whether the regulatory presence is sufficiently comprehensive and defined that the owner of commercial property

> cannot help but be aware that his property will be subject to periodic
> inspections undertaken for specific purposes.

*Burger*, 482 U.S. at 705 n.16.   Therefore, we find that Defendants have failed to

raise a genuine issue of material fact in proving that "the warrantless inspections

[are] 'necessary to further the regulatory scheme'" at issue under the second

element.  *See Burger*, 482 U.S. at 702-03.

Despite Defendants' assertion that unannounced inspections are necessary to

ensure that equipment is not only installed, but is functioning properly, we find it

probable that the motivation to become compliant with regulations in anticipation

of a scheduled inspection, only to drift back into noncompliance following an

inspector's departure from the premises, is a less likely occurrence in the funeral

directing industry than in industries where the Supreme Court has found

warrantless and unannounced inspections necessary.  *See Burger*, 482 U.S. at 710

("[b]ecause stolen cars and parts often pass quickly through an automobile

junkyard, 'frequent' and 'unannounced' inspections are necessary in order to detect

them.").  For example, Defendants admit that inspectors generally monitor

compliance with requirements such as whether the license is displayed in an

appropriate public place, whether the preparation room is in good order, and

whether documents, such as pre-need and at-need contracts, and statements of

goods are services, are accurate.  We find it difficult to conceive of an exigency

that would justify a warrantless inspection for such items.  Moreover, we are unable to discern a potential motive on behalf of funeral directors that would induce them to place a funeral license in a public place, properly maintain a preparation room, or accurately record pre-need or at-need contracts, but subsequently remove a license, revert to disorder in a preparation room, or to dishevel administrative records simply because an inspection has passed.

Furthermore, we do not find that regulation of the funeral industry is akin to the unannounced inspections of automobile junkyards in *Burger*, because the transient nature of items in the automobile industry are not analogous to the fixed location of a funeral home and the items to be inspected therein.  Simply put, funeral homes are not on wheels.  Moreover, even if the governmental interest in regulating funeral directing was found to be similar to the exigencies posed by the facts in *Burger*, the Court therein found that such inspections were justified because the inspection was limited in "time, place, and scope" to impose "appropriate restraints upon the discretion of the inspecting officers."[17]  482 U.S. at 711 (citing *United States v. Biswell*, 406 U.S. 311, 315 (1972)).  Here, we find that

---

[17] Specifically, the inspecting officers in *Burger* were statutorily permitted to only conduct inspections "during the regular and usual business hours," and "inspections [could only be made] of vehicle-dismantling and related industries," and "the permissible scope of these searches is narrowly defined: the inspectors may examine the records, as well as any vehicles or parts of vehicles which are subject to the record keeping requirements of this section and which are on the premises."  *Burger*, 482 U.S. at 711 (internal marks and citations omitted).

a plain reading of section 16(b) provides few if any limitations on the time, place, and scope of inspections that would limit the discretion of inspecting officers. *See* 63 PA. STAT. ANN. § 479.16(b); (*see also* Pl. R. at 1316) (Board member Goldstein testifying that frequency, nature, and extent of an inspection is "usually up to the inspector"). Plaintiffs also cite the deposition testimony of John Katora who noted that the scope of an inspection depends on who shows up and that what they look for has changed over the years. (Pl. R. at 6468-69).

In addition, the Supreme Court stated in *Donovan v. Dewey*:

> [w]here Congress has authorized inspection but made no rules governing the procedures that inspectors must follow, the Fourth Amendment and its various restrictive rules apply. . . . a warrant may be necessary to protect the owner from the unbridled discretion of executive and administrative officers, by assuring him that reasonable legislative or administrative standards for conducting an . . . inspection are satisfied with respect to a particular establishment.

452 U.S. 594, 599 (1980). Therefore, despite Defendants' citation to the deposition testimony of a few funeral directors indicating that they do not oppose unannounced inspections, the mere existence of a handful of funeral directors who consider such inspections unobjectionable, and possibly even beneficial, is insufficient to overcome the clear lack of statutory or regulatory guidelines imposing restrictions on the time, place, and scope of inspections that would provide certainty and regularity throughout the inspection process. The lack of

such parameters perpetuates unbridled discretion of administrative officers and fails to provide a "constitutionally adequate substitute for a warrant." *See Burger*, 482 U.S. at 702-03; *see also Showers*, 957 F. Supp. at 591-92 (finding that the failure of a Pennsylvania Game Commission regulation governing taxidermists "to limit the inspecting officer's discretion through careful limitations of place and scope render[ed] it unconstitutional."). As a result, the instant provision fails to constitute a "sufficiently comprehensive and defined [statute such] that the owner of commercial property cannot help but be aware that his property will be subject to periodic inspections undertaken for specific purposes." *Burger*, 482 U.S. at 703 (quoting *Donovan*, 452 U.S. at 600).

Accordingly, we find that Defendants have failed to raise a genuine issue of material fact as to the second and third elements of the *Burger* criteria set forth above. Therefore, we shall grant Plaintiffs' motion to this extent and deny Defendants' motion as to the same.

> **2.     Count II: Undue Restriction on Ownership & Count III: Undue Restriction on Ownership to Licensed Funeral Directors**

> **a.     Counts II & III – Commerce Clause**

Plaintiffs next challenge the FDL's provision restricting a funeral director to possessing an ownership interest in one entity operating a funeral home, such as a

sole proprietorship, partnership, or a professional corporation, plus one "branch" location associated with that entity.  (Doc. 140 at 48 (citing 63 PA. STAT. ANN. § 479.8(a), (d), (e))).  They claim that the FDL's restriction of ownership to two locations violates the Commerce Clause.  (*Id*. at 59).  Plaintiffs note that the Third Circuit in *Tri-M Group, LLC v. Sharp* stated, "[t]he dormant Commerce Clause prohibits the states from imposing restrictions that benefit in-state economic interests at out-of-state interests' expense" and "[s]tates cannot impede free market forces to shield in-state businesses from out-of-state competition, and, notably, state laws that discriminate against out-of-state businesses by forcing them to surrender whatever competitive advantages they may possess are especially suspect."  (*Id*. at 60 (citing 638 F.3d 406, 426-27 (3d Cir. 2011))).  They contend that in analyzing a dormant Commerce Clause issue, a court first considers whether heightened scrutiny applies, and if not, whether the law is invalid under the balancing test of *Pike v. Bruce Church, Incorporated*.  (*Id*. (citing 397 U.S. 137 (1970))).

Additionally, Plaintiffs argue, "[h]eightened scrutiny applies when a law discriminates against interstate commerce in its purpose or effect."  (*Id*. (citing *Cloverland-Green Spring Dairies, Inc. v. Pa. Milk Mktg. Bd.*, 462 F.3d 249, 261 (3d Cir. 2006) ("*Cloverland II*"))).  They assert there are two types of

discrimination that can trigger heightened scrutiny.  Under the first, plaintiffs may

demonstrate that the challenged state statute forces producers in other states "to

surrender whatever competitive advantages they may possess."  (*Id*. at 61 (citing

*Cloverland II*, 462 F.3d at 261)).  As to the second, a plaintiff "may show that the

object of the law is local economic protectionism, in that it disadvantages out-of-

state businesses to benefit in-state ones."  (*Id*. (citing *Cloverland II*, 462 F.3d at

262)).  Moreover, they emphasize, "there is no requirement that discrimination

must be the primary purpose or effect of the challenged state law."  (*Id*. (citing

*Cloverland II*, 462 F.3d at 261 n.14)).  Finally, if the purpose or effect of the state

law is not discrimination against interstate commerce, and it is found that the

statute "regulates even-handedly to effectuate a legitimate local public interest, and

its effects on interstate commerce are only incidental," the court will then analyze

the statute under the *Pike* balancing test and ask "whether the burden imposed on

such commerce is clearly excessive in relation to the putative local benefits."  (*Id*.

at 61-62 (citing *Cloverland II*, 462 F.3d at 263 (quoting *Pike*, 397 U.S. at 142))).

In the case *sub judice*, Plaintiffs argue that the discriminatory purpose of the

FDL's ownership restrictions is clear from the exemptions crafted to favor

Pennsylvania family-owned funeral homes.  (*Id*. at 62).  For example, they

maintain that the only way for an out-of-state entity to enter the funeral directing

42

industry in Pennsylvania is to pay a de facto tariff through the purchase of an

exorbitantly priced pre-1935 license.[18]  On the other hand, an unlicensed spouse,

child, grandchild, widow, or estate of a Pennsylvania funeral director may own a

funeral home in Pennsylvania.  (*Id*. at 62).  They contend the Third Circuit has held

that laws burdening out-of-state business interests, but which are inapplicable to

in-state interests, constitute "blatant" and "overt" evidence of discrimination.  (*Id*.

(citing *CloverlandII*, 462 F.3d at 265)).  In addition, they claim the Supreme Court

has held that the Commerce Clause is violated not only when a state prohibits out-

of-state interests from entering the market, but when it grants in-state interests

access to the market on preferential terms.  (Doc. 168 at 55).  Moreover, Plaintiffs

argue that even restrictions seemingly applicable to Pennsylvania funeral directors

are easily circumvented by transferring interests in funeral businesses to family

members through an RBC license.  (Doc. 140 at 63).[19]  They compare the instant

---

[18]  Plaintiffs emphasize that prior to 1935, funeral directing licenses were issued to both individuals and corporations.  However, when the legislature restricted licensure to individuals, the corporations that held existing licenses sued to retain the right to operate under these licenses.  As a result, there are a limited number of grandfathered "pre-1935" licenses, which currently consist of fifty-six (56) active pre-1935 licenses and twenty-one (21) inactive pre-1935 licenses.  In addition, Plaintiffs contend that many of the FDL's restrictions are inapplicable to pre-1935 corporations.  For instance, Plaintiffs suggest there are no limitations concerning who may own a corporation that holds a pre-1935 license or on the number of pre-1935 corporations an individual entity may own.  (Doc. 140 at 50).

[19]  Plaintiffs note that a funeral home license may be awarded to a restricted business corporation ("RBC") incorporated for the purpose of engaging in funeral directing.  (*Id*. at 48).  They claim that the stock of an RBC may be owned by:  (i) a Pennsylvania licensed funeral

case to *Jones v. Gale* where plaintiffs, owners of interests in Nebraska farms, filed a Commerce Clause challenge against a Nebraska ballot initiative prohibiting corporations from owning farms in the state while exempting from the restriction corporations owned by Nebraska farmers or their families.  (*Id*. at 63-64 (citing 470 F.3d 1261 (8th Cir. 2006))).  In that case, the court found that the initiative was facially discriminatory because it prohibited ownership of farms by corporations, but not by Nebraska family farm corporations.  (*Id*.).  Plaintiffs emphasize that like the ballot initiative in *Jones*, the FDL prohibits ownership of funeral homes by non-licensees, but this prohibition does not apply to in-state funeral directors and their families.  (*Id*. at 64).

In addition, Plaintiffs challenge the assertion that the FDL is not discriminatory since its restrictions apply to in-state interests, because, as just noted, the restrictions do not apply to Pennsylvania funeral directors and their families.  They further claim that in deciding whether to apply heightened scrutiny, "it is immaterial whether the statute or ordinance also burdens some in-state businesses."  (*Id*. at 65 (citing *Cloverland II*, 462 F.3d at 262)).  Consequently, Plaintiffs argue that the FDL's incidental burdens on in-state funeral directors

---

director; (ii) the spouse, children, or grandchildren of a Pennsylvania licensed funeral director; or (iii) a trustee or custodian for the spouses, children, or grandchildren of a licensed funeral director.  (*Id*. at 48-49).

cannot save it from its discriminatory effect because if the restrictions "protect incumbent in-state dealers not only from out-of-state competitors, but also from in-state ones . . . , that simply exacerbates their protectionist effect." (*Id*. at 65 (citing *Cloverland-Green Spring Dairies, Inc. v. Pa. Milk Mktg. Bd.*, 298 F.3d 201, 214 (3d Cir. 2002) ("*Cloverland I*"))).

Furthermore, Plaintiffs argue that even if the Court finds the statute to be facially neutral, the FDL is still subject to heightened scrutiny because of its discriminatory effect. (*Id*. at 66 (citing *W. Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 194 (1994) (noting that a state regulation "had the same effect as a tariff or customs duty – neutralizing the advantage possessed by lower cost out-of-state producers" and was thus unconstitutional))). They claim the FDL produces a discriminatory effect because its prohibition on the ownership of more than two funeral homes precludes clustering of the same, thereby preventing a reduction in costs that would result from eliminating needless duplication of preparation rooms, equipment, and employees at each location. (*Id*. at 67). Additionally, Plaintiffs highlight that the discriminatory effect of the FDL is exemplified by the large number of small, family-owned funeral homes in Pennsylvania, compared to states of similar or greater size which have far fewer funeral homes. (*Id*. at 70). For example, they highlight the conclusion of their expert Dr. Harrington that "the

fraction of very small funeral homes in states like Pennsylvania is due to anti-competitive funeral regulations, not the preferences of consumers for this type of funeral home." (*Id*. at 72 (citing Pl. R. at 337)). Therefore, Plaintiffs maintain that Defendants' contention, that a corporation wishing to expand into Pennsylvania need only acquire a corporation holding a pre-1935 license, is evidence of the discriminatory effect of the FDL.

Finally, Plaintiffs argue that even if the Court decides that the FDL regulates out-of-state and in-state interests even-handedly, the ownership restrictions of the FDL should be invalidated under the *Pike* balancing test because the burden is clearly excessive in relation to any putative local benefit. (*Id*. at 74). Following a recitation of the statutory prerequisites to becoming a licensed funeral director, Plaintiffs contend the burdens are particularly oppressive given the fact that in-state family members of funeral directors are exempt from such educational requirements. (*Id*. at 75-76). Again, they claim that the restrictions on out-of-state corporate ownership of Pennsylvania funerals homes, limiting them to the purchase of pre-1935 RBCs, also prevents the few out-of-state corporations that enter the market through the effective payment of a tariff from lowering prices for consumers by clustering and achieving economies of scale in the provision of funeral services. (*Id*. at 77-79). On the other hand, they assert that the only local

benefit identified by Defendants is "having a local business owned by local people. " (*Id*. at 82).  To this, Plaintiffs maintain that "preservation of local industry by protecting it from the rigors of interstate competition is the hallmark of the economic protectionism that the Commerce Clause prohibits."  (*Id*. at 82-83 (citing *Healy*, 512 U.S. at 205)).  As a result, they claim that the only benefit conferred by the FDL is one strictly prohibited by the Commerce Clause.

While Defendants argue that more funeral homes reduce the cost for consumers, Plaintiffs counter that an excessive number of small funeral homes performing fewer funerals actually increases the price because such establishments are forced to raise prices for the few funerals they perform.  (*Id*. at 84).  Moreover, Plaintiffs claim that each of the non-licensed individuals permitted to own a funeral home pursuant to an FDL exception are required to employ a licensed funeral director.  Therefore, they argue that this requirement, and not the ownership restrictions that effectively discriminate against out-of-state individuals and corporations, provides accountability in the industry.  (*Id*. at 85).  Also, restricting ownership to licensees does not eliminate absentee owners because unlicensed individuals are still permitted to make temporary funeral arrangements.  (*Id*. at 86 (citing 63 PA. STAT. ANN. § 479.13(d))).

At the outset, regarding the ownership restriction issue, Defendants contend

that all of the individually named Plaintiffs in Counts II and III lack standing to

challenge the FDL under the Commerce Clause because they are all Pennsylvania

residents.  Therefore, because they contend Plaintiff Wellman, a Louisiana

corporation, is the only Plaintiff with standing as to these claims, Wellman's

position is the only one Defendants contest herein.  We disagree with Defendants

that the appropriate comparison is between Wellman, the only out-of-state party

named in Counts II and III, and a Pennsylvania corporation.  Defendants rely on

*United Haulers Association, Incorporated v. Oneika-Herkimer Solid Waste*

*Authority* where the Supreme Court stated, "of course, any notion of discrimination

assumes a comparison of substantially similar entities" and that under a dormant

Commerce Clause analysis, a publicly owned solid waste facility is different from

a privately owned solid waste facility.  550 U.S. 330, 342 (2007).  However, here

we are not confronted with a public and private entity, rather, we have private

corporations and individuals aligned as Plaintiffs, and both have the right to own

funeral licenses through sole proprietorships, partnerships, or professional

corporations.  Contrary to Defendants' position, we find that for purposes of our

Commerce Clause analysis, both the individually-named Plaintiffs in Counts II and

III, and the corporate Plaintiffs named therein, are treated the same under the

Commerce Clause.  Thus, we find Defendants' attempt to again challenge the

48

standing of individual Plaintiffs in Counts II through III to be unavailing.

Furthermore, to the extent Defendants premise their opposition to Plaintiffs'

motion on the theory that the appropriate comparison is between Plaintiff Wellman

and a Pennsylvania corporation, and not between Wellman and the alleged

advantages enjoyed by private individuals in Pennsylvania, we find such approach

unduly constricting.

As to Count II, Defendants claim that the named Plaintiffs lack standing to

assert a dormant Commerce Clause challenge against provisions of the FDL.  (Doc.

158 at 82).  For example, they argue that Plaintiff Wellman is a Louisiana

corporation, and thus the appropriate inquiry is whether the FDL treats Wellman

differently than any Pennsylvania corporations.  Defendants assert that just as a

Pennsylvania corporation can own stock in a pre-1935 RBC, Wellman can also

enter the Pennsylvania market in this way.  (*Id*. at 83).  They claim Plaintiffs'

argument regarding its alleged restriction from clustering in Pennsylvania fails to

demonstrate, through specific figures, a comparison of the costs from Louisiana,

where clustering has occurred, with the costs of operating in Pennsylvania, where

they allege clustering cannot occur.  (*Id*. at 86-87).  Defendants contend that based

on *Cloverland II*, Plaintiffs were obligated to prove that clustering would provide

them with a competitive advantage that is effectively stifled by the one-and-a-

49

branch provision. Additionally, Defendants challenge Dr. Harrington's conclusion that there is a close relationship between the challenged provisions of the FDL and the large number of small, family-owned funeral homes. (*Id*. at 87).

Defendants also counter Plaintiffs' argument under the *Pike* balancing test. They argue that contrary to Plaintiffs' assertions, there are no additional burdens on Plaintiff Wellman compared with the requirements applicable to a Pennsylvania corporation seeking a funeral license. (*Id*. at 90). Defendants further claim that many of the Plaintiffs herein cluster funeral establishments, and that such establishments charge consumers more for funeral services. (*Id*. at 91 (citing SMF ¶¶ 405-07)). According to Defendants, limiting Pennsylvania funeral directors to one-and-a-branch promotes competition by reducing the ability of any one business to dominate the market. (*Id*.).

Regarding Count III, Defendants claim that Plaintiff Wellman provides no evidence he is being treated differently from a Pennsylvania corporation concerning his ability to own a Pennsylvania funeral establishment. (*Id*. at 95). They further claim that nothing in the FDL requires immediate family members of funeral directors who are given stock in a RBC, to be from Pennsylvania. As a result, they claim there is no violation of the dormant Commerce Clause. Moreover, Defendants reiterate Plaintiffs' failure to provide actual evidence of the

competitive advantage obtained from clustering.  (*Id*. at 97).

The Commerce Clause in Article I, § 8 of the United States Constitution provides, "Congress shall have the Power . . . to regulate Commerce . . . among the several States."  While this clause speaks in terms of Congress' affirmative grant of power to regulate commerce, it has also been interpreted as an implied limitation on the power of states to impose additional burdens on interstate commerce.  *Dept. of Revenue of Ky. v. Davis*, 128 S.Ct. 1801, 1808 (2008) ("The modern law of what has come to be called the dormant Commerce Clause is driven by concern about 'economic protectionism' – that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors.").

When analyzing a dormant Commerce Clause issue, courts first determine "whether heightened scrutiny applies, and, if not, then we determine whether the law is invalid under the *Pike v. Bruce Church, Inc.*, 397 U.S. 383, 390 (1970), balancing test."  *Am. Express Travel Related Servs. v. Sidamon-Eristoff*, 2012 U.S. App. LEXIS 129, at *25-26 (3d Cir. Jan. 5, 2011).  A court will apply heightened scrutiny when a law "discriminates against interstate commerce" in its purpose or effect."  *Cloverland-Green Spring Dairies, Inc. v. Pa. Milk Mktg. Bd.*, 462 F.3d 249, 261 (3d Cir. 2006).  If heightened scrutiny applies, the party challenging the statute bears the burden of demonstrating the existence of discrimination, at which

point the burden shifts to the state to prove that "the statute serves a legitimate local purpose, and that this purpose could not be served as well by available nondiscriminatory means."  *Id.* at 261 (citing *Brown-Forman Distillers Corp. v. New York State Liquor Auth.*, 476 U.S. 573, 576 (1986) ("When a state statute directly regulates or discriminates against interstate commerce, or when its effect is to favor in-state economic interests over out-of-state interests, we have generally struck down the statute without further inquiry").  In *Cloverland* the Third Circuit stated, "[i]n determining whether heightened scrutiny should be applied instead of the *Pike* test, 'the critical consideration is the overall effect of the statute on both local and interstate activity,' with special attention paid to whether a 'facially neutral' state law 'has the effect of eliminating a competitive advantage possessed by out-of-state firms."  462 F.3d at 263.  If heightened scrutiny is applied, the State must prove: (1) "that the statute serves a legitimate local interest," and (2) "that this purpose could not be served as well by available non-discriminatory means." *Am. Trucking Ass'ns v. Whitman*, 437 F.3d 313, 319 (3d Cir. 2006).  In *Pike v. Bruce Church*, the Supreme Court established the test to use in analyzing a Commerce Clause challenge not subject to heightened scrutiny and noted that "[w]here the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld

unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits."  397 U.S. 137, 142 (1970).

Thus, our first task is to determine whether heightened scrutiny applies. Here, we find that Plaintiffs have presented sufficient factual evidence to demonstrate that the purpose or effect of the ownership restrictions in the FDL is to discriminate against out-of-state competitors.  The burdensome nature of the FDL's ownership restrictions is demonstrated by the exemptions crafted to favor Pennsylvania family-owned funeral homes by providing for ownership by untrained and unlicensed individuals who are required to employ a full-time licensed funeral director to supervise the facility.  *See* 63 PA. STAT. ANN. § 479.8(a).  As previously noted, the FDL allows in-state interests, through unlicensed spouses, children, grandchildren, widows, or the estate of a Pennsylvania funeral director, to own a funeral home in Pennsylvania and operate the same through a licensed funeral director employed on a full-time basis.  (*Id*. at 62); *see* 63 PA. STAT. ANN. § 479.8(a) ("Upon the death of a licensee, the board shall issue a license and renewal thereof to his estate, only for a period not exceeding three (3) years, or widows or widowers of deceased licensees without time limitations, as long as they remain unmarried, providing the widow or widower, the executor or administrator of the estate of the deceased licensee's

heirs, informs the board, of the intent to continue practice, within ten (10) days and

applies within thirty (30) days for a certificate of licensure. . . .  The practice

carried on by a licensee's estate, widow or widower shall be under the supervision

of a licensed funeral director employed on a full time basis.").  The exception from

licensed funeral home ownership provided in section 479.8(a) for widows,

widowers, children, grandchildren, and heirs of a licensed funeral home director

demonstrates the discriminatory effect of the FDL's ownership restrictions by

exempting this class of individuals from the extensive educational prerequisites

demanded of those seeking to become licensed funeral home directors.  *See Tri-M

Grp, LLC v. Sharp*, 638 F.3d 406, 426-27 (3d Cir. 2011) ("The dormant Commerce

Clause 'prohibits the states from imposing restrictions that benefit in-state

economic interests at out-of-state interests' expense, thus reinforcing 'the principle

of the unitary national market.'").  Through the creation of numerous exceptions to

licensed funeral home ownership for the surviving family members and heirs of

licensed funeral directors, the FDL has shielded in-state businesses from out-of-

state competition by effectively limiting the avenues by which an out-of-state firm

may enter the Pennsylvania funeral market.

        Moreover, while an out-of-state individual may obtain a Pennsylvania

funeral license by complying with the requirements for applicants, the only way for

an out-of-state corporation to enter the funeral directing industry in Pennsylvania is to find and pay for a rare, pre-1935 license.  *Id.* ("States 'cannot impede free market forces to shield in-state businesses from out-of-state-competition,' and, notably, 'state laws that discriminate against out-of-state businesses by forcing them to 'surrender whatever competitive advantages they may possess' are especially suspect.").  Out-of-state entities that simply desire the opportunity to operate funeral homes in the same manner permitted by widows, widowers, children, grandchildren, or heirs of licensed funeral directors who are permitted to operate the same through the supervision of a licensed funeral director are prohibited from doing so by the instant section of the FDL.  For example, under the current provisions of the FDL an out-of-state corporation cannot acquire a funeral home license, unless it purchases shares in a pre-1935 funeral corporation, and subsequently hires a licensed funeral director to manage the establishment. However, an unlicensed in-state widow, widower, child, grandchild, heir, or estate of a Pennsylvania licensed funeral director is permitted to own a funeral home license and operate such an establishment, through entities other than a RBC, by simply hiring a licensed funeral director to supervise and management the establishment.

Even if heightened scrutiny did not apply, the asserted interest in allowing

such individuals to continue operation of the funeral home and ensure that pre-need funerals and at-need funerals are performed, while admittedly a legitimate local interest, is outweighed by the burdensome nature of the ownership restrictions requiring that other individuals seeking to enter the funeral market become licensed, or that corporations wishing to do the same acquire the assets of a pre-1935 corporation. Furthermore, and to reiterate, the currently permitted practice of Pennsylvania funeral directors transferring shares of RBCs to family members also demonstrates the extent to which this statutory scheme discriminates against out-of-state individuals and entities and instead promotes local interests. Section 479.8(b) states, in relevant part, "[s]uch license shall be valid only if the following conditions exist at the time of issuance of the license and continue in effect for the license period: . . . (4) All of its shareholders are licensed funeral directors or the members of the immediate family of a licensed funeral director or a deceased licensed funeral director who was a shareholder in the corporation at death." Again, the exception for a licensed funeral director's immediate family has the effect of discriminating against firms, both inside and outside of Pennsylvania, that desire to own shares of an RBC but are precluded from doing so unless such entities acquire the stock of a pre-1935 corporation. *See Cloverland*, 462 F.3d at 262 ("In deciding whether a state law discriminates against out-of-state businesses,

it is immaterial whether the statute or ordinance also burdens some in-state businesses.").

Thus, even if heightened scrutiny were inapplicable, we nevertheless find that under the *Pike* balancing test, Plaintiffs have established that the burdens imposed on out-of-state firms seeking to enter the Pennsylvania funeral industry are excessive when compared to the purported local interests that Defendants contend are advanced by the instant provisions of the FDL.

Accordingly, we shall grant Plaintiffs' motion to the extent of their Commerce Clause argument pertaining to Counts II and III, and deny Defendants' motion as to the same.  While we recognize that this ruling is dispositive, for the sake of completeness, we will proceed to analyze Plaintiffs' due process arguments as well.

### b.   Count II:  Substantive Due Process – "One-and-a-Branch"

Plaintiffs also argue in Count II that the FDL's ownership and bequest restrictions violate the Due Process Clause.  (*Id*. at 87 (citing *Nicholas v. Pa. State Univ.*, 227 F.3d 133, 139 (3d Cir. 2000) ("[A] legislative act will withstand substantive due process challenge if the government identifies a legitimate state interest that the legislature could rationally conclude was served by the statute."))).  They claim "a court applying rational-basis review . . . must strike down a

government classification that is clearly intended to injure a particular class of private parties, with only incidental or pretextual public justifications."  (*Id*. at 89 (citing *Kelo v. City of New London*, 545 U.S. 469, 491 (2005); *see also W. Va. Univ. Hosp., Inc. v. Rendell*, 2007 U.S. Dist. LEXIS 81901, at *23 (M.D. Pa. Nov. 5, 2007) ("[e]ven under the deferential rational basis standard, state laws discriminating against out-of-state residents and businesses have been viewed with particular skepticism by the courts."))).  They highlight the Board's recognition that one of the changes needed regarding the FDL is that "there be no limit on the number of funeral establishments that a person owns."  (*Id*. at 91 (citing Pl. R. 200)).  Plaintiffs also allege that contrary to Defendants' assertions, the FDL does not promote competition and fails to provide the accountability and competency that Defendants purport it does.  (*Id*. at 93).

Moreover, Plaintiffs claim that Defendants' only explanation for the rational relationship between the FDL and the prevention of market domination is that such "decentralized market structure" is "further[ed] by the FDL."  (Doc. 168 at 96 (citing *Romer v. Evans*, 517 U.S. 620, 632 (1996) ("even in the ordinary . . . case calling for the most deferential standards, we insist on knowing the relation between the classification adopted and the object to be obtained"))).  They also contend Defendants' assertion that restricting funeral directors to one-and-a-branch

58

limits the number of funerals a director may perform, is incorrect.  For example,

Board member Goldstein owns the maximum of two funerals homes and performs

approximately 1,800 funerals annually, while Plaintiff Heffner and his wife own

twelve (12) funeral homes and only handle 900 funerals per annum.  (*Id*. at 97-98

(citing Pl. R. at 1267-68, 1271-72; 5510-11)).  Plaintiffs argue that the absence of a

rational relationship between the FDL's ownership restriction and its purported

goal of preventing market domination is also belied by the fact that funeral

directors may effectively own an unlimited number of funeral homes by

transferring RBC licenses to family members.  (*Id*. at 99).  Therefore, they

maintain that limiting a funeral director to two locations does not necessarily

prevent him from obtaining a dominant market share.

   In response, Defendants argue that none of the Plaintiffs in Count II have

standing to challenge the one-and-a-branch provision because none of them

currently own or operate a branch funeral home.  (Doc. 158 at 37).  We find this

argument to be disingenuous.  Simply because some Plaintiffs have not yet availed

themselves of the opportunity to own or operate a branch location does not negate

the fact that we previously found Plaintiffs to in fact have standing to challenge

these portions of the FDL since "the threat of prosecution to [Plaintiffs] is not

imaginary or speculative." (Doc. 32 at 16).  Therefore, we reject outright and

decline to revisit this argument further.

Moreover, despite Defendants' contention that the FDL does not permit family members of a licensed funeral director to own stock in an unlimited number of Pennsylvania funeral homes, Plaintiffs nevertheless allege that Mrs. Heffner owns stock in numerous RBCs.[20]  (Doc. 168 at 97 (citing Pl. R. at 5510-11 (Ernest

---

[20]  Notably, the FDL provides that one of the prerequisites for a valid RBC is that:

[a]ll of its shareholders are licensed funeral directors or the members of the immediate family of a licensed funeral director or a deceased licensed funeral director who was a shareholder in the corporation at death.  For the purposes of this paragraph 'members of the immediate family' shall mean (i) spouse, (ii) children, (iii) grandchildren, (iv) a trustee or custodian who holds shares for the benefits of such spouse, children or grandchildren.

63 PA. STAT. ANN. § 479.8(b)(4).

The FDL also states:

[n]o licensed funeral director shall be eligible to apply for more than one restricted corporate license or own shares in more than one restricted corporation.  Nor shall any licensed funeral director who obtains a restricted corporate license or holds shares in a restricted corporation have any stock or proprietary interest in any other funeral establishment, except a branch place of practice as authorized by subsection (e) . . . .

Id. §479.8(b).  Still, Plaintiffs highlight, there is no restriction on the number of RBCs, and the shares of the same, that the family members of a Pennsylvania licensed funeral director may hold.  (Doc. 140 at 35).

As in their commerce clause argument above, Plaintiffs contend that the FDL's limitation of RBC ownership to licensed funeral directors, in conjunction with the wide exception carved out for the family members of licensed funeral directors, discriminates against out-of-state interests and, under a due process analysis, is not rationally related to a legitimate state interest. Moreover, they emphasize that the exception practically swallows the rule and any rational relationship to a legitimate state interest is belied by the reality that funeral directors easily circumvent the FDL's restrictions by transferring ownership shares to family members while continuing to manage the day-to-day operations of the facility.

Heffner deposition stating as follows: **"Q:** Second thing is, my wife, who is not a licensed funeral director, and I own and operate 12 funeral homes, 11 in Pennsylvania and one in the State of New York; is that correct?  **A:** Correct"))).  Defendants also contend that the highly localized market for funeral establishments provides a rational basis for the one-and-a-branch provision.  (Doc. 158 at 40 (citing SMF ¶¶ 408-11, 414-26)).  They also claim that allowing ownership of more than two locations in a market could result in market domination, thereby reducing competition and consumer choice.  (*Id.*).  Defendants further argue that allowing funeral directors to own more than one-and-a-branch could spread funeral directors too thin, and that the funeral industry in Pennsylvania is comprised of smaller business with a personal connection to the community.  (*Id.* at 40-41).  All of these reasons, they assert, constitute legitimate state interests rationally related to the provisions at issue.

The Fourteenth Amendment states, in relevant part, "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law . . . ."  U.S. Const. amend XIV.  Both parties agree that the right to practice one's profession, the right involved in all of Plaintiffs'

substantive due process counts, is not a "fundamental right." *Meier v. Anderson*, 692 F. Supp. 546, 550 (E.D. Pa. 1988).  When a fundamental right is not implicated, the "rational basis standard" is employed for resolving substantive due process challenges. *Lawrence v. Texas*. 539 U.S. 558, 588 (2003).  According to this standard, substantive due process rights have not been violated if the laws or regulations at issue are rationally related to a legitimate government interest. *Id.* at 578.

The legitimate state interests highlighted by Defendants are not rationally related to the FDL's restriction on ownership for funeral directors to one-and-a-branch.  We pause here to repeat the Board's own remarkable admission that one of the changes needed to the FDL is "[t]hat there be no limit on funeral establishments that a person owns . . . ."  (Pl. R. at 200).  Additionally, we find Defendants' contention that restricting a funeral director to one-and-a-branch necessarily limits the number of funerals that can be conducted, and prevents funeral directors from being stretched too thin, to lack support in the record.  As previously referenced, Plaintiffs assert that Board member Goldstein owns the maximum of two funerals homes and performs approximately 1,800 funerals annually, while Plaintiff Heffner and his wife own twelve (12) funeral homes and only handle 900 funerals.  (Doc. 168 at 97-98 (citing Pl. R. at 1267-68, 1271-72

(Bennett Goldstein deposition testimony); 5510-11 (Ernest Heffner deposition testimony))).  This example obliterates Defendants' thread-bare argument.  We also agree with Plaintiffs that the rationality of this provision is further called into question by a funeral director's ability to transfer shares of a RBC to family members, while continuing to provide services through the very same facility.

Therefore, we shall grant Plaintiffs' motion regarding their substantive due process claim in Count II and deny Defendants' motion as to the same.

### c.    Count III:   Substantive Due Process  – Ownership by Licensees

Similarly, Plaintiffs contend that Defendants' alleged rational basis for restricting ownership of funeral homes to licensed funeral directors is not related to a legitimate state interest.  (Doc. 168 at 103).  They maintain that restricting ownership of funeral homes to licensed funeral directors does not promote the goals of consumer protection, accountability, competency, trust, and accessibility because the state's requirements for operation of a funeral home are applicable regardless of who owns the establishment.  (*Id*. at 104).  For example, they note that funeral homes owned by licensed funeral directors, unlicensed widows, unlicensed executors, unlicensed family members, or an unlicensed pre-1935 corporation are all held to the same standard of conduct.  (*Id*.).  Moreover, they claim that in the case of an unlicensed widow possessing a funeral home license,

Pinkerton testified that no consumer protection concerns are raised because the
Board can revoke the widow's license or the license of the funeral director
supervising the home.  (*Id*. (citing Pl. R. at 979-82 ("It is a widow's license that
can be revoked.  A widow's license can be revoked, so it goes to the individual
licensed funeral director, the supervisor of that facility to the widow's license.")).
Thus, they claim Defendants' assertion that permitting unlicensed individuals to
own funeral homes "would make it more difficult for the Commonwealth to ensure
that those who had been disciplined as funeral directors did not return to own such
business because, by not having a license, there would be no way for the
Commonwealth to regulate participation in the profession," is disingenuous and
not rationally related to a legitimate government interest.  (*Id*. at 105 (citing Doc.
126 at 40)).  They also highlight that no provisions of the FDL prohibit a funeral
director from "hiding" behind the corporate form of the RBC and only making
sporadic visits to their funeral homes.  (*Id*. at 106).

In addition, Plaintiffs claim that Defendants' reliance on *Brown* is misplaced
because in that case fifty-eight (58) Maryland corporations issued licenses prior to
1945 were grandfathered under the current law in order to "protect reliance
interests of family members."  (*Id*. at 107 (citing *Brown v. Hovatter*, 561 F.3d 357,
369 (4th Cir. 2009))).  They emphasize that Maryland's requirement that a

corporate license be continuously renewed since 1945 lends support to the asserted

legislative intent to protect the reliance interests of family members.  (*Id*. (citing

MD. CODE ANN. HEALTH OCC. § 7-309(b)(2))).  Plaintiffs also note that Maryland

law requires a surviving spouse who acquires a deceased spouse's funeral home

license to pass an examine on state funeral law.  (*Id*. at 108 (citing MD. CODE.

ANN. HEALTH OCC. § 7-308(b))).  However, in Pennsylvania, a surviving spouse is

not required to possess knowledge about funeral directing.  (*Id*. (citing Pl. R. at

167)).  Finally, Plaintiffs claim that the "wind-down"[21] period in Maryland is only

six months, compared to three years in Pennsylvania.  (*Id*. at 109 (citing Md. Code

Ann. Health Occupations, § 7-308.1(g); 63 PA. STAT. ANN. § 479.8(a))).  They

argue that the FDL's restriction of ownership to licensed funeral directors is

illogical in light of the multitude of exceptions, including pre-1935 corporations,

estates, widows, children, and grandchildren, that practically swallow the rule.  (*Id*.

---

[21] Maryland law provides that "[w]ithin 6 months of the issuance of the surviving spouse
license, the applicant must taken the written Maryland State law examination administered by
the Board under § 7-304(b), (c), (d)(1), (e), and (f) of this subtitle."  Under the FDL:

> [u]pon the death of a license, the board shall issue a license and renewal thereof to
> his estate, only for a period not exceeding three (3) years, or widows or widowers of
> deceased licensees without time limitations, as long as they remain unmarried,
> providing the widow or widower, the executor or administrator of the estate of the
> deceased licensee's heir or heirs, informs the board, of the intent to continue practice,
> within ten (10) days and applies within thirty (30) days for a certificate of licensure.

63 PA. STAT. ANN. § 479.8(a).

at 110).  As a result, Plaintiffs maintain that the FDL's restriction is not rationally

related to the alleged legitimate government interest.

In an attempt to counter these arguments, Defendants assert that the FDL

requires licensed funeral establishments to be owned through a sole proprietorship,

partnership, widow/executor license, RBC, or a pre-1935 corporation.  (Doc. 126 at

36 (citing 63 PA. STAT. ANN. § 479.8(a), (b), and (d)).  They also reiterate that

there are exceptions, including the ability to transfer stock of an RBC to immediate

family members, and ownership of a pre-1935 corporation.  (*Id*.).  Defendants

claim that Plaintiffs fail to analyze whether the requirements of licensed ownership

are rational, and instead focus on comparing various groups and the existence of

exceptions to licensed funeral home ownership in attempting to allege a

substantive due process claim.  (Doc. 158 at 42-43 (citing *North Dakota State Bd.*

*Of Pharmacy v. Snyder's Drug Stores, Inc.*, 414 U.S. 156, 166-67 (1973))).  They

argue that nothing in the FDL prohibits a person or corporation from acquiring the

assets of a funeral establishment, and that Plaintiffs could enter the funeral industry

in this way.  (*Id*. at 43).  Defendants also claim that in order to operate, an RBC

must be licensed and its stock must be held by a licensed funeral director.  (*Id*. at

44 (citing 49 PA. CODE § 13.185 (requiring approval of the board after ownership

is changed and before operations can begin))).

66

Likewise, Defendants maintain that requiring licensure as a condition of ownership allows the Commonwealth to establish requirements and prerequisites for participation in the profession and to control the industries' operational practices, including, among others, trusting of pre-need monies and caring for the dead at a time when survivors are grief-stricken. (Doc. 126 at 40). Defendants assert that allowing unlicensed individuals or corporations to own funeral homes would make it difficult for the Commonwealth to regulate the industry. (*Id*.). For example, they argue that in the case of a widow operating a funeral home, discipline can be taken against such individuals because that person is a licensee. (*Id*. at 40-41). Defendants further claim that the winding-down of a funeral home operated by way of a sole proprietorship, partnership, or an RBC by a widow or executor, is a legitimate state interest rationally promoted by the FDL. (*Id*. at 42-43).

As in Count II, we find that the subject statute is not rationally related to the asserted state interest identified by Defendants. The limitation of ownership to licensees appears particularly arbitrary given the exception allowing untrained and unlicensed widows, widowers, and heirs of licensed funeral directors to continue operating a funeral home for up to three years, or in the case of widows and widowers, for an unlimited duration provided they remain unmarried, while at the

same time otherwise limiting ownership to licensed funeral directors.  The reality that the FDL permits such individuals to operate a funeral establishment by employing a full-time licensed funeral director to act as a supervisor, but prohibits other individuals or entities from doing the same, demonstrates that the restriction on ownership to licensees is not rationally related to the legitimate state interest of ensuring competency and accountability in the funeral industry.

In addition, Defendants' own contentions in their supporting and opposition briefs appear contradictory.  In their supporting brief, Defendants claim that one of the exceptions to licensed funeral home ownership is the transfer of stock in an RBC to immediate family members.  (Doc. 126 at 36).  However, in their opposition brief, Defendants claim that "in order to continue operations, the RBC must remain licensed and the stock of the RBC must be owned by a licensed funeral director."  (Doc. 158 at 44).  Defendants' equivocation on this issue reflects the contradictory position assumed by them herein and again demonstrates the lack of a rational relationship between the FDL's restriction of ownership to licensees and the stated goals of regulating, disciplining, and overseeing the funeral industry. Moreover, Defendants' purported interest in providing a wind-down period for family-owned funeral homes fails to justify the restriction upon ownership to licensees, because unlicensed entities and individuals owning funeral homes could

be required to employ a supervising funeral director to oversee operations during a wind-down period in the same way that widows or widowers are required to do so. Therefore, we find that the instant ownership restriction is not rationally related to the asserted governmental interest.

Accordingly, we shall grant Plaintiffs' motion regarding their substantive due process claim in Count III and deny Defendants' motion as to the same.

### 3.    Count IV:   Ownership Restrictions – Substantive Due Process[22]

Plaintiffs also argue that the FDL's ownership restrictions, and its restriction on the bequest of a funeral home, should be invalidated as a violation of the Due Process Clause.  (Doc. 140 at 87).  They contend that here, the Commonwealth has acknowledged that the FDL is designed to protect a discrete group of family-owned funeral homes.  (*Id*. at 89).  Furthermore, Plaintiffs highlight Defendants' admission that the purpose of the instant provision is to ensure that "local business is owned by local people."  (*Id*. at 90 (citing *Metro. Life Ins. Co. v. Ward*, 470 U.S.

---

[22]  Although Plaintiffs apparently premise Count IV upon the Due Process and Equal Protection Clauses, (*see* doc. 101 ¶ 237), in their supporting brief they couch their arguments concerning this claim in terms of the Commerce Clause and the Due Process Clause, with little reference to an Equal Protection claim.  (*See* Doc. 140 at 33-72; Doc. 168 at 32-95).  As a result, we shall only address Plaintiffs' arguments regarding Count IV as briefed and to the extent they are grounded in the Commerce Clause and the Due Process Clause.  Given the voluminous filings in this case, it seems apropos to remind the parties that "Judges are not like pigs, hunting for truffles buried in briefs, in the universe of legal precedent, or the record on summary judgment."  *Smith v. Central Dauphin School Dist.*, Slip Copy, 2007 WL 2262936 at *6 (M.D. Pa. Aug. 6, 2007).

869, 882 (1985) (finding state's "aim to promote domestic industry is purely and completely discriminatory" and "constitutes the very sort of parochial discrimination that the Equal Protection Clause was intended to prevent."))). Moreover, Plaintiffs once again highlight the Board's own conclusion that one of the changes needed to the FDL is that "there by no limit on [the number of] funeral establishments that a person owns." (*Id*. at 91 (citing Pl. R. at 200)). Plaintiffs reiterate their claim that the legitimate state interests identified by Defendants, including protecting local funeral homes, competition, accountability, competency, and public health, are not rationally related to the FDL's instant restriction and that Defendants fail to provide an explanation demonstrating such rational relationship. (*Id*. at 91-92).

Additionally, Plaintiffs contend that Defendants' suggestion that the FDL promotes competition is at odds with its stated goal of protecting Pennsylvania funeral directors from competition. (*Id*. at 93). They also attack Defendants' assertion that the FDL promotes accountability and competency when the statutory scheme allows the family, widows, estates of funeral directors, and pre-1935 corporations to own funeral homes without requiring that they first obtain any knowledge, skill, or training in the industry. (*Id*. at 93). Plaintiffs assert that the Board's ability to hold a funeral home accountable is unrelated to the identity of

70

the owners of the funeral home since the Board directs enforcement against an establishment's license, the supervisor of the funeral home, or the funeral directors that are employed by the funeral home.  (*Id*. at 94).  Furthermore, they claim that the ownership restrictions bear no rational relation to public health concerns since untrained relatives of a funeral director, or those owning shares of a pre-1935 corporation, can also own a funeral home.  (*Id*. at 96).

Finally, Plaintiffs claim that the ownership restrictions of the FDL prohibit funeral directors without spouses or children from passing ownership of the funeral home to siblings, cousins, life partners, business partners, or other non-licensees. (Doc. 168 at 111).  They note Defendants' only reply is that unmarried, childless funeral directors can avail themselves of alternative dispositional options other than those options available to married, child-rearing funeral directors.  In addition, Plaintiffs dismiss Defendants' suggestion that childless funeral directors who wish to bequeath a funeral home simply obtain a pre-1935 corporation, because such an option, they claim, would cost a funeral director tens of thousands of dollars just to confer the same benefit that funeral directors who are married or have children can confer for free.  (*Id*. at 112).  They claim that the issuance of an estate license upon the death of an unmarried, childless funeral director is not the same as bequeathing a license to a surviving spouse or child because an estate license is only valid for

three years and cannot be transferred to an unlicensed heir.  (*Id*.).

In countering these assertions, Defendants claim that invalidating this provision of the FDL would not provide the named Plaintiffs to this count with any relief because neither Haas nor Wachter has attempted to own a licensed funeral home, whether it be in the form of a sole proprietorship, partnership, professional corporation, RBC, or a pre-1935 corporation.  (Doc. 158 at 47-48).  Furthermore, they claim that their challenge to the FDL's restriction on bequeathing assets of a funeral home is premature because none of these individuals yet have a will.  (*Id*. at 48 (citing SMF ¶¶ 226, 233)).  Defendants contend that because the Court dismissed all equal protection claims at the dismissal stage that Count IV should consequently be dismissed.  Finally, they assert that as with Plaintiffs' substantive due process claim in Count III, Plaintiffs' attempt to prove an equal protection claim by comparing themselves to licensed funeral directors who created RBC's is inapt.  (*Id*.).

Applying the rational basis standard, we find that Plaintiffs have demonstrated that the purported justification for the provisions of the FDL limiting the bequest of a funeral home to surviving spouses and children is not rationally related to the legitimate state interests that Defendants highlight.  We also find that the FDL's restriction upon the bequest of a funeral home by an unmarried and

childless funeral home director to another individual, while married funeral

directors with children are afforded the opportunity to bequeath such assets to a

surviving spouse or children, is not rationally related to a legitimate state interest.

Therefore, we shall grant Plaintiffs' motion to this extent and deny Defendants'

motion as to the same.

**4.   Count V: Undue Restriction on Place of Practice &
Count VI: Undue Requirement of "Full Time" Supervisor**

**a.   Commerce Clause**

Plaintiffs further argue that the FDL's place of practice restriction and full-

time supervisor requirement violate the Commerce Clause.  (Doc. 140 at 97-99

(citing 63 PA. STAT. ANN. § 479.7, § 479.8(e))).  They claim that the restrictions

discriminate against out-of-state interests in both purpose and effect because, for

example, a funeral director who practices at one location in another state cannot

practice in Pennsylvania because this would constitute practicing at a second

location, which is not a Pennsylvania branch.  (*Id*.).  Likewise, a funeral director

who supervises a funeral home in another state cannot be a full-time supervisor of

a Pennsylvania funeral home.  (*Id*. at 99-100 (citing Pl. R. at 10552-53 (noting that

Leonard Terranova was denied an application seeking a license as a funeral

supervisor because he was already managing a funeral home in New Jersey, a

position equivalent to a funeral supervisor in Pennsylvania))).

In addition, Plaintiffs claim that the place of practice restriction and full-time supervisor provision discriminate against out-of-state interests by eliminating the competitive advantage that could be achieved through clustering. (*Id*. at 100). They argue that the FDL prohibits clustering because it precludes sharing of personnel between multiple locations. The result, Plaintiffs contend, is that a firm attempting to cluster in Pennsylvania is required to hire more personnel at greater expense. (*Id*. at 101). They cite Dr. Harrington's expert report where he opined that "these provisions limit the extent to which the services of a funeral director can be shared across a cluster of funeral homes, dramatically reducing the potential savings from clustering funeral homes." (*Id*. (citing Pl. R. at 343 (David Harrington expert report))). Notably, Plaintiffs highlight a legislative initiative submitted to the Governor on behalf of the Board, which stated:

> Because many funeral homes have a very low call volume and it is not economically feasible to have a funeral director employed on a full-time basis, the Board would like to amend the [FDL] to authorize the Board to permit a funeral director to supervise more than one funeral establishment where the combined call volume is sufficiently small so that the supervising funeral director would be available at all supervised locations as needed.

(*Id*. at 101-02 (citing Pl. R. at 3237 (State Board of Funeral Directors Legislative Initiative))). However, they maintain that the draft legislation was crafted to allow only a licensed funeral director to supervise a principal funeral home and that

establishment's branch, thus limiting firms outside of Pennsylvania that are attempting to cluster in Pennsylvania from achieving desirable economies of scale. (*Id*. at 102-03).

Plaintiffs claim that even if the place of practice restriction and full-time supervisor requirement are determined to be non-discriminatory, these provisions must nevertheless be invalidated under the *Pike* balancing test. They assert that the burdens imposed on funeral directors and consumers as a result of these requirements are substantial. For example, Plaintiffs highlight Dr. Harrington's report where he concluded that the place of practice restriction and full-time supervisor requirement cost Pennsylvania consumers $550 per funeral. (*Id*. at 104 (citing Pl. R. at 351(Dr. Harrington's expert report))). Moreover, funeral homes are compelled to increase the price of each funeral they perform because the limitations on funeral directors traveling to different funeral homes reduces the number of funerals each establishment is able to conduct. They also emphasize the Board's acknowledgment that a funeral home is required to employ a full-time supervisor "even if there is no business available to justify the employment." (*Id*. (citing Pl. R. at 3238 (State Board of Funeral Directors Legislative Initiative))).

In comparison to the substantial burdens on funeral directors, Plaintiffs claim, the benefits conferred are weak or non-existent. (*Id*.). They argue that

Defendants' reliance on competency, public health, accountability, and competition, as justifications for the law, are insufficient to support the burdens placed on funeral directors.  (*Id*.).  Specifically, Plaintiffs contend that the restrictions fail to ensure that there are a sufficient number of funeral directors at funeral homes to complete the work, and in fact, the provisions actually hinder such goals by limiting the locations where a funeral director can practice.  Pointing to the disparate impact of such regulations, they claim that for Plaintiff Heffner's funeral home in Renovo, Clinton County, this requires staffing a full-time supervisor for a home that performs 25-35 funerals per year, while for Board member Goldstein's funeral home in Philadelphia, it fails to ensure that adequate personnel are staffing his home which performs approximately 1,000 funerals per year.  (*Id*. at 105-106 (citing Pl. R. at, 6597 (David Halpate deposition); 1268-69, 1274. 5392 (Heffner deposition))).  As a result, Plaintiffs maintain that the restrictions fail to ensure competency in the profession.

Plaintiffs further claim that a funeral director's attention to health concerns is unrelated to the number of funeral homes where he can practice, but is related to an individual's skill and workload at a particular location.  (*Id*. at 107).  Concerning accountability, they highlight that funeral directors are subject to the same professional standards regardless of where, or at how many locations, the

funeral director practices. (*Id*. at 107). Finally, they argue that prohibiting a funeral director from practicing at more than a principal location and a branch site inhibits competition. (*Id*.). Plaintiffs contend that simply because the place of practice restrictions apply to all funeral homes in Pennsylvania does not alleviate the burden on interstate commerce because, as the *Carbone* court stated, an ordinance is "no less discriminatory because in-state or in-town processors are also covered." (Doc. 168 at 115 (citing *C & A Carbone v. Town of Clarkstown*, 511 U.S. 383, 391 (1994))). Furthermore, they highlight that in *BPOA v. Hunsicker*, the Board recognized the tension between the ostensibly contradictory provisions of the FDL, which prohibit a funeral director from practicing at a location other than the one listed on his license, and the provision permitting funeral directors to assist other funeral directors. (*Id*. at 117). Despite the Board's finding that Hunsicker did not violate the FDL, they contend that Plaintiffs herein legitimately fear prosecution for practicing extensively at a third location when the FDL fails to define what constitutes acceptable levels of "assistance."

Defendants respond that Plaintiffs' facial argument, that a funeral director who practices at more than one location in another state cannot practice in Pennsylvania, is without merit. (Doc. 158 at 98-99). Specifically, they claim Plaintiffs admit that they have practiced funeral directing in a number of locations

without prosecution by the Board.  (*Id*. (citing SMF ¶¶ 450-58)).  Additionally,

Defendants argue that the FDL expressly authorizes reciprocal licensure of funeral

directors with other states, which permits funeral directors to practice at locations

in Pennsylvania and in other states.  (*Id*. at 99 (citing 63 PA. STAT. ANN. §

479.13(a))).  They highlight that 63 PA. STAT. ANN. § 479.13(a) states "no person

shall practice as a funeral director as defined herein, in this Commonwealth unless

he holds a valid license so to do as provided in this act."  (*Id*.).  Defendants further

emphasize that the FDL does not regulate the practice of funeral directing in other

states, and thus does not prevent Plaintiffs from practicing in other states so long as

they satisfy the requirements of those states.

Defendants argue that Wellman, for example, has not provided any support

for its position that it enjoys a competitive advantage over a Pennsylvania

corporation because it can cluster resources in Louisiana.  (*Id*. at 101).  They also

challenge Dr. Harrington's conclusion that restrictions on the locations where a

funeral director may practice are statistically relevant in reaching his conclusion

that Pennsylvania consumers pay more for funeral services.  Under the *Pike*

balancing test, Defendants contend that there are no burdens because the FDL does

not restrict the number of locations at which a Pennsylvania licensed funeral

director may practice.  Furthermore, Defendants claim that the definition of full-

time supervisor illustrates that funeral directors may perform other tasks, provided any additional activities do not substantially interfere with or prevent the supervision of the funeral establishment that he or she supervises. (Doc. 126 at 48 (citing 63 PA. STAT. ANN. § 479.2(11))).

We find Defendants' unsubstantiated attempts to claim that Plaintiffs are permitted to practice funeral directing at more than one principal location and a branch location, or at any location other than those listed on the funeral director's license, to once again be rather uncandid.  The FDL provides specifically, in section 479.7, that "[a] license shall authorize the conduct of the profession at the particular place of practice designated therein and no other, . . . ."  63 PA. STAT. ANN. § 479.7.  While we do not find that the instant provision discriminates against out-of-state interests in its purpose or effect to the same extent as the provisions dealing with restrictions upon ownership to licensees, we nevertheless find under the *Pike* balancing test that the alleged legitimate state interests are outweighed by the burdens on out-of-state interests.  For example, the Board itself recognized that there is clearly an inherent contradiction between the FDL's prohibition of a funeral director practicing at a location other than that listed on his or her license, and the provision permitting one funeral director to assist another funeral director. (Doc. 136-1 at 139-46 (citing *BPOA v. Hunsicker* (finding on the

facts of this case that a licensed funeral director's assistance at another funeral establishment not identified on his license did not cause his conduct to become "the conduct of a separate funeral establishment."))).  Thus, the Board's own recognition that the FDL requires clarification in this area so that in-state and out-of-state interests are not burdened by the threat of prosecution for engaging in the practice of funeral directing at a separate funeral establishment, illustrates the burdens placed upon out-of-state interests seeking to engage in funeral directing in Pennsylvania.  (*See* Pl. R. at 10552-53 (noting that Leonard Terranova was denied an application seeking a license as a funeral supervisor because he was already managing a funeral home in New Jersey, a position equivalent to a funeral supervisor in Pennsylvania)).

We agree with the Board admission as just noted, and in fact find this area to be strikingly obscure.  Therefore, we conclude that the burden imposed by the current statutory scheme, to the extent it renders unclear what activities can and cannot be prosecuted under the statute, outweighs the purported state interests.  Given the Board's own recognition that requiring a full-time licensed funeral director to act as a supervisor at each funeral home makes little sense, we decline to find that the Board's interest in furthering the goals of competency, public health, accountability, and competition are sufficiently strong to outweigh the

attendant burden on out-of-state interests imposed by this requirement.

Accordingly, we shall grant Plaintiffs' motion as to their commerce clause arguments in Counts V and VI, and deny Defendants' motion concerning the same. While we recognize that this ruling is dispositive, for the sake of completeness, we will proceed to analyze Plaintiffs' due process arguments as well.

### b.    Due Process

Similarly, Plaintiffs contend that the place of practice restriction and the full-time supervisor requirement are not rationally related to a legitimate government interest.  (Doc. 140 at 108).  As above, they claim that Defendants fail to explain how the subject regulations concerning where a funeral director may practice are rationally related to, or further the stated goals of, competency, health, accountability, and competition in the industry.  Plaintiffs also highlight that the exception in the FDL from the full-time supervisor requirement for sole proprietorships and partnerships demonstrates that the restrictions are not rationally related to the goals Defendants present.  (*Id*. at 110).  Despite Defendants' contention that sole proprietors and partners themselves supervise the funeral home, Plaintiffs again note the case of Terranova, who surrendered his RBC license and obtained a sole proprietor license in the same name.  The significance is that under the RBC, a funeral home is required to have a full-time supervisor,

while under a sole proprietorship, there is no such requirement.  Thus, Terranova

was able to continue managing a funeral home in New Jersey while at the same

time owning and operating a funeral home in Pennsylvania as a sole proprietor.

Although he was initially denied a supervisor's license for his RBC in

Pennsylvania, because he was already managing a New Jersey funeral home, he

was nevertheless able to circumvent the supervisor requirement by surrendering his

RBC license and instead registering his Pennsylvania funeral home as a sole

proprietor, which does not include the supervisor requirement.  (*Id*. at 111).

Furthermore, Plaintiffs highlight that Defendants merely provide a rational

basis for requiring supervision of facilities, not for restricting supervisors to one

funeral home or requiring a full-time supervisor even when the volume of business

fails to justify the same.  They also argue that if a funeral director can simply

"assist" at additional locations, the benefits Defendants claim are furthered by the

FDL in limiting funeral directors to two locations, are illusory.  (Doc. 168 at 125).

In response, Defendants argue that the FDL permits a licensed funeral

director to provide services in multiple places and for multiple funeral

establishments.  (Doc. 126 at 45).  They cite section 479.7 which states:

> [t]his provision shall not prevent a person licensed for the practice of
> funeral directing from assisting another duly licensed person, partnership
> or corporation in the conduct of the profession in an approved funeral
> establishment nor shall it prevent a person licensed for the practice of the

82

> profession from conducting a funeral at a church, a private residence of the deceased, or an approved funeral establishment.

(*Id*. at 45 (citing 63 PA. STAT. ANN. § 479.7)).  As a result, they claim that §479.8(e) does not prevent licensed funeral directors from working at other funeral homes, but only limits the licensee to two physical establishments, namely, the principal and branch places of business.  (*Id*. at 45).  Defendants note that Plaintiffs such as Heffner and Cavanagh, licensed funeral directors employed by funeral homes with multiple locations, have not been prosecuted for providing services at multiple locations.  They point to the Board's previous decision in *BPOA v. Hunsicker* as evidence that the Board has already decided the issue of practicing at multiple locations.

Similar to our commerce clause analysis above, we find that Defendants' asserted goals of competency, public health, accountability, and competition are not rationally related to the restrictions contained in the FDL pertaining to place of practice and full-time supervisors.  Accordingly, we shall grant Plaintiffs' motion to this extent and deny Defendants' motion as to the same.

### 5.   Count VII:  Undue Requirement that Every Establishment Include a Prep Room

#### a.   Commerce Clause

Plaintiffs also claim that the FDL's requirement that every funeral home

83

have a separate embalming preparation room violates the Commerce Clause.  (Doc.

140 at 112).  They note that section 479.7 states:

> [E]very establishment in which the profession of funeral directing is
> carried on shall include a preparation room, containing instruments and
> supplies necessary for the preparation and embalming of dead human
> bodies and be constructed in accordance with sanitary standards
> prescribed by the board, for the protection of the public health.

(*Id*. (citing 63 PA. STAT. ANN. § 479.7)).

Consistent with their earlier arguments, Plaintiffs maintain that the FDL's

requirements concerning preparation rooms burden competitors seeking to enter

the Pennsylvania funeral industry and perpetuate the protection of small, family-

owned funeral homes.  (*Id*.).  They highlight the Board's recognition that "[t]here

is a significant trend in the industry to consolidate embalming operations, resulting

in many funeral establishments never actually using the preparation room."  (*Id*. at

113 (citing Pl. R. at 536)).  Thus, Plaintiffs assert that the FDL discriminates

against out-of-state competition by constricting their ability to employ a centralized

embalming facility and instead mandating that every location have a separate

preparation room, regardless of whether it will be used.  (*Id*. at 113-14 (citing *Tri-*

*M Group, LLC v. Sharp,* 638 F.3d 406, 428 (3d Cir. 2011)("[S]tatutes that increase

out-of-state competitors' costs are subject to heightened scrutiny."))).  Plaintiffs

also cite the Audit Report which noted "[a]ccording to the PFDA, the cost to

construct and equip a preparation room to meet Board standards is $40,000 to $50,000 . . . ." (*Id*. at 114 (citing Pl. R. at 171)). Plaintiffs argue that to build and equip a new preparation room today would cost between $193,000 to $223,000. (*Id*. (citing Pl. R. at 5620, 9416-20, 5809)). In addition, they claim the Board noted that allowing the use of a centralized preparation room was one of the modifications needed to the FDL, and that "[n]ot every funeral home needs a preparation room as required by existing law. A centralized embalming facility makes a lot more sense, according to the way this business is conducted today." (*Id*. at 115 (citing Pl. R. at 201, 242)). They also note the Board's recognition that eliminating this requirement would "reduce costs of doing business without substantially impairing protection of the public." (*Id*. at 116 (citing Pl. R. at 536)).

Notwithstanding the Board's recognition that the requirement should be altered, Plaintiffs highlight that the Board's proposed legislation would only permit a principal funeral establishment and its branch location to share a centralized embalming facility. (*Id*. at 117). Thus, they assert that the proposed amendment would only perpetuate the protectionist scheme already advanced by the FDL. (*Id*. at 118). In addition, Plaintiffs maintain that the same list of legitimate state interests that Defendants previously asserted are furthered by this provision, are inadequate in light of the excessive burden on out-of-state interests. (*Id*. at 119).

In particular, they contend that the requirement of a preparation room does not ensure competency or accountability.  Plaintiffs highlight the inequity of allowing funerals to be conducted at churches and private residences, where there are no preparation rooms, but requiring that every funeral home be equipped with one even if it is never used.  (*Id*. at 121 (citing 63 PA. STAT. ANN. § 479.7)).

Defendants counter these assertions by claiming that because funeral directors take precautions to protect themselves from diseases possibly carried by the deceased body, and since they employ toxic and hazardous chemicals to disinfect, sanitize, and prepare the dead, that it is rational, reasonable, legitimate, and necessary to require that every funeral home have access, on site, to a preparation room.  (Doc. 126 at 51-53).  They claim such requirement guarantees that a licensed funeral director will have access to the facilities needed to prepare the dead and that such person will bear responsibility for the quality and condition of the preparation room.  (*Id*. at 53).  In addition, Defendants argue that many states have a similar requirement.  (*Id*.).

As above, the Board's own positions contradict the arguments asserted herein by Defendants.[23]  In light of the Board's recognition that requiring every

---

[23]  Simply put, Defendants' arguments are once again rendered unavailing by the Board's meandering and illogical positions.  Dead bodies are daily being embalmed at one location and then flown, sometimes intercontinentally, to another location.  At times the remains may even changes planes en route to their final destination.  All of this is the result of what we presume are

funeral home to maintain and equip a preparation room is unnecessary, and that allowing the use of centralized facilities has already become commonplace and would reduce costs in the industry without adversely affecting the public interest, we again find that Defendants' purported interest in requiring every funeral home to maintain and equip a preparation room is outweighed by the burden this places upon out-of-state interests.  In particular, and as noted, Plaintiffs indicate that the cost of constructing and equipping a preparation room could be as much as $190,000 to $220,000.  As Defendants have failed to demonstrate that the public interest in requiring each funeral home to equip and maintain a preparation room outweighs the burdens placed upon out-of-state interests by the same, we find that this requirement also runs afoul of the Commerce Clause.

Thus, we shall grant Plaintiffs' motion as to their commerce clause argument in Count VII, and deny Defendants' motion concerning the same.   While we recognize that this ruling is dispositive, for the sake of completeness, we will proceed to analyze Plaintiffs' substantive due process arguments as well.

### b.      Substantive Due Process

Plaintiffs also contend, under the Due Process Clause, that mandating a

---

long distance, coordinated logistical arrangements made by both licensed funeral directors and others, and reflect the realities of business, commerce, and modern transportation modalities. The Defendants' arguments appear to presume the handling of dead bodies in a manner more consistent with the practices of the nineteenth century than those of the twenty-first century.

preparation room is meaningless if it is never used, and that such a requirement does not ensure that a funeral director personally embalms the body at that facility. (Doc. 168 at 132).  They argue that Defendants fail to provide a justification for not extending the repeal of this restriction beyond the principal and branch locations in order to allow three or more funeral homes to share a centralized facility.  (*Id*. at 133).  Plaintiffs focus on the Board's acknowledgment of the "significant trend" in the funeral industry toward centralized embalming facilities. (*Id*.).  They claim that requiring funeral homes to expend substantial sums of money for construction and maintenance of a separate preparation room, while acknowledging the industry trend toward centralized embalming facilities, represents irrationality in its most extreme.  (Doc. 140 at 124-25).  Plaintiffs maintain that despite their admission that having access to a preparation room is rational, reasonable, and legitimate, such recognition does not necessarily mean that a preparation room is required at every funeral home in the Commonwealth. (*Id*. at 125).  They contend there is no rational relationship between providing access to preparation rooms and requiring that funeral homes expend unnecessary funds on the same when the Board recognizes that many existing preparation rooms remain largely unused, and when such costs are merely passed on to consumers.

Defendants raise the same response in opposition as in the previous section. Here again, it does not move us.  As a result, we find that given the Board's admission that requiring each funeral home to equip and maintain a preparation room is unnecessary, and that the use of centralized embalming facilities can be employed without harm to the public or the services provided, that any interest Defendants have in maintaining a preparation room at each funeral home is not rationally related to the requirement at issue herein.[24]

Consequently, we shall grant Plaintiffs' motion as it relates to their substantive due process argument in Count VII, and deny Defendants' motion as to the same.

### 6.     Count VIII:  Undue Restriction on Food

Plaintiffs also move for summary judgment on their claim that the FDL imposes an undue restriction upon food in funeral homes.  (Doc. 140 at 126).  They highlight section 479.7 which states, "[n]o food or intoxicating beverages shall be served in any funeral establishment in which the profession of funeral directing is carried on.  Beverages, if served, must be restricted to a separate room not used for the preparation and conduct of a funeral service."  (*Id.* (citing 63 PA. STAT. ANN. §

---

[24]   While we find for the Plaintiffs on this issue based on the facts before us, we express no opinion as to whether any limitation on centralized embalming facilities is per se unconstitutional.

479.7)).  Plaintiffs also contend that the Board previously directed former Board counsel Thomas Blackburn to draft a regulation eliminating the food prohibition. (*Id*. at 127).  They claim that the regulatory analysis for the proposed regulation stated, "[a]lthough food and beverages should not be served in the preparation room, there is no reason why the service of food should be completely prohibited in a funeral establishment."  (*Id*. (citing Pl. R. at 3531, 3587)).  Plaintiffs point to Dr. Wecht who testified that "[f]rom a public health perspective, I find no medical or scientific merit in the argument that serving food at a funeral home would constitute a potential public health risk" and "[d]istinguishing between foods and beverages in this manner is obviously illogical" because hygiene concerns attributable to food would also apply to beverages.  (*Id*. at 129 (citing Pl. R. at 412-413)).  Plaintiffs also highlight that funerals which host open-casket viewing may be held in a church, and the same facility may host a reception that includes food. (*Id*. at 130).

In addition, they claim that the only rationale for the restriction provided by Defendants are quotations from Board members regarding their personal position against food service in funeral homes.  (*Id*. at 131-32 (citing *Sweezy v. New Hampshire*, 354 U.S. 234, 267 (1957) (noting that due process must be "founded on something much deeper and more justifiable than personal preference."))).

90

Moreover, Plaintiffs note that the exception Board member Pinkerton attempted to create for families who bring food into a funeral home is insufficient to save the statute and establish a rational basis for the same.  (*Id*. at 133 (citing Pl. R. at 1037-38; 2288-89 (Commissioner Merenda testifying that his understanding of the statute is that a family can bring food into a funeral home, but a funeral director cannot provide food to the family))).  In sum, Plaintiffs argue that section 7 of the FDL provides for a complete prohibition on food in funeral homes.

In response, Defendants argue that the Board has never disciplined anyone for bringing food into a funeral establishment.  (Doc. 126 at 54-55).  They contend that nothing in the FDL prohibits funeral directors from owning or operating a food service or catering business on the same parcel of land or in a building connected to a funeral home so long as the food is not served in an area designated as part of the "funeral establishment," defined as the "place or premise approved by the State Board of Directors wherein a licensed funeral director conducts the professional practice of funeral directing including the preparation, care and funeral services for the human dead."  (*Id*. at 55-56 (citing 63 PA. STAT. ANN. § 479.2(6))).  Moreover, Defendants claim that rooms or areas of a building can be excluded from the definition of "funeral establishment," and these areas can be utilized to provide such food services.

Defendants further note that so long as funeral directors satisfy the applicable health and food safety laws, providing food services in an area other than that designated as part of the "funeral establishment" is permissible.  (*Id*. at 56).  They contend a rational basis exists for prohibiting food service in areas designated as part of the "funeral establishment" because funeral directors embalm dead human bodies and employ toxic and hazardous materials posing a health risk to others based on the viruses, bacteria, and other pathogens that a dead body may carry.  (*Id*. at 57).  Finally, Defendants maintain that all of the Plaintiffs, except for JMFH, lack standing.  (Doc. 158 at 56).

Here, as above, we find the Board's own recognition in proposed regulatory amendments that "there is no reason why the service of food should be completely prohibited in a funeral establishment" to be indicative of the lack of a rational relationship between this restriction and the purported state interest.  (Pl. R. at 3531, 3587).  Furthermore, despite Defendants' claim that Plaintiffs are currently permitted to provide food services in areas connected to and even under the same roof as a funeral establishment, so long as those areas are not designated as part of the funeral establishment, this explanation fails to explain why prohibiting food services in funeral establishments is rationally related to the asserted state interests. Although Defendants cite a funeral directors' responsibility to embalm dead human

bodies with toxic and hazardous chemicals as the legitimate state interest underlying the prohibition of such services, they nevertheless fail to explain how the use of such chemicals in one part of the "funeral establishment" would necessarily contaminate other areas of the establishment providing food service that have nothing to do with preparation of dead bodies.

In addition, we find Defendants' contention that funeral directors are already permitted to serve food in areas under the same roof or connected to "funeral establishments," provided such areas satisfy state and local health and food safety regulations, to inherently contradict their purported rationale for the instant prohibition.  Defendants' logic seems to suggest that if rooms A and B were next to each other under the same roof, and room A, a preparation room, was part of the licensed "funeral establishment," but room B was not, that a funeral director could provide food services in room B.  The same rationale would preclude room B from being used for food service if room B were simply characterized as a room where "the professional practice of funeral directing, including the preparation, care and funeral services for the human dead" was conducted.  *See* 63 PA. STAT. ANN. § 479.2(6).  Although we quite obviously understand the reason for precluding food services in the same rooms where preparation of the human dead takes place, we presume that some rooms in a "funeral establishment," particularly those employed

93

for general "funeral services for the human dead," include rooms other than the preparation or embalming rooms and include rooms in which dead bodies are never present. Thus, we find that under the hypothetical above, room B could reasonably be included in the area licensed as a "funeral establishment," when in reality deceased bodies are never cared for in such rooms. Hence, any rational relationship between the FDL's restriction on food service in such areas, and preventing potential contamination of food from toxic or hazardous chemicals, appears strained. In addition, we find the distinction between allowing beverages in "a separate room not used for the preparation and conduct of a funeral service," while permitting a room under the same roof as a "funeral establishment" to serve food, but which is not licensed as an area where "preparation, care and funeral services for the human dead" are conducted, to constitute a distinction without a difference.

Therefore, we shall grant Plaintiffs' substantive due process claim in Count VIII and deny Defendants' motion regarding the same.

### 7. Count IX: Infringement on Commercial Speech

Plaintiffs also move for summary judgment claiming that the FDL's restriction on funeral home names violates the First Amendment. (Doc. 140 at 136). They highlight that the FDL permits a funeral home to be operated under the

name of the current licensed funeral director or the name of a predecessor funeral

director.  (*Id*. at 137 (citing 63 PA. STAT. ANN. §§ 479.8(a), (b), (d), 479.9(a); 49

PA. CODE § 13.158a)).  Plaintiffs emphasize that only a sole proprietorship or

partnership utilizing a predecessor name is required to disclose the name of the

current owner when advertising.  (*Id*. (citing 63 PA. STAT. ANN. § 479.8(a))).  On

the other hand, corporate funeral homes operating as an RBC, professional

corporation, or a pre-1935 corporation, which employ a predecessor name, are only

required to disclose the name of the home's supervisor.  (*Id*. (citing 479.8(b), (d),

(d), 479.9; 49 PA. CODE §§ 13.83-84)).  Finally, a funeral home operating through

a widow or estate license must maintain the predecessor's name of the funeral

home.  (*Id*. (citing 49 PA. CODE § 13.158a)).

Plaintiffs note that the FDL's ban on trade names is evaluated under the

four-prong test of *Central Hudson*, which asks first "whether the commercial

speech concerns unlawful activity or is misleading."  (*Id*. at 138 (citing *Central

Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 566 (1980))).  If

the speech is not unlawful or misleading, the second prong is "whether the asserted

governmental interest is substantial."  (*Id*. (citing *Central Hudson*, 447 U.S. at

566)).  Assuming it is, the third steps asks "whether the regulation directly

advances the governmental interest asserted," and the fourth step evaluates

"whether it is not more extensive than is necessary to serve that interest."  (*Id*. (citing *Central Hudson*, 447 U.S. at 566)).

Regarding the first element, Plaintiffs contend there is nothing inherently misleading about trade names.  (*Id*. at 139 (citing *Pub. Citizen Inc. v. La. Atty. Disciplinary Bd.*, 632 F.3d 212, 219 (5th Cir. 2011))).  They maintain that conducting business under a trade name is no more deceptive than operating under a predecessor's name because registration of trade names requires more disclosure. (*Id*. at 140).  Plaintiffs further argue that Defendants provide no evidence demonstrating that trade names are deceptive.  (*Id*. at 141 (citing *Alexander v. Cahill*, 598 F.3d 79, 95 (2d Cir. 2010) (striking ban on attorney trade names given the "dearth of evidence . . . that consumers have, in fact, been misled."))).  They maintain that the mere fact fictitious names do not identify the owner of the funeral home fails to render the same inherently misleading under the first element.  (Doc. 168 at 141).

As to the second element, Plaintiffs assert that the only substantial interests Defendants highlight are "providing accurate and not misleading information to the public" and "consumer protection."  (Doc. 140 at 142 (citing *Edenfield v. Fane*, 507 U.S. 761, 768 (1993) ("[T]he *Central Hudson* standard does not permit us to supplant the precise interests put forward by the State with other suppositions.

96

Neither will we turn away if it appears that the stated interests are not the actual interests served by the restriction.")))  They claim that the interests asserted are actually contrary to the instant restriction.  For example, Plaintiffs maintain that allowing a funeral home to operate under a predecessor name, without disclosing the current owner, fails to promote accountability or consumer protection.  They note Chairman Yeosock's testimony that the interest promoted by the predecessor provision is to allow a current owner to retain the goodwill of the prior funeral home.  (*Id*. at 143-44 (citing Pl. R. at 780)).  Plaintiffs imply that while this makes logical sense from an owner's perspective, it also eviscerates Defendants' arguments regarding accountability.

Regarding the third element, Plaintiffs claim that the State has failed to prove that the FDL's ban on trade names directly advances the purported goals of ensuring accurate information or consumer protection.  (*Id*. at 144-45).  They claim Defendants' argument that prohibiting the use of trade names prevents chains like SCI from buying small, family-owned funeral homes, and subsequently misleading consumers by using the family name, lacks merit and does not prove that the statute directly advances the asserted interests.  (*Id*. at 145 (citing Pl. R. at 9618-20, 9584)).  For example, Plaintiffs claim that SCI purchased Defendant Pinkerton's funeral home and operates it under the name of Orion C. Pinkerton Funeral Home,

Inc. (*Id*.). They also highlight that a number of Board members operate funeral homes that have retained the name of a predecessor corporation, or funeral corporations whose names are comprised of numerous pre-1935 funeral corporations merged together. (*Id*. at 146-47 (citing Pl. R. at 1310-13) (Goldstein explaining that no one named Rosenberg, Raphael, or Sacks owns or works at the funeral home bearing the name "Goldsteins', Rosenberg's, Raphael-Sacks, Inc.")). Significantly, Plaintiffs contend, no consumers are harmed by the use of fictitious names because establishments are encouraged to provide high quality services to maintain the reputation and goodwill associated with their name.

Plaintiffs highlight the prosecution of William Sucharski who operated Delaware Valley Cremation Center ("DVCC"), and was charged with the unlicensed practice of funeral directing and aiding and abetting DVCC based upon the use of the DVCC name. (*Id*. at 148). They claim that Sucharski lost the goodwill he established over the course of many years operating as DVCC, because the Board required that he cease and desist from engaging in funeral directing under the DVCC name. (*Id*. at 149). They also note the case of Jefferson Memorial Park, which, after acquiring a pre-1935 license, constructed a funeral home on cemetery property and wished to include Jefferson in its name. (*Id*. at 151 (citing Pl. R. at 5724-25)). To do so, the cemetery conducted a statewide

search for a funeral director named Jefferson.  After that failed, it convinced Jan

Beichler, the funeral director who was to supervise the funeral home, to change her

last name to Jefferson.  (*Id.* (citing Pl. R. at 5716)).  She agreed, and after she

changed her last name the cemetery sold her one share of stock in the funeral home

and applied to change its name from the David G. Frankenfeld Funeral Home to

Jefferson Memorial Funeral Home, which the Board subsequently granted.[25]  (*Id.*).

Thus, Plaintiffs contend that such irrational results demonstrate that the prohibition

on trade names does not directly further a substantial governmental interest.  (*Id.*).

Finally, as to the fourth element, Plaintiffs argue that a ban on trade names

fails because the total prohibition is more extensive than necessary.  (*Id.* at 152

(citing *Pitt New v. Pappert*, 379 F.3d 96, 108 (3d Cir. 2004) (noting that the fourth

prong of *Central Hudson* "does not requirement government to use the least

restrictive means to achieve its goals, but it does demand a reasonable fit between

the legislature's ends and the means chosen to accomplish those ends."))).  They

argue that the prohibition on trade names excludes the marketing of accurate and

honest information.  For example, Plaintiffs contend that the Board already

possesses the power to suspend, revoke, or refuse to grant or renew a license if an

applicant or licensee provides the public with false or misleading information.  (*Id.*

---

[25]  This example would be comedic were the matter *sub judice* not so critical.

at 153 (citing 63 PA. STAT. ANN. § 479.11(a)(4))).  Moreover, in order to obtain

approval for a name change an applicant must submit to the Board letterhead, a

statement of funeral home goods, and a telephone listing, all of which display the

name of the funeral home.  (*Id*. at 153-54 (citing 49 PA. CODE §§ 13.91, 13.117)).

Finally, the Board must approve any name change.  (*Id*. at 154).

To counter, Defendants rely on *Zauderer v. Office of Disciplinary Counsel

of Supreme Court of Ohio*, where the Court found that requiring an attorney to

disclose to clients that they may have to bear certain expenses if their case is lost

did not restrict commercial speech but "required [attorneys] to provide somewhat

more information than they might otherwise be inclined to present."  (Doc. 126 at

73-73 (citing 471 U.S. 626, 637, 650 (1985)).  They highlight that the *Zauderer*

Court concluded, "in virtually all our commercial speech decisions to date, we

have emphasized that because disclosure requirements trench much more narrowly

on an advertiser's interests than do flat prohibitions on speech, 'warning[s] or

disclaimer[s] might be appropriately required . . . in order to dissipate the

possibility of consumer confusion or deception."  (*Id*. at 74 (citing *Zauderer*, 471

U.S. at 651)).  Defendants also cite *Kleese v. Pennsylvania State Board of Funeral

Directors* for the proposition that a disclosure requirement, such as one directing

that a funeral establishment include the name of the supervising funeral director in

its advertisements, does not violate a businesses' commercial free speech rights because such regulations are "reasonably related to the state's interest in preventing deception of consumers." (*Id*. (citing 738 A.2d 523, 526-27 (Commw. Ct. 1999))).

Concerning the first element of the *Central Hudson* test, Defendants assert that this test only applies to lawful or non-misleading speech. (Doc. 126 at 85). Thus, they argue that because section 479.8 (a, b, d) requires disclosure of truthful information, including that an owner identify themself in advertising, the use of fictitious names would yield misleading speech. (*Id*.). Defendants contend that since *Central Hudson* does not apply to false or misleading speech, it is inappropriate to apply the same to the trade name restriction in the FDL. For example, Defendants argue that the fictitious name Sucharski employed, Delaware Valley Cremation Society ("DVCS"), is misleading, because it does not identify Sucharski and suggests that the "society" has a membership or is comprised of an organized group of individuals or entities working together. (Doc. 158 at 120-21). They also contend that the use of "Delaware Valley" misleadingly suggests approval by the Board of Sucharski's geographic exclusivity in this region.

As to the second element, Defendants claim that the State has a substantial interest in consumer protection, accountability, and accurate disclosure of

information concerning the name of the licensed funeral director that owns the

funeral establishment.  (Doc. 126 at 86).  Allowing fictitious names, they argue,

would obscure the identity of the owner of the funeral establishment.  (*Id*. at 87).

Regarding the third element, Defendants assert that requiring funeral directors to

identify who is responsible for the facility advances the State's interest in

consumer protection, because it allows Defendants to monitor the funeral industry

and enforce the FDL.  (*Id*. at 89-90).

Concerning the fourth element, Defendants maintain that the *Central*

*Hudson* test does not require the State to use the least restrictive means, but only

requires that there be a "reasonable fit between the legislature's ends and the means

chosen to accomplish those ends."  (*Id*. at 91 (citing *Walker*, 364 F. Supp. 2d at

524)).  They emphasize that because personal liability is imposed on funeral

directors operating through a sole proprietorship or a partnership, that this

requirement is rational.  (*Id*. at 91).

In the case *sub judice*, we find that the restriction on trade names in the FDL

violates *Central Hudson*.  As to the first element, we agree with Plaintiffs that there

is nothing inherently misleading about a trade name.  Additionally, we conclude

there is little difference between conducting business under a predecessor name or

a trade name, as neither name indicates to the public who currently owns or

operates the funeral establishment.  The only suggestion Defendants make

regarding the potentially misleading character of fictitious names is that regional

names, such as "Delaware Valley Cremation Center," may improperly suggest to

consumers that DVCC is the exclusive cremation center in this region.  Given the

prevalence of regional names or descriptions in other businesses and industries, we

find the likelihood to be quite low that a consumer would infer, on the basis of

name alone, that a funeral establishment is the exclusive service provider in that

region.  Aside from their argument that identifying a funeral home owner in the

establishment's name provides for ease of oversight, Defendants fail to present

sufficient factual evidence demonstrating that the omission of a funeral director's

name necessarily creates a false or misleading communication to consumers.

As to the second element, while we agree with Defendants that "providing

accurate and not misleading information to the public," and consumer protection,

are substantial interests, we find that under the third and fourth elements of *Central*

*Hudson* Defendants fail to demonstrate that the FDL's restrictions directly advance

these goals and are, importantly, "no more extensive than necessary to serve

[those] interests."  *See Central Hudson*, 447 U.S. at 566.  Notably, Defendants fail

to suggest how such restrictions directly advance these goals when funeral homes

are permitted to operate under a predecessors' name and are permitted to conduct

business under the names of former owners.  Moreover, the fact that some funeral directors have developed creative methods to bypass this requirement highlights the failure of the FDL's restrictions on the use of trade names to directly advance the interests above.  In addition, it is clear that the instant requirements are more extensive than necessary to serve the interests of consumer protection and accuracy in advertising.  For example, any funeral home attempting to changes its name must already have the same approved by the Board, (*see* Pl. R. at 9993 (Application for Change of Name or Location for Funeral Establishments); 49 PA. CODE § 1391(a)), and funeral home corporations operating under a fictitious name are required to register with the Board the name of a licensed funeral director who will serve as the establishment's full-time supervisor.  Thus, the restriction on the use of trade names, in light of the existing safeguards in the FDL regarding names changes, appears more extensive than necessary in promoting Defendants' stated interests.[26]

Accordingly, we shall grant Plaintiffs' motion as to its First Amendment claim for infringement of commercial speech in Count IX, and deny Defendants'

---

[26]  Again, we recognize that some restrictions on the use of trade names may pass constitutional muster, and we express no opinion on the validity of such regulations should the same be promulgated in the future.  Our holding herein is limited to our evaluation of the current version of the FDL, and thus we reiterate our finding that the same is clearly injurious to Plaintiffs' commercial free speech rights under the First Amendment.

motion as to the same.

### 8.   Count XI:   Unlawful Interference with Trade

Plaintiffs also move for summary judgment on grounds that the FDL's restrictions on cremation violate the Commerce Clause, the First Amendment, and the Due Process Clause.  (Doc. 140 at 154).  They highlight that for decades cemeteries provided cremation services to the public, and have been subject to regulation by the Pennsylvania Real Estate Commission with authority under the Real Estate Licensing and Registration Act (the "Real Estate Act").  (*Id*. (citing 63 PA. STAT. ANN. § 455.101 *et seq*.)).  The Real Estate Commission is charged with enforcing laws related to "cemeteries and cemetery companies."  (*Id*. (citing 63 PA. STAT. ANN. § 455.406)).  The act defines "cemetery" as "[a] place for the disposal or burial of deceased human beings, by cremation or in a grave, mausoleum, vault, columbarium or other receptacle."  (*Id*. (citing 63 PA. STAT. ANN. § 455.201)).  Plaintiffs claim that nothing in the Real Estate Act or the Real Estate Commission's regulations requires licensure as a funeral director or funeral establishment as a prerequisite to providing cremation services to the public.  (*Id*. at 155).

Furthermore, they highlight that the Department of Environmental Protection ("DEP") regulates the permitting process applicable to constructing,

operating, and modifying new and existing crematories.  (*Id*. (citing 36 Pa. Bulletin

3724 (July 15, 2006); Pl. R. at 10570-79)).  Plaintiffs argue that a crematory must

comply with workplace safety standards, (*id*. at 156 (citing Pl. R. at 10575-77)),

health laws and zoning laws, (*id*. (citing 35 P.S. § 1121)), and annual inspections

of crematories conducted by DEP.  (*Id*. (citing Pl. R. at 8895-98)).  They

emphasize that nothing in the DEP's regulations requires that cremations only be

provided to the public by a licensed funeral director or licensed funeral

establishment.  (*Id*.).  The Future Interment Act ("FIA") also permits anyone to sell

"personal property" or "personal services to be used in connection with the

interment of a deceased human being" on a pre-need basis provided 70% of the

sale price is placed in trust.  (*Id*. at 157 (citing 63 PA. STAT. ANN. § 480.1 *et seq*.)).

Plaintiffs argue that given this regulatory framework, the Board has

historically stated that cremation does not fall within the purview of the FDL.  (*Id*.

at 157 (citing Board meeting minutes, Pl. R. at 10009-51)).  They claim that

despite the Board's recognition that the FDL does not cover cremation services,

and despite its "requesting that this Law be revisited by the Legislature to . . .

broaden its influence upon a larger industry than the licensed funeral director," (*id*.

at 157-58 (citing Pl. R. at 236)), no amendments to the FDL have been

promulgated that include cemeteries and crematories within the purview of the

106

FDL.  Instead, they note, the Board has simply begun prosecuting anyone who offers cremation services to the public without a funeral director's license because traditional funeral homes feel threatened by the competition.  (*Id*. at 158).  As a result, Plaintiffs maintain that the Board only permits cemeteries and crematories to offer cremation services to funeral directors, and effectively prohibits anyone but a licensed funeral director from offering such services to the public.  (*Id*. at 159 (citing Pl. R. at 628-30, 1544-46, 2067-70, 2398-99, 2402-05, 3062-63, 4930)).  It is against this backdrop that Plaintiffs raise their Commerce Clause, First Amendment, and Due Process challenges.  We shall address each in turn.

### a.    Commerce Clause

Plaintiffs contend the FDL requires that the cremation market be diverted to in-state funeral homes.  (*Id*. at 160).  They assert that requiring all cremation services to be funneled through a licensed funeral director is similar to *C&A Carbone, Incorporated v. Town of Clarkstown*, where the Court held that a flow control ordinance requiring all solid waste in a town to be deposited at a local transfer station violated the Commerce Clause.  (*Id*. (citing 511 U.S. 383 (1994))).  The *Carbone* Court acknowledged:

> what makes garbage a profitable business is not its own worth but the fact that its possessor must pay to get rid of it.  In other words, the article of commerce is not so much the solid waste itself, but rather the service of processing and disposing of it.  With respect to this stream of

> commerce, the flow control ordinance discriminates, for it allows only the favored operator to process waste that is within the limits of the town.  The ordinance is no less discriminatory because in-state or in-town processors are also covered by the prohibition.

(*Id*. at 160-61 (citing *C&A Carbone, Inc.*, 511 U.S. at 390-91)).  Here, Plaintiffs contend, the FDL channels cremation services through in-state funeral homes to the detriment of out-of-state crematories, cemeteries, and funeral homes because it requires that cremation services only be provided through licensed Pennsylvania funeral directors.  (*Id*. at 161).  Plaintiffs maintain that the requirement is not saved by virtue of its application to in-state cemeteries and crematories because, as the Court concluded in *Carbone*, it made no difference that in-state interests were also burdened by the flow control ordinance.  (*Id*.).

Additionally, Plaintiffs compare the instant restriction to provisions found to be discriminatory in *Tri-M*.  In that case, the Third Circuit found that a Delaware law, which required a contractor to hold a Delaware resident business license and maintain a permanent place of business in the state in order to pay apprentices on public works projects less than the prevailing wage, violated the Commerce Clause.  (*Id*. at 161-62 (citing *Tri-M Grp, LLC v. Sharp*, 638 F.3d 406, 427-28 (3d Cir. 2011))).  They also highlight the *Tri-M* court's holding that "States cannot require an out-of-state firm to become a resident in order to compete on equal terms."  (*Id*. at 162 (citing *Tri-M*, 638 F.3d at 428)).

108

Plaintiffs claim that the FDL requires cremation firms to expend substantially more money in contracting with a licensed funeral director or a licensed funeral establishment.  (*Id*. at 162).  As the cremation industry's competitive advantage is its more simple and less expensive process than that of traditional funeral homes, Plaintiffs argue that the Board's restriction significantly increases costs for such firms.

In addition, Plaintiff argue that even if heightened scrutiny does not apply, the burdens imposed on cremation providers are clearly excessive under the *Pike* balancing test.  (*Id*. at 163).  For example, they claim that the only way for an out-of-state crematory to expand into Pennsylvania is to acquire a pre-1935 license. (*Id*. (citing Pl. R. at 3128-29)).  Plaintiffs also assert that the average savings consumers experience in switching from a traditional funeral service to cremation is $4,875.  (*Id*. (Pl. R. at 353)).  They note that if cremation providers were permitted to market their services directly to consumers, the lower costs for cremations would cause funeral homes to reduce the costs of traditional funerals in order to remain competitive.  (*Id*. at 164).

Plaintiffs contend that the interest Defendants claim to have in regulating cremations, including ensuring that medical devices such as pacemakers are removed prior to cremation, are already furthered by existing DEP regulations

requiring the same.  (*Id*. at 165).  Illustrating that such interests are baseless, they

contend the Board subsequently acknowledged that removal of pacemakers and

other medical devices is not part of a funeral director's formal education or

training.  (*Id*. at 166 (citing Pl. R. at 571, 845, 1262, 1358, 1078-79)).

Furthermore, Plaintiffs argue that Defendants' interest in consumer protection and

accountability fails to justify the regulation, because funeral directors do not

possess special education or training related to cremation services that prepares

them to better protect the public.  (*Id*. at 167 (citing Pl. R. at 563-64 (noting

Chairman Yeosock's deposition testimony wherein he stated "we were told . . . the

crematory handles it," referring to whether he received any formal training or

education regarding cremation))).

Finally, they highlight that the only involvement of licensed funeral

directors consists of dropping the body off at the cemetery or crematory, often by

unlicensed staff or contract services, and subsequently receiving the remains back

after the cremation has been conducted.  (*Id*. at 167 (citing Pl. R. at 569-75, 872-

76, 1278-79, 1375-78)).  Specifically, Plaintiffs maintain that consumer protection

and accountability are not promoted by a funeral director merely transporting

bodies to and from a crematory.  (*Id*. at 168-69).  They further contend that while

requiring licensure of cremation providers may advance some public interests,

Defendants fail to explain how licensing cremation providers as *funeral directors* protects such interests, aside from channeling virtually every aspect of the death care industry completely through funeral directors.  (Doc. 168 at 150).

To counter these assertions, Defendants argue that the FDL does not prevent corporations or individuals from selling cremation services.  (Doc. 158 at 112). However, they concede that the FDL does limit crematories to providing cremation services to licensed funeral directors and licensed funeral establishments.  (*Id.*). Defendants cite two Pennsylvania Commonwealth Court cases for the proposition that selling, on a pre-need basis, services and packages that include cremating a body constitutes the practice of funeral directing and thus cannot be performed without a licensed funeral director or a licensed funeral establishment.  (*Id.* (citing *Pre-Need Family Services Eastern Region v. Bureau of Prof'l and Occupational Affairs*, 904 A.2d 996 (Pa. Commw. Ct. 2006); *Cornerstone Family Servs., Inc. v. Bureau of Prof'l and Occupational Affairs*, 802 A.2d 37 (Pa. Commw. Ct. 2002))). Defendants claim that because a crematory's business model includes retrieving a body from the place of death, the completion of paperwork, including death certificates, authorizations from county coroners, sanitizing the body, discussing with the family whether cremation is still the desired disposition, the actual cremation, and returning the remains, that the appellate courts of Pennsylvania

correctly found such services to be similar, or the same, as those provided by funeral directors and funeral establishments. (*Id*. at 113).

Defendants further claim that if unlicensed groups were permitted to sell pre-need services directly to the public, there would be no regulation requiring trusting of pre-need monies since such individuals and entities would not be subject to the FDL. (*Id*. at 114). On the other hand, under the FDL, 100% of all pre-need monies received by a funeral director or licensed funeral establishment must be placed in trust. (*Id*. (citing 63 PA. STAT. ANN. § 479.13(c))). They argue such lack of oversight does not meet the State's legitimate interest in consumer protection and accountability.

Additionally, Defendants claim that the instant requirement is distinct from *Carbone* because Pennsylvanians can be cremated in any state, and the FDL does not require that a person be cremated in Pennsylvania, or by a Pennsylvania licensed funeral director or funeral establishment. (*Id*. at 115). Regarding Plaintiffs' argument that the requirement discriminates against out-of-state interests in its effect, Defendants assert that Plaintiffs fail to provide any particular facts demonstrating an alleged competitive advantage they could enjoy that is precluded by the FDL.

Here, we agree with Defendants that Pennsylvania's appellate courts have

provided guidance to us by holding that cremation service providers fall within the scope of funeral directing.  While this fact does not preclude us from finding that the restrictions placed upon cemeteries and crematories under the FDL as a result of these decisions violate the Commerce Clause, it is instructive to our finding that the State has a legitimate interest in regulating the cremation industry.  Regarding heightened scrutiny, we do not find that this standard applies as the regulations concerning cremation service providers, regardless of their location, do not discriminate against out-of-state crematories, but merely require that all cremation service providers affiliate with a licensed Pennsylvania funeral director.

As a result, we shall evaluate the subject regulations under the *Pike* balancing test.  Under this standard, we find that the State's interest in regulating this area of the death care industry outweighs any purported burdens on out-of-state interests.  The mere requirement that cemeteries and crematories in Pennsylvania, or out-of-state crematories wishing to provide cremation services in Pennsylvania, affiliate with a Pennsylvania licensed funeral director is amply justified by the State's interest in establishing threshold standards for the services noted above.  Furthermore, we do not find that the instant case is most analogous to *Carbone* because unlike the flow control ordinance at issue therein, which required that all solid waste be channeled through a particular waste processing

113

facility, nothing in the FDL precludes deceased Pennsylvanians from being

transported to out-of-state crematories or requires that all deceased persons be

cremated by a particular crematory.  *See Carbone*, 511 U.S 383.

Here, given the State's asserted interest in regulating, among other things,

retrieval of a body from the place of death, the completion of paperwork, including

death certificates, authorizations from county coroners, sanitizing the body,

discussing with the family whether cremation is still the desired disposition, the

actual cremation, and returning the remains, we find that regulations requiring that

cemeteries or crematories either be licensed to practice funeral directing in

Pennsylvania, or contract with a licensed funeral director to provide such services,

are not clearly excessive in relation to the putative local benefits.  *See Pike*, 397

U.S. at 142.[27]

Despite this finding, we are constrained to recognize that the manner in

---

[27]  We believe that Plaintiffs oversimplify and generalize the task of retrieving dead
bodies, which in many cases is a difficult and less than pristine endeavor.  There is no evidence
whatsoever that absent some oversight by the State via the FDL, other agencies such as the DEP
and Real Estate Commission could appropriately regulate many of the aspects of cremation that
involve handling human remains.  While the example may appear extreme, we nonetheless are
compelled to recall the horrific circumstances discovered at the Tri-State Crematory in Noble,
Georgia, in 2002.  There, over three hundred bodies that had been delivered for appropriate
disposal were never cremated, but were instead found dumped on the site of the crematorium.
Outrageous as this example may be, the ghastly incident was ultimately the product of a loophole
that allowed the crematorium to operate without a license, which resulted in a failure to inspect
the premises.  Accordingly, we are exceedingly loath to declare the regulations in question,
awkward and post hoc though some may be, unconstitutional.

which the Board began regulating the cremation industry appears, on its face, to involve a series of post-hoc regulations that essentially boot-strapped cremation service providers into the regulatory ambit of the FDL.  Although such heavy-handed governance of the cremation industry appears somewhat backwards to the Court, under the *Pike* balancing test we are only called upon to determine whether the burdens on interstate commerce are clearly excessive in relation to the putative local benefits.  As we have already concluded that the State's regulations are not clearly excessive in relation to the benefits accruing to the State, the fact that the Board has chosen a rather unorthodox method by which to regulate the same does not influence our analysis of the regulations under *Pike*.

Thus, because we find that Plaintiffs have failed to raise a genuine issue of material fact regarding this issue, we shall grant Defendants' motion to this extent and deny Plaintiffs' motion as to the same.  While we recognize that this ruling is dispositive of the First Amendment claim interposed by Plaintiffs, in the interest of being comprehensive we will proceed to analyze that area as well.

### b.    First Amendment

Plaintiffs also claim that prohibiting cemeteries and crematories from advertising their services, discussing cremation with potential customers, and entering into contracts for the provision of such services violates their commercial

speech rights under the First Amendment.  As to the first *Central Hudson* element,

they allege that cemeteries and crematories legally perform cremations under

regulations promulgated by the Real Estate Commission and the DEP.  (Doc. 140

at 170).  They note that the Board implicitly conceded this point by allowing

crematories to provide cremation services to funeral directors and establishments.

Thus, the only restriction imposed upon crematories is the prohibition on

commercial speech itself.  Plaintiffs highlight that in *Walker*, the Board argued that

unlicensed individuals' communications with customers were not entitled to First

Amendment protection because the Board had previously prosecuted such

individuals for the unlicensed practice of funeral directing, and those prosecutions

were upheld by state courts under the FDL.  (Doc. 168 at 156).  They emphasize

this Court's finding that such circular reasoning is unpersuasive because "it would

mean that government speech regulations can be protected from examination as to

their constitutionality if a state court preemptively holds that the regulation does

not violate a state law" and that "we are not estopped from evaluating the

constitutionality of the Board members' actions simply because another court

analyzed whether the Board violated state law under different facts."  (Doc. 140 at

171 (citing *Walker*, 364 F. Supp. 2d at 519)).  Thus, they argue that Defendants'

analogous argument herein must fail, namely, that Plaintiffs' instant claim is

precluded by the prior ruling of state courts upholding the Board's prosecution of the unlicensed sale of cremation services. (*Id*.).

Regarding the second element, Plaintiffs contend that Defendants' purported interest in "allowing funeral directing services to only be performed by licensed professionals who have received adequate education and training in this field" is not a substantial interest, because licensed funeral directors admittedly possess little education or training in cremation services. (*Id*). They also argue that unlike in *Walker*, where we held that it is possible for an "unattached and unsupervised insurance salesperson who is not trained by a licensed funeral director" to pose a threat to consumers, here, in contrast, cemeteries and crematories seek to communicate directly to consumers concerning services they already provide under the authority of state law. (Doc. 168 at 157). Consequently, Plaintiffs contend that in this case, the funeral directors are more analogous to the hypothetical insurance salesperson in *Walker*, because the FDL forces cremation customers to interact with a funeral director who will not be the individual performing the cremation. (*Id*. at 157-58).

As to the third element, they argue that Defendants present no evidence of consumer harm from contracting for cremation services directly with cemeteries and crematories. (Doc. 140 at 172). On the other hand, Plaintiffs highlight that

Defendants have not provided any evidence that requiring consumers to purchase cremation services directly from licensed funeral directors prevents consumer harm. (*Id*. (citing *Edenfield*, 507 U.S. at 770-71 (holding that a state "must demonstrate . . . that its restriction will in fact alleviate [the harms] to a material degree."))).

Concerning the fourth element, Plaintiffs maintain that the FDL's complete prohibition on cemeteries and crematories interacting directly with customers is more extensive than necessary to achieve the State's goals. (*Id*.). They claim that the Board did not attempt to utilize less restrictive means and instead shifted from an interpretation of the FDL that did not include regulation of the cremation industry, to one announcing a total ban on direct cremation services. (*Id*. at 172-73).

In response, Defendants argue that all of the Plaintiffs' business models concerning this function of the industry violate the FDL because performing such services constitutes the unlicensed practice of funeral directing. (Doc. 126 at 80). They contend that permitting advertising and solicitation of business for such services would be misleading because Plaintiffs would be promoting services they are not licensed to provide. (*Id*. at 81). Defendants highlight that the FDL's definition of "funeral director" includes:

> any person engaged in the profession of a funeral director or in the care and disposition of the human dead, or in the practice of disinfecting and preparing by embalming the human dead for the funeral service, burial or cremation, or the supervising of the burial, transportation or disposal of deceased human bodies, or in the practice of funeral directing or embalming as presently known.

(*Id*. at 87 (citing 63 PA. STAT. ANN. § 479.2(1))).  As a result, they claim the State has a significant governmental interest in allowing only those who are licensed Pennsylvania funeral directors to practice in the industry.  (*Id*. at 88).  Defendants claim that since the profession involves not only the preparation of potentially infectious dead bodies, but also trusting of significant amounts of money for pre-need services, that the Commonwealth has a substantial interest in regulating cremation service providers.  They cite our decision in *Walker* for the proposition that "an unattached and unsupervised insurance salesperson who is not trained by a licensed funeral director, and not acting as a funeral director's agent or employee, could represent potential harm to consumers and thus trigger a significant governmental interest."  Defendants argue that since the FDL requires funeral directors to place 100% of pre-need monies in trust, that the FDL necessarily provides for greater consumer protection in this area.  In addition, they assert that since the Plaintiffs in Count XI are not licensed funeral directors, they would be permitted to promise millions of dollars' worth of future services, collect the money now, but avoid all trusting requirements.  (*Id*. at 89).

As to the third element, Defendants argue that the State's interests in consumer protection and accountability are directly advanced by the FDL's limitation on cremation services to licensed funeral directors, because preventing unlicensed individuals from practicing ensures that 100% of pre-need monies will be placed in trust. (*Id*. at 89-90 (citing *Walker*, 364 F. Supp. 2d at 524 (noting the demographics of funeral customers and concluding that the Board has an interest in regulating individuals who are not linked to a licensed funeral director and prohibiting the actual sale of pre-need funerals by unlicensed individuals absent the direct involvement of a licensed funeral director))).

Regarding the fourth element, Defendants argue that their position would not preclude crematories or cemeteries from advertising or soliciting business that they can legally perform.  Instead, they contend that unlicensed persons and businesses cannot advertise or solicit for cremation services when they are unlicensed to perform the same. (*Id*. at 92).  According to the appellate courts of Pennsylvania, Defendants claim, the FDL only prohibits direct sale to the public of pre-need services that include disposition of a deceased by cremation, as this falls within the definition of funeral directing. (Doc. 158 at 127-28).

Pursuant to the first *Central Hudson* element, we find that Plaintiffs' conduct does not concern unlawful or misleading conduct simply because the

Commonwealth Court has previously upheld the Board's prosecution of the unlicensed sale of cremation services. However, regarding the second and third elements, we find that as aforestated Defendants have an interest in accountability and consumer protection and that such interests are advanced by regulations that restrict cremation to licensed funeral directors or those who contract with them. Finally, under the fourth element, we find that the instant regulations are not more extensive than necessary, because the FDL only precludes the direct sale of pre-need services to the public that include cremation of the deceased as the ultimate disposition since this qualifies as the "practice" of funeral directing under section 13(a) and (c). *See* 63 PA. STAT. ANN. § 479.13(a) and (c).

Accordingly, we shall grant Defendants' motion to this extent and deny Plaintiffs' motion regarding the same.

### c.   Due Process

Plaintiffs also contend that there is a lack of a rational relationship between the FDL's prohibition on the sale of cremation services by anyone other than a licensed funeral director, and the state interests allegedly advanced by the subject regulations. (Doc. 140 at 173). In support of this contention, Plaintiffs rely on *St. Joseph Abbey v. Castille*, a case involving a Louisiana Board of Funeral Directors' order that the monks of St. Joseph Abbey cease and desist from making wooden

caskets because doing so, they concluded, violated a state law restricting the sale of caskets to funeral directors employed through a licensed funeral establishment. (*Id*. at 173 (citing 2011 U.S. Dist. LEXIS 79327 (E.D. La. July 21, 2011))).  They claim that the court in *St. Joseph Abbey* concluded that the state's reliance on local economic protectionism was misplaced.  Plaintiffs highlight the same court's finding that while consumer protection and public health were legitimate state interests, there was no rational relationship between these interests and the prohibition in the regulation.  (*Id*.).

Additionally, Plaintiffs note the *St. Joseph Abbey* court's finding that prohibiting casket sales by unlicensed funeral directors "restrict[s] competition and limit[s] casket sales to the licensed few, accomplishing just the opposite of protecting the consumer."  (*Id*. (citing 2011 U.S. Dist. LEXIS 79327, at *19)). They emphasize the court's conclusion that requiring caskets to be sold by funeral directors had no rational relation to consumer protection because Louisiana state law did not require funeral directors to possess education or training in caskets or grief counseling.  (*Id*. at 175 (citing 2011 U.S. Dist. LEXIS 79327, at 22)). Finally, Plaintiffs highlight the court's finding that the Louisiana Board's asserted consumer interest was "actually aimed at customer service, which in and of itself is not a legitimate government interest."  (*Id*. (citing *St. Joseph Abbey*, 2011 U.S.

122

Dist. LEXIS 79327, at * 23)).

Similar to *St. Joseph Abbey*, Plaintiffs maintain that restricting competition and limiting choice fails to advance consumer protection.  (*Id*.).  Also, the sale of cremation services by crematories and cemeteries will not preclude funeral directors from offering such services.  They further contend that as in the case above, nothing in the FDL requires funeral directors to be trained in cremation. (*Id*. at 176).  Plaintiffs argue that like the Louisiana Board, the Pennsylvania Board's concerns are primarily aimed at customer service and as a consequence it is not a legitimate subject of regulation.  (*Id*.).

Furthermore, they maintain that Defendants fail to present any evidence of the public health risks associated with cemeteries and crematories performing cremations.  Plaintiff note that the FDL does not address the public health aspects of cremation, and instead focuses on embalming, a service that few crematories are called on to perform.  (*Id*. at 177).  Finally, as to Defendants' contention that cemeteries and crematories would be exempt from all trusting requirements if the FDL is found inapplicable to them, Plaintiffs maintain that the FIA still governs the sale of merchandise and services, including pre-need, related to the interment of a body.  (*Id*.).  They claim that while Defendants suggest that many of these tasks are performed by funeral directors, such as identification, sanitization, removing

pacemakers, and completion of legal documents, Defendants subsequently acknowledge that such tasks are actually performed by cemeteries and crematories on behalf of funeral directors.  (Doc. 168 at 160).

On the other hand, Defendants argue that substantive due process challenges to executive interpretations are only cognizable where real property rights are violated by conduct that "shocks the conscience."  (Doc. 126 at 62 (citing *Nicholas v. Pa. State Univ.*, 227 F.3d 133, 141 (3d Cir. 2000))).  Here, they argue, real property is not implicated by Counts XI and XII.  Defendants again note that the FDL prohibits anyone from engaging in the practice of funeral directing unless that person is licensed.  (*Id*. at 63 (citing 63 PA. STAT. ANN. § 479.2(1))).  However, they claim that the Plaintiffs to Count XI can perform cremation or cemetery services, (*id*. at 63 (citing 63 PA. STAT. ANN. § 479.13(a)(1))), and sell interment merchandise either at-need or pre-need under the FIA.  (*Id*. at 64).  Moreover, it does not shock the conscience to require licensure of individuals who sell and perform funeral directing services to the public.  (*Id*. at 65).  Regarding educational requirements, Defendants reiterate that funeral directors are required to undergo extensive training, including training to prevent the spread of infection and to deal with families during the grieving process.  (*Id*. at 65 (citing 63 PA. STAT. ANN. § 479.13(a), § 479.15, § 479.3, § 479.5)).

Defendants highlight the FDL's requirement that funeral directors place

100% of all pre-need money in trust.  (*Id*. at 66 (63 PA. STAT. ANN. § 479.13(c))).

They contend that excluding Plaintiffs' stand-alone crematory business from the

FDL would exempt them not only from licensure but also from the 100% trusting

requirement.  (*Id*. at 67).  Defendants contend that arguments similar to those

raised by Plaintiffs herein have been rejected by the Fourth Circuit in *Guardian*

*Plans, Incorporated v. Teague*, where the court held that Virginia had a legitimate

interest in protecting the health, safety, and welfare of its citizens through

regulation of the funeral industry, and that a rational relationship existed between

these goals and the prohibition upon the sale of pre-need funeral arrangements by

unlicensed individuals.  (*Id*. at 68-69 (citing 870 F.3d 123, 126-27 (4th Cir.

1989))).

Additionally, Defendants argue that Plaintiffs' reliance on *St. Joseph* is

misplaced because the court in that case was not presented with a challenge to pre-

need services, and it found significant that the monastery only wished to sell

caskets, a service that was not regulated under the Louisiana funeral statute.  (Doc.

158 at 65).  They further emphasize that nothing in the FDL prohibits Plaintiffs

from providing cremation services to funeral directors and funeral establishments,

but that the FDL and Pennsylvania appellate case law restrict them from selling

125

pre-need services that include cremation as the method of disposition because this

constitutes the practice of funeral directing.  (*Id*. at 66-67 (citing *Pre-Need Family*

*Servs. Eastern Region v. Bureau of Prof'l and Occupational Affairs*, 904 A.2d 996

(Pa. Commw. Ct. 2006); *Cornerstone Family Servs. Inc. v. Bureau of Prof'l and*

*Occupational Affairs*, 802 A.2d 37 (Pa. Commw. Ct. 2002))).  Defendants also

contend that the FIA is inapplicable to Plaintiffs' cremation services because it

only applies to the pre-need sale of interment merchandise or services, such as the

sale of urns, caskets, and grave preparation, but not to the actual cremation of a

body.  (*Id*. at 69).

     As we concluded above that the State's asserted interests in accountability

and consumer protection are advanced by the instant regulations, we also find that

there is a rational relationship between the same under a due process analysis.

Although, as noted above, our constitutional analysis is not bound by the

Pennsylvania Commonwealth Court's decision in *Pre-Need Family Services*

*Eastern Region v. Bureau of Professional & Occupational Affairs*, we find the

court's determination therein, that services such as the pick-up and removal of

bodies, storage and sheltering of the deceased, placement of the remains in a

container, crematory fees, and the completion of paperwork constitute the

"practice" of funeral directing, to influence our determination that the instant

regulations are rationally related to a legitimate state interest.  In addition, we agree with Defendants that Plaintiffs' reliance on *St. Joseph* is misplaced because the Louisiana court therein found that a restriction on the monastery's sale of caskets bore no rational relationship to "public health and safety" as the act failed to mention regulation of caskets.  *See St. Joseph Abbey*, 2011 U.S. Dist. LEXIS 79327, at * 24-25.  Unlike the act at issue in *St. Joseph*, which failed to address the regulation of caskets, the cremation services provided by crematories and cemeteries has been interpreted by the Pennsylvania Commonwealth Court to constitute the "practice" of "funeral directing" under sections 13(a) and (c) of the FDL, and is therefore explicitly regulated by the same.  *See* 63 PA. STAT. ANN. § 479.13(a) and (c); *Pre-Need Family Servs. Eastern Region v. Bureau of Prof'l and Occupational Affairs*, 904 A.2d 996, 1000 (Pa. Commw. Ct. 2006).  As a result, Plaintiffs' comparison of the instant case to *St. Joseph* is inapt.

Therefore, we shall grant Defendants' motion to this extent and deny Plaintiffs' motion concerning the same.

### 9.    Count XII:  Unlawful Restriction on Ownership of Merchandise Company

Plaintiffs next move for summary judgment regarding the FDL's restriction upon ownership of merchandise companies on grounds that this limitation violates the First Amendment, the Due Process Clause, and the Contract Clause.  By way of

background for each of these arguments, Plaintiffs maintain that the FIA allows any individual or entity to contract for pre-need services "for the sale of personal property or for the furnishing of personal services to be used in connection with the interment of a deceased human being" provided 70% of the sales price is placed in trust.  (Doc. 140 at 178 (citing 63 PA. STAT. ANN. §§ 480.1-2)).  The seller is permitted to retain the remaining 30%.  (*Id*.).  Specifically, 63 PA. STAT. ANN. § 480.2(a) states:

> [a]ny person entering into any such contract as the seller shall deposit into a merchandise trust fund, established for that purpose with a banking institution in the Commonwealth authorized to perform trust functions, as trustee of such fund, seventy percent of the retail price of the personal property or personal services so sold for future need.

63 PA. STAT. ANN. § 480.2(a).  Conversely, § 479.13(c) of the FDL provides:

> [n]o person other than a licensed funeral director shall, directly or indirectly, or through an agent, offer to or enter into a contract with a living person to render funeral services to such person when needed. If any such licensed funeral director shall accept any money for such contracts, he shall, forthwith, either deposit the same in an escrow account in, or transfer the same in trust to, a banking institution in this Commonwealth, conditioned upon its withdrawal or disbursement only for the purposes for which such money was accepted.

63 PA. STAT. ANN. § 479.13(c).

Plaintiffs note that previously the Board's position under the FIA, which was enacted after the FDL, was that funeral directors could trust 70% of pre-need sales. (*Id*. at 179).  However, the PFDA disagreed and filed a declaratory judgment action

128

against the Board and in *PFDA v. State Board of Funeral Directors*, the

Pennsylvania Commonwealth Court held that a funeral director is subject to the

greater trusting requirement for funeral services and merchandise contained in the

FDL rather than the 70% trusting requirement in the FIA.  (*Id*. (citing 494 A.2d 67

(Pa. Commw. Ct. 1985))).

Still, Plaintiffs argue that the question of whether a funeral director may

possess an ownership interest in a merchandise company and sell merchandise

through a company, trusted at 70%, was left unresolved.  (*Id*.).  They contend that

in 1991, after a suit was filed against funeral directors who established separate

companies to sell merchandise, Board prosecutor Kathleen Grossman drafted a

memorandum stating that the Board "has opined that there is no violation of

funeral law or regulations when a corporation operating separate and apart from a

funeral home (even if owned by a funeral director) sells pre-paid, pre-need

merchandise and deposits 70%."  (*Id*. at 180 (citing Pl. R. at 255-56)).  The

memorandum further stated:

> However, the key is: are the pre-need sales merchandising corporations.
> . . operated separate and apart from the funeral business located at the
> same location?  Are there two sets of bookkeeping records kept?
> Separate advertising signs?  Do the corporations display signs for the
> public view at all?  Which businesses display signs?  Are there separate
> entrances?  How is the building set up, i.e., a common vestibule leading
> to separate suites?

129

(*Id*. (citing Pl. R. at 3134)).  Plaintiffs assert that in reliance on this memo, known

as the "Grossman Memo," funeral directors began establishing separate companies

to sell merchandise.  They also highlight the PFDA's creation in 1996 of the

"Model Incorporation Kit for Pennsylvania Merchandise Corporations," which

provided members with the forms needed to establish a Pennsylvania merchandise

corporation.  (*Id*. at 181 (citing Pl. R. 2758-61, 2961-64, 3692-3769)).  Moreover,

Plaintiffs emphasize the PFDA's advertisement of a fund for members to trust 70%

of merchandise sales, which stated:

> Today's preneed market is more challenging than ever.  Everyone selling
> merchandise needs financial resources UPFRONT, in order to compete.
> That's why PFDA created the Pennsylvania Funeral Merchandise Trust.
> After careful legal research, a method has been established that allows
> a separate merchandising corporation to put 70 percent of the retail price
> of merchandise in trust under the terms of the Pennsylvania Future
> Interment Act – and makes 30 percent available to MEET THE
> COMPETITION with other merchandising companies.

(*Id*. at 181-82 (citing Pl. R. at 2961-66, 5304)).  Plaintiffs maintain that the Board

has more recently changed its position and now requires 100% trusting of pre-need

sales.  They contend that the opposition to separate merchandising companies was

because "the Funeral Director's Association wants the hundred percent trusting so

that funeral directors will not do [preneed]."  (*Id*. (citing Pl. R. at 5971); *see also*

Pl. R. at 2916 (PFDA's General Counsel testifying that PFDA believes funeral

directors should not be permitted to sell preneed merchandise through a separate

company because "they would have 30 percent of the money to use for purposes of marketing and to pay people to do pre-need.")).  They argue that without the 30%, funeral directors are forced to fund pre-need services out of their own pocket, and are therefore less likely to offer this service.  (*Id.* at 183).  Plaintiffs highlight Cavanagh's testimony that this situation is what funeral directors want, to deal with an emotional customer proximate to a loved one's death rather "than with someone who can spend two weeks trying to decide what he wants to do."  (*Id.* at 183 (Pl. R. at 5954)).  However, Plaintiffs highlight one of Defendants' discovery responses as evidence that it is unclear whether establishing a separate merchandise company removes Plaintiffs from the 100% trusting requirement.  In that response they stated:

> Defendants do not oppose the ownership of merchandise companies by licensed funeral directors; however, separate companies must be set up to do this business.  In that regard, the FDL requires 100% trusting of all pre-need monies received and the Future Interment Act requires only 70% trusting of pre-need monies.  Keeping a bright-line distinction between these companies (and the goods/services provided by each) is legitimate and protects consumers, makes it easier for employees to know the applicable trusting requirements, and enhances the enforcement ability of the Board given the different trusting requirements.

(*Id.* at 186-87 (citing Pl. R. at 10284)).  Plaintiffs also highlight the deposition testimony of numerous Defendants concerning whether a funeral director is permitted to own a merchandise company which trusts 70% of pre-need sales

money.  They contend that the answers varied widely from"I don't know," (*id*. at

187 (citing Pl. R. at 1322, 1402-03)), to "yes," (*id*. (citing Pl. R. at 1216-17)), to "it

depends," (*id*. (citing Pl. R. at 2447-54)), to "whatever the law states," (*id*. (citing

Pl. R. at 2174-75)), to "better be careful . . . I'm getting a little leary."  (*Id*. (citing

Pl. R. at 1516, 1521)).   The foregoing forms the background for Plaintiffs' claims

in Count XII.  We shall address each argument in turn.

### a.    First Amendment

First, Plaintiffs argue that Defendants' de facto prohibition on the

communications of funeral directors with customers via a merchandise company

violates the First Amendment and *Central Hudson*.  (*Id*. at 188).  They also

contend that Defendants' reliance on *PFDA v. State Board* is misplaced, because

the court therein only decided whether the FIA exempted funeral directors from the

FDL's trusting requirements, and not whether a funeral director may have an

ownership interest in a separate merchandise company which trusts at 70%.  (*Id*.).

Consequently, Plaintiffs assert that the court's decision in *PFDA v. State Board*

does not preclude this Court from deciding the constitutionality of the FDL's

restriction on funeral directors owning separate merchandise companies.  (*Id*.).

As to the first element under *Central Hudson*, Plaintiffs maintain that

Defendants again employ circular reasoning in asserting that it is unlawful for

funeral directors to interact with customers through a merchandise company simply because the Board has decided that the FDL renders such activity unlawful. Contrary to Defendants' contention, Plaintiffs claim it is nevertheless unclear whether it is unlawful for a funeral director to have an ownership interest in a merchandise company that trusts at 70%. (*Id.*). Plaintiffs also cite to *In re. R.M.J.* for the proposition that a state "may not place an absolute prohibition on certain types of potentially misleading information." (Doc. 168 at 169 (citing 455 U.S. 191, 203 (1982))). Moreover, they contend Defendants' acknowledgment that Plaintiffs may own merchandise companies implicitly concedes that there is a non-misleading way for Plaintiffs to do so. (*Id.*).

Regarding the second element, Plaintiffs argue that the only viable interest Defendants propose is ensuring proper trusting of pre-need monies. (Doc. 140 at 189). They note that Defendants' reasoning proceeds as follows – funeral directors interacting with customers through a merchandise company yields improper trusting, thus, a prohibition on such interactions is justified by the State's interest in prohibiting improper trusting. (*Id.*). Plaintiffs contend that the State lacks a substantial interest in prohibiting funeral directors from selling funeral goods through a merchandise company and trusting 70%, while other individuals and entities are permitted to do so. They highlight that funeral directors are required to

complete training regarding the "selling of funeral service merchandise," "counseling of families on the types of . . . merchandise available," and "prepaid burial accounts." (*Id*. (citing 49 PA. CODE § 13.28(2)(vi), (xii), (xiii))).  As a result, Plaintiffs contend, funeral directors are trained in the marketing of funeral merchandise and the proper trusting of pre-need funds.

Plaintiffs also contend that Defendants' position concerning cremation services conflicts directly with their position regarding merchandise companies. Specifically, Defendants require that cremation services be provided through a licensed funeral director, when in fact they lack extensive training or education in this area and merely contract with a crematory or cemetery to provide such services.  On the other hand, Defendants prohibit funeral directors from engaging in the pre-need sale of funeral merchandise despite the training they receive regarding the same. (*Id*. at 190).  Plaintiffs suggest that the actual purpose behind the prohibition on separate merchandise companies is preventing funeral directors from using the retained 30% of sales funds "to pay people to do pre-need." (*Id*. (citing Pl. R. at 2916)).

Pursuant to the third element, Plaintiffs maintain that Defendants fail to produce any evidence of real harm stemming from funeral directors' interactions with customers through merchandise companies. (*Id*. at 191).  They argue

134

Defendants present no evidence that customers are confused or misled when purchasing goods from a merchandise company owned by a funeral director. (*Id*.). Therefore, Plaintiffs contend that prohibiting funeral directors from interacting with customers through merchandise companies does not directly promote any substantial consumer protection interests. (*Id*.). As to the fourth element, Plaintiffs contend that an outright ban on sales through merchandise companies owned by funeral directors is too broad to satisfy the requirement that the regulation not be more extensive than necessary to promote the State's interest. (*Id*. at 191-92).

In response, Defendants argue that Plaintiffs fail to cite any provisions in the FDL that prohibit merchandise companies from advertising or soliciting. (Doc. 126 at 81). In fact, they argue that Plaintiffs are free to own and operate merchandise companies provided there are separate corporations and transactions. (*Id*.). Defendants claim that while Plaintiffs are permitted to advertise and solicit future interment business, they are prohibited from using a merchandise company to shift some of the funeral costs to the "other side of the ledger or to blur the transaction or to mislead consumers." (*Id*. at 82). They emphasize the Commonwealth Court's finding that a funeral director cannot circumvent the FDL by running the merchandise portion of a unified transaction through a "merchandise company," thereby disguising the true nature of the transaction. (*Id*.

135

at 83).

As to the first element of *Central Hudson*, Defendants contend that while Plaintiffs may own a separate merchandise company, they are prohibited from using such business to mislead or confuse consumers by "muddy[ing] the transaction and avoid[ing] the distinct trusting requirements of the FDL and the FIA." (*Id*. at 85). In addition, they emphasize that soliciting funeral directing services without a license to do so, converting interment sales into funeral directing services, and advertising under a fictitious name that does not identify the owner, is unlawful and misleading. (*Id*. at 86).

Regarding the second element, Defendants reiterate the State's substantial governmental interest in consumer protection, accountability, and accurate disclosure of information. (*Id*. at 86 (citing *Walker*, 364 F. Supp. 2d at 519-20 ("there is a substantial governmental interest in (1) protecting the interests of the general public in its purchase of preneed funeral services, and (2) ensuring that consumers receive only accurate price lists when purchasing or shopping for preneed funeral services."))). Moreover, they argue the State has a substantial interest in ensuring the accurate and lawful trusting of pre-need monies, and making certain that consumers are not misled or confused by a transaction that appears to be negotiated with a licensed funeral director, but in reality is not. (*Id*.

136

at 89 (citing 63 PA. STAT. ANN. § 479.13 (100% trusting), § 480.2 (70% trusting)).

As to the third element, Defendants maintain that requiring the name of at least one licensed funeral director to be disclosed directly advances the goals of consumer protection and accountability because it clearly identifies the individual held accountable for any violations of the trusting requirements. (*Id*.). Concerning the fourth element, Defendants claim that a state regulation should be upheld if there is a "reasonable fit between the legislature's ends and the means chosen to accomplish those ends." (*Id*. at 91 (citing *Walker*, 364 F. Supp. 2d at 524)). They assert that requiring the use of a licensed funeral director's name does not prohibit advertising by funeral establishments or solicitation of business. As a result, Defendants maintain that preventing unlicensed funeral directors from contracting directly with consumers for funeral services is reasonable. They note that without a bright-line demarcation between funeral directors selling pre-need services, and unlicensed individuals selling interment merchandise, companies will mislead and confuse consumers. (*Id*. at 92).

Here, as to the first factor, we cannot find that Plaintiffs' communications to consumers through a merchandise company are illegal or misleading based on the Board's decision that Plaintiffs are permitted to own merchandise companies, but are prohibited from shifting funeral costs to the "other side of the ledger or to blur

137

the transaction or to mislead consumers." (*See* Doc. 126 at 82).  In the absence of evidence that Plaintiffs have in fact "blurred the lines," shifted transactions, or misled consumers, we find that Plaintiffs have satisfied the first element and Defendants have failed to demonstrate that Plaintiffs actively misled or confused consumers in this way.

As to the second element, while we recognize the State's substantial interest in accountability and consumer protection, we fail to see how this interest is directly advanced by regulations restricting Plaintiffs' communications to consumers when licensed funeral directors receive more training and education in this realm than unlicensed individuals.  Moreover, Defendants' interest in ensuring that 100% of pre-need monies are placed in trust does not appear threatened.  Plaintiffs are still required to maintain separate corporations and transactions, and trust either 100% of pre-need monies or 70% of sales for future interment merchandise.  *See* 63 PA. STAT. ANN. § 479.13, § 480.2(a).  Concerning the fourth element, we find that preventing licensed funeral directors from communicating to consumers through merchandise companies is a more extensive prohibition than necessary to satisfy the State's interests.

Accordingly, we shall grant Plaintiffs' motion to this extent and deny Defendants' motion as to the same.  While we recognize that this ruling is

138

dispositive, for the sake of completeness, we will proceed to analyze Plaintiffs' due process arguments as well.

### b.    Due Process

Plaintiffs also argue that no legitimate state interest is rationally furthered by prohibiting licensed funeral directors, who possess training in funeral merchandise and trusting requirements, from selling goods to the public and trusting at 70%. (Doc. 140 at 192). They claim that requiring funeral directors to undergo such training, and then restricting them from marketing the same, is irrational. Plaintiffs contend that the State, under the FIA, allows anyone except funeral directors to sell funeral merchandise and trust at 70%, despite the fact that funeral directors in Pennsylvania are required to complete education and training in funeral merchandise and trusting requirements. (Doc. 168 at 179).

On the other hand, Defendants claim that neither the FDL nor Defendants' interpretation of the same prohibits Plaintiffs from owning a separate company that sells merchandise. (Doc. 126 at 70 (citing 63 PA. STAT. ANN. § 479.8 (b), (d) (only prohibiting licensees from owning other funeral establishments); 63 PA. STAT. ANN. § 480.1; 63 PA. STAT. ANN. § 480.2))). They also claim that requiring "separate and apart" transactions and "separate and apart" corporations does not shock the conscience and is in fact, wholly rational. For example, in highlighting

the potential risk to consumers, Defendants highlight Plaintiff Heffner's business which, they contend, combines a customer's services and merchandise into a single contract and requires the customer to cut a single check to PNA, Heffner's business. They note that PNA has the same address, phone number, and fax number as the funeral establishment, and on the back of its form customers are informed that prices are not guaranteed. (*Id*. at 71 (citing CSMF ¶¶ 158-69)). Defendants claim that this is one example of the abuses that can occur if separate corporations and separate transactions are not required.

While we agree with Defendants that separate corporations and separate transactions are rationally related to the State's interest in consumer protection, we fail to see how the FDL's prohibition on licensed funeral directors selling goods to the public and trusting at 70%, provided such transactions are maintained separate and apart from other pre-need services, furthers the State's interests. This limitation seems particularly suspect in light of the educational requirements concerning funeral merchandise and pre-need trusting that licensed funeral directors are required to complete.

As a result, we shall grant Plaintiffs' motion to this extent and deny Defendants' motion regarding the same.

### c.   Contract Clause

Finally, Plaintiffs move for summary judgment on grounds that Defendants'

shifting application of the FDL to funeral director ownership of merchandise

companies violates the Contract Clause.  The Contract Clause states, in pertinent

part, "[N]o state shall . . . pass any . . . law impairing the obligation of contract."

U.S. CONST., ART. I, § 10.  Plaintiffs highlight that determining whether the

Contract Clause has been violated is a three step inquiry.  First, a plaintiff is

required to demonstrate that it possesses a contractual right or obligation that was

altered by the law.  (Doc. 140 at 193 (citing *Nieves v. Hess Oil V.I. Corp.*, 819 F.2d

1237, 1243 (3d Cir. 1987))).  Plaintiffs note that "[t]his inquiry has three

components: whether there is a contractual relationship, whether a change in law

impairs that contractual relationship, and whether the impairment is substantial."

(*Id*. (citing *Gen. Motors Corp. v. Romein*, 503 U.S. 181, 186 (1992))).  If a contract

is impaired, the second step asks whether the governmental entity had a

"significant and legitimate public purpose behind the regulation, such as the

remedying of a broad and general social or economic problem."  (*Id*. at 193-94

(citing *Nieves*, 819 F.2d at 1243)).  Finally, should such a purpose be identified, the

third step asks "whether the adjustment of the rights and responsibilities of

contracting parties is based upon reasonable conditions and is of a character

appropriate to the public purpose justifying the legislation's adoption."  (*Id*. (citing

141

*Energy Reserves Grp. v. Kan. Power & Light Co.*, 459 U.S. 400, 412 (1983))).

Plaintiffs claim that the first element is satisfied here because they entered

into pre-need merchandise contracts with consumers through merchandise

companies that trusted at 70%.  (*Id*. at 194).  Moreover, the Board previously took

the position that such contracts were permissible and its prosecutor even drafted a

memorandum to that effect.  Plaintiffs contend that after the Board's August 2007

rulemaking, the Board decided that such contracts were unlawful and began

investigations into merchandise companies and prosecutions of funeral directors.

(*Id*.).  They argue that under the Board's new interpretation of the FDL, Plaintiffs

may no longer retain 30% of the contract price, agreements may be subject to

rescission, and they face a threat of potential prosecution.  (*Id*.).  Furthermore,

Plaintiffs claim that "change in law" includes any "exercise of legislative power

delegated by the legislature . . . having all the force of law."  (*Id*. at 195 (*Transp.*

*Workers Union, Local 290 v. SEPTA*, 1996 U.S. Dist. LEXIS 10608, at *9 (E.D.

Pa. 1996); *Ross v. Oregon*, 227 U.S. 150, 16-63 (1913) (holding that the Contact

Clause "reach[es] every form in which the legislative power of a State is exerted,

whether it be a constitution, a constitutional amendment, an enactment of the

legislature, a by-law or ordinance of a municipal corporation, or a regulation or

order of some other instrumentality of the State exercising delegated legislative

142

authority.")))).

Under the second step, Plaintiffs argue that Defendants have presented no "significant and legitimate public purpose behind the regulation."  (*Id*. at 195).  They maintain that Defendants have no legitimate interest in prohibiting consumers from interacting with merchandise companies owned by licensed funeral directors, who are trained in funeral merchandise and pre-need trusting, while permitting such interactions with companies owed by those who are unlicensed.  (*Id*. at 196).  Finally, even if Defendants can provide a legitimate purpose for the change in interpretation, Plaintiffs assert that the most recent interpretation of the FDL must fail because it is not based upon reasonable or appropriate conditions given the Board's protectionist goals.  (*Id*. at 196).

Defendants contend that contrary to Plaintiffs' assertions, the FDL, or the Board's interpretation of it, does not prohibit them from fulfilling such contracts.  (Doc. 126 at 98).  Moreover, they claim that whether a licensed funeral director can own a merchandise company has no relevance to whether any contracts between the company and consumers have been impaired under the Contract Clause.  (Doc. 158 at 140).  Defendants contend that the only litigants raising cognizable arguments herein are Heffner, Cavanagh, and the Connells, and therefore, the claims of all other Plaintiffs must be rejected.  They argue that any contracts for the

sale of merchandise exist between the corporate entity and the consumer, and such corporate entities are not a party to this litigation. (*Id*. at 140-41). Finally, Defendants maintain that no existing contracts have been impaired by a legislative change. (*Id*. at 141).

We agree with Plaintiffs that Defendants' apparent equivocation regarding interpretation of the FDL has impaired contracts entered into by Plaintiffs under the first element. In particular, we find that inasmuch as there was a contractual relationship between Plaintiffs and consumers for pre-need merchandise contracts trusted at 70%, the Board's subsequent interpretation of the FDL impairs such contracts by requiring 100% trusting of all pre-need contracts. Furthermore, we find this impairment to be substantial because Plaintiffs' contracts may be subject to rescission and Plaintiffs themselves face a threat of prosecution. As to the second element, we find that Defendants fail to provide a legitimate state interest for prohibiting Plaintiffs from communicating with consumers regarding funeral merchandise and pre-need trusting, particularly when licensed funeral directors are required to complete education and training in these areas. Finally, pursuant to the third element, we find that even if Defendants had provided a legitimate purpose for the change in interpretation, such change does not appear to be based on a reasonable condition given the Board's fluctuating interpretation of the same.

144

Therefore, we shall grant Plaintiffs' motion to this extent and deny

Defendants' motion as to the same.

### 10.   Count XIII: Challenge to Section 11(a)(8) of the FDL and Section 13.202(5) of the Regulations.

Plaintiffs also move for summary judgment on Count XIII which presents a

First Amendment challenge to the FDL's prohibition on the payment of

commissions by funeral directors to unlicensed salespersons.  (Doc. 140 at 196).

They highlight that in *Walker*, this Court held that the Board could not, pursuant to

the First Amendment, prohibit unlicensed employees and agents of funeral

directors from interacting with customers concerning pre-need sales.  (*Id.*).

Plaintiffs cite section 11(a)(8) of the FDL which provides:

> (a) The board, by a majority vote thereof, may refuse to grant, refuse to renew, suspend or revoke a license of any applicant or licensee, whether originally granted under this act or under prior act, for the following reasons: . . . (8)   Soliciting patronage other than by legitimate advertisement, or paying a commission or agreeing to pay a commission to any person or persons for soliciting or for business secured, or paying any gratuity to any person with intent to have such person aid in securing business, or other similar unprofessional conduct.

(*Id.* at 197 (citing 63 Pa. Stat. Ann. § 479.11(a)(8))).  They further highlight the

Board's regulations stating that unprofessional conduct includes: "Paying or

extending an offer to pay or give to a person, agency, or group a commission or a

valuable consideration for the solicitation or procurement of clientele."  (*Id.* (citing

145

49 PA. CODE § 13.202(5))).

In addition, Plaintiffs highlight Defendants' discovery responses as proof that although they claim "not [to] oppose" commissions from insurance companies, (*id*. at 199 (citing Pl. R. 10284-85)), they contend that compensation should not be based on a percentage of the value of goods or services sold. (*Id*. at 200). They further claim that despite Defendants' assertion that they do not oppose commissions, the fact remains that the express language of the FDL prohibits commissions. For example, Defendants highlight the deposition testimony of Board member Murphy who stated that he did not agree with the discovery response provided because they conflict with section 11(a)(8) of the FDL. (*Id*. at 200 (citing Pl. R. at 1625-26 (noting "**A.** My trouble would be it appears in conflict with the statute that says they cannot. **Q.** Okay. **A.** Funeral directors cannot make such payments."))). They contend that Board member Gerdes also expressed skepticism regarding the payment of commissions because the goal of section 11(a)(8) is "preventing the overselling by a salesperson," and "if a salesperson is encouraged to oversell by whatever commission structure is set up, that could be a problem with this section." (*Id*. at 200-01 (citing Pl. R. at 2458-59)).

Under *Central Hudson*, Plaintiffs assert that unlicensed employees'

146

interactions with customers are protected, lawful, and not misleading. (*Id*. at 201 (citing *Walker*, 364 F. Supp. 2d at 517-19 (finding unavailing the Board's conclusion that such speech was unlawful simply because the Board interpreted the FDL to render it so))). As to the second element, Plaintiffs contend that Defendants' only purported interest in restricting the speech of an unlicensed employee of a funeral director is preventing a "conflict between the seller and the consumer" caused by payment of commissions on sales. (*Id*. at 202). They maintain that nothing about the unlicensed employees of funeral directors makes them more likely to harm consumers than funeral directors. Plaintiffs note that in rejecting a proposed rulemaking by the Board, 16A-4816, the IRRC stated:

> In response to questions about consumer complaints, the Board reports
> . . . that from 1999 to 2008, while there were 420 complaints concerning
> possible unlicensed practice of funeral directing, only one case "involved
> a situation where a licensed funeral entity utilized an unlicensed
> individual to engage in preneed sales." These statistics are consistent
> with the record in both *Ferguson* and *Walker* that indicated there was
> little to no record of consumer complaints or harm related to the
> activities of unlicensed individuals and unlicensed employees.

(*Id*. (citing Pl. R. at 10356)). As a result, they contend the lack of any actual harm to consumers reveals that the Board's primary interest is economic protectionism, which is not a substantial state interest. (*Id*. at 203). Moreover, Plaintiffs maintain that even if the State's interest is substantial, the prohibition on paying commissions to unlicensed employees of funeral directors does not directly

147

advance it.  They argue that if Defendants do not oppose commissions paid by insurance companies or payments to unlicensed employees "per contract made; per contract entered into by the licensed funeral director; or for performance bonuses," that prohibiting compensation "premised on a percentage of the value of goods and services sold" will not prevent the potential for "up-selling" to consumers because such compensation structures pose the same incentive.  (*Id*.).  Concerning the fourth element of *Central Hudson*, Plaintiffs argue that the instant prohibition is more extensive than necessary and lacks a reasonable fit between the ends sought to be achieved and the means employed.  (*Id*. at 203-04).

In response, Defendants argue that they have not violated the Court's holding in *Walker*.  (Doc. 126 at 18).  They claim that in *Walker*, we held that "under no circumstances may unlicensed individuals contract with consumers for the sale of preneed funerals, nor may they act as a 'funeral director' as defined in 63 PA. STAT. ANN. §479.2(1).'" (*Id*. at 19 (citing *Walker*, 364 F. Supp. 2d at 529)). Defendants contend that every Plaintiff herein, be they a licensed funeral director or an unlicensed person who has sold funeral services and merchandise on a pre-need basis, has been paid all amounts they earned for such services and were never disciplined by the Board. (*Id*. at 20).  Specifically, they maintain that compensation for such services has been paid through salaries, bonuses, and percentages on

amounts sold or trusted, and commissions on insurance products sold to fund

services and merchandise selected.  Consequently, Defendants assert that

Plaintiffs' argument, that the FDL prohibits them from being compensated, is

baseless.  (*Id*. at 21).

Moreover, Defendants claim that complying with the 100% trusting

requirement for pre-need monies is impossible if money is taken off the top to pay

commissions for unlicensed salespersons.  (*Id*. at 22).  They argue that Plaintiffs

wish to expand *Walker* to use unlicensed pre-need salespersons, who are not

employed or supervised by licensed funeral directors or licensed funeral

establishments, and pay such persons commissions out of monies that are to be

trusted.  (*Id*. at 23).  Defendants claim that Plaintiffs failed in the amended

complaint to plead a violation of the First Amendment, a theory they now advance

in their supporting and opposition briefs.  (Doc. 158 at 133).  Consequently, they

claim that Plaintiffs' vague references to violations of the Constitution are

insufficient.

In countering Plaintiffs' *Central Hudson* analysis, Defendants maintain that

Plaintiffs' proposed interactions with consumers fail the first element because the

subject communications are unlawful speech not entitled to protection.  (*Id*. at

137).  For example, they claim that Heffner's transactions mislead consumers

because they begin with communications with a funeral establishment, include review of funeral establishment materials, selection of funeral services and merchandise, are paid for by a single check written to a non-funeral establishment, and are confirmed by letters from the funeral establishment. (*Id*. at 137-38). Defendants contend that such commingled interactions are unclear and misleading to consumers. Concerning the remaining factors, they claim that despite Plaintiffs' arguments there are still other methods by which to compensate unlicensed salespersons, and that prohibiting commissions is directly advanced by the FDL's requirement that 100% of pre-need monies be trusted, and the restriction on non-licensees engaging in such contracts. (*Id*. at 138).

The Contract Clause states, in pertinent part, "[N]o state shall . . . pass any . . . law impairing the obligation of contract." In determining whether there is a violation of the Contract Clause,

> [T]he threshold inquiry is whether the state law has substantially impaired a contractual relationship. If the state regulation does constitute a substantial impairment, the second step is to determine whether there is a significant and legitimate public purpose behind the regulation, such as the remedying of broad and general social or economic problems. Once a legitimate public purpose has been identified, the court must address whether the adjustment of the parties' rights and responsibilities is based upon reasonable conditions and is of a character appropriate to the legislature's public purpose.

*Keystone Bituminous Coal Ass'n v.Duncan*, 771 F.2d 707, 717 (3d Cir. 1985).

In *Walker v. Flitton*, we stated that Board members are not to "prohibit agents or employees of specific licensed funeral directors from providing accurate information to consumers regarding the sale of pre-need funeral plans and services . . . . [U]nder no circumstances may unlicensed individuals contract with consumers for the sale of pre-need funerals, nor may they act as a 'funeral director.'" *Walker*, 364 F. Supp. 2d. at 529.  A logical extension of this pronouncement, and implicit therein, is that these agents and employees can be compensated by licensed funeral directors for their services.[28]

As to Defendants' argument that Plaintiffs are precluded from raising a First Amendment claim in their supporting brief, when they failed to specify the same in their amended complaint, we find such argument to be unavailing in light of Defendants' failure to direct us to any case law supporting such proposition. Despite Plaintiffs' failure to specifically couch their claim in Count XIII as a First Amendment claim, we find that to dismiss this claim at this stage of the litigation, without rendering a decision on the merits, would be imprudent.  As such, we shall

---

[28]  We expressly highlight that our discussion of the *Walker* decision herein is not a revisiting of that holding, as both parties agree that agents can sell pre-need.  Despite Defendants' attempt to characterize Plaintiffs' argument in Count XIII as a rehashing of *Walker*, we explicitly make clear that we believe Plaintiffs' argument is more nuanced.  Simply put, the real issue presented *sub judice* is whether the FDL's restriction on compensation structures for unlicensed employees and agents of funeral homes who sell pre-need services is violative of the First Amendment.  As a result, any attempts to construe the foregoing analysis as a review or revision of *Walker* are inappropriate.

proceed to analyze the same.

As to the first *Central Hudson* element, we disagree with Defendants that simply because the Board has formulated regulations prohibiting Plaintiffs from compensating unlicensed individuals by way of a commission structure, that the interactions of unlicensed employees with customers regarding pre-need services is necessarily unlawful or misleading.  Regarding the second element, we previously acknowledged in *Walker* that the State has a substantial and appropriate interest in regulating unlicensed individuals' interactions with consumers concerning pre-need services.  364 F. Supp. 2d at 527.  While we recognize this interest, Defendants fail to prove that they have a substantial interest in regulating the compensation structure for such individuals, and point to nothing but the possibility of consumer confusion from interactions with an unlicensed individual concerning pre-need services.  Moreover, they fail to cite any examples affirmatively demonstrating that such confusion has taken place or that consumers have been misled.  Thus, we find that Defendants' argument fails under the second element.

Pursuant to the third element, we find Defendants' contention, that other methods for compensating unlicensed salespersons exist, merely serves to highlight that the subject regulation fails to serve the asserted goal of consumer protection.

If consumer protection and the prohibition on "over-selling" of pre-need services is the State's primary interest, it seems that permitting other compensation structures for such salespersons fails to eliminate the possibility of "over-selling" and thus neglects to serve the interests Defendants seek to advance. Accordingly, under the fourth element, we similarly find that the instant regulation is more extensive than necessary to serve the alleged state interest.

Accordingly, we shall grant Plaintiffs' motion to this extent and deny Defendants' motion as to the same.

## V.     Conclusion

For the foregoing reasons, we shall grant in part and deny in part Plaintiffs' motion for summary judgment, (doc. 137), and grant in part and deny in part Defendants' motion for summary judgment. (Doc. 117). In so doing, we note that taken as a whole, the statutory scheme of the FDL and the Board's interpretation of this clearly outdated law, evince the urgent need for the Board to finally clarify and modernize the FDL, a request Plaintiffs, funeral directors, and cremation service providers have been requesting for some time. Additionally, while the Court recognizes the Board's previous hesitation, at best, and outright recalcitrance, at worst, to comply with our mandate following *Walker v. Flitton*, we take this opportunity to encourage its members to take a considered look at the provisions of

the FDL highlighted herein in developing an appropriate approach to regulation of the funeral industry in Pennsylvania.

In reaching this point, we find Board member Murphy's statement regarding the contradictory provisions of the FDL governing food service, and the Board's attempt to reconcile the same, to serve as an apt characterization for what has apparently been the Board's position since the inception of this litigation, namely, that "trying to reconcile those two confusing or competing views proved to be an impossible task in this as well as the other parts of the regulation.  So we're on hold until we get through with the present litigation to see if this gets in and clarification and . . . ."  (Pl. R. at 1557:20- 1558:3).  Accordingly, at this juncture we admonish the Board to apply appropriate focus and craft, or clarify, regulations that appropriately govern the funeral industry in this, the twenty-first century.[29] The time for relying on antiquated and ever-changing interpretations of the FDL, which constitute nothing more than thinly-veiled attempts to maintain the status

_____

[29] Our experience with the Board through this case and *Walker*, spans almost the ten year length of our judicial service.  While we are certain that its members are upstanding and well-intentioned, we can only describe the Board as a whole as moribund.  Time and again, in the face of the extreme scrutiny these lawsuits have generated, a clearly ossified Board has refused to revisit regulations that appear both obsolete and ultimately unconstitutional.  We have endeavored to give the Board the widest possible berth to cure at least some of these defects, but to no avail.  Astonishingly, as was the case with *Walker*, we conclude that the Board is virtually daring us to act in lieu of making these difficult decisions itself.  If our surmise is correct, we have today filled the vacuum created by the Board's recalcitrance.

quo for established funeral directors and their families, or to confuse those honestly seeking to comply with the law, has passed, and it is well past time to provide meaningful guidance to those actively engaged in the noble and respected practice of funeral directing in this Commonwealth.

Given the disposition of the instant motions, and our finding that while many of the subject provisions fail to pass constitutional muster they may lend themselves to being redrawn in a way that does, we find that staying our mandate and providing the Board with an appropriate period of time to consider and possibly rectify the issues identified through this opinion is the most appropriate course of action.

**NOW, THEREFORE, IT IS HEREBY ORDERED THAT:**

1.   Plaintiffs' Motion for Summary Judgment (Doc. 137) is **GRANTED in part and DENIED in part** to the following extent:

    a.   The Motion is **GRANTED** to the extent of Plaintiffs' arguments regarding the following:

        i.    Count I – Fourth Amendment

        ii.   Count II – Undue Restriction on Ownership

        iii.  Count III – Undue Restriction on Ownership to Licensed Funeral Directors

        iv.     Count IV – Ownership Restrictions

        v.      Count V – Undue Restriction on Place of Practice

        vi.     Count VI – Undue Requirement of "Full Time"
Supervisor

        vii.    Count VII – Undue Requirement that Every
Establishment Include a Prep Room

        viii.  Count VIII – Undue Restriction on Food

        ix.     Count IX – Infringement on Commercial Speech

        x.      Count XII – Unlawful Restriction on Ownership of
Merchandise Company

        xi.     Count XIII – Challenge to Section 11(a)(8) of the FDL
and Section 13.202(5) of the Regulations

   b.    The Motion is **DENIED** to the extent of Plaintiffs' arguments
regarding the following:

        i.      Count XI – Unlawful Interference with Trade

        ii.     Plaintiffs are precluded from seeking money damages
from Defendants sued in their individual or official
capacity for violations of state law.

2.   Defendants' Motion for Summary Judgment (Doc. 117) is

**GRANTED in part and DENIED in part** to the following extent:

a.  The Motion is **GRANTED** to the extent of Defendants'

arguments regarding the following:

    i.  Count XI – Unlawful Interference with Trade

    ii.  Plaintiffs are precluded from seeking money damages

from Defendants sued in their individual or official

capacity for violations of state law.

b.  The Motion is **DENIED** to the extent of Defendants' arguments

regarding the following:

    i.  Count I – Fourth Amendment

    ii.  Count II – Undue Restriction on Ownership

    iii.  Count III – Undue Restriction on Ownership to Licensed

Funeral Directors

    iv.  Count IV – Ownership Restrictions

    v.  Count V – Undue Restriction on Place of Practice

    vi.  Count VI – Undue Requirement of "Full Time"

Supervisor

    vii.  Count VII – Undue Requirement that Every

Establishment Include a Prep Room

viii.    Count VIII – Undue Restriction on Food

ix.    Count IX – Infringement on Commercial Speech

x.    Count XII – Unlawful Restriction on Ownership of

Merchandise Company

xi.    Count XIII – Challenge to Section 11(a)(8) of the FDL

and Section 13.202(5) of the Regulations

3.    Defendants' Motion to Strike (Doc. 163) is **DENIED**.[30]

4.    The mandates issued herein are **STAYED** for a period of ninety (90)

days from the date of this Order, or more for good cause shown,

pending the Board's reexamination and possible revision of the

subject provisions in a manner consistent with this Memorandum and

Order.

---

[30] In denying Defendants' Motion to Strike, we simply note that Defendants fail to provide the Court with any compelling justifications for excluding the vast majority of the information they seek to strike through their instant motion. Instead, Defendants' brief in support is comprised primarily of rehashed legal and factual arguments pulled, ostensibly, straight from their summary judgment briefs and presented in support of their assertion that Plaintiffs' expert reports should not be permitted to contradict their alleged admissions elicited during discovery. For example, Defendants argue that the 1994 Audit Report, the FTC Report, various meeting minutes, committee transcripts, proposed regulations, legislative initiatives, and more, should be stricken because such materials contain hearsay. (Doc. 164 at 5-7). However, as Plaintiffs highlight, such documents may be properly considered pursuant to Federal Rule of Evidence 803(8) under the public records and reports exception to the hearsay rule. (Doc. 173 at 10). As the Court has already devoted substantial judicial resources to deciding the cross motions for summary judgment, and because we find that Defendants' motion to strike lacks merit, we shall deny the same.

5.      A conference call with all counsel to determine, *inter alia*, whether

additional action by this Court will be necessary to enforce the

mandates herein shall be conducted on August 8, 2012 at 10:00 a.m.

Defendants' counsel **SHALL** initiate the telephone conference call

and join all other counsel prior to calling chambers.  The Court's

telephone number is 717-221-3986.


                                        s/ John E. Jones III_____
                                        John E. Jones III
                                        United States District Judge